FILED

DEC 1 9 2016

Clerk, U.S. District and
Bankruptcy Courts

# US BANKRUPCY COURT FOR THE
# DISTRICT OF COLUMBIA

DOUGLASS SLOAN,

)
)
)
)          Case No. 16-00023
)
)                                                          )
)          Adversary Proceeding No. 16-10027
)
CARLOS ALLEN, *et al.*,                )
)
Defendants.              )
)

## REPLY OF DEFENDANT TO SUPPORT <u>HIS MOTION FOR SUMMARY JUDGMENT</u>

Defendants Carlos Allen submits this reply in support of his Motion for Summary

Judgment. ("Motion").[1]  Defendants' Motion for Summary Judgment pursuant to Rule 12(b)(6)

of the DC Court's Rules of Civil Procedure for failure to state a claim upon which relief can be

granted.  As explained below, Plaintiff's Opposition (filed Nov. 30, 2016) ("Opposition") fails to

adequately respond to the arguments raised by Defendants in support of his Motion especially to

the statute of limitations for the District of Columbia on any contract that is 3 years from the date

the Plaintiff  knew of the breach .  Among other deficiencies, Plaintiff's Opposition relies on

assertions of fact that are not supported by the allegations in the Summary Judgment, and

assertions of law that are not supported by any citation to legal authority and that are clearly

wrong.  The Court should therefore award Summary Judgment to Defendant, with prejudice, with

respect to all claims against Defendants.

Here, Plaintiff goes far beyond the allegations of his opposition, and any reasonable

interpretation of law.  With respect to his claim for breach of contract, and as explained in

Defendants' Memorandum, the Plaintiff alleges that the parties to the subject contract were Defendant, and his Mother Anna Allen. The contract was formed on **July 23, 2008** for **$60,000** with a **20% interest** rate and the payoff was **60 days** from the date of the signing. The Defendant was in default because the loan payoff was to be in **60 days** at a dollar amount of **$72,000.** On Feb 27th 2014 Plaintiff provided a contract proof to DC Superior Court with his 2nd Amended Complaint. The contract had a stamped date of **May 14, 2009** from the US Bankruptcy Court. Plaintiff filed the same contract with the United States Bankruptcy Court as evidence of the **Breach of Contract in May 14, 2009 for Anna Allen.** ***(See Exhibit A – Promissory Note with Equity Interest Conversion feature and Second Amended Complaint)*** On May 14, 2009 Plaintiff provided a proof of claim to the United States Bankruptcy Court for the **Breach of Contract** based on Anna Allen's Personal Bankruptcy for **$80,000** which was **$8,000** more than the contract stated of **$72,000.** The added **$8,000** was **20%** accumulated interest the Plaintiff was charging Defendant from **July 2008** to **May of 2009,** based on Plaintiff's knowledge of the **Breach of Contract.** ***(See Exhibit B - Proof of Claim)*** Plaintiff's attorney has stated that his client did not know of the breach and was submitting a proof of claim "to preserve his right to a cause of action" but has not provided any case law to substantiate his claim or any citation to legal authority, so Plaintiff's attorney clearly does not know the law or is making up his own laws as he goes. Also Plaintiff stated in his emails numerous times that Defendant was in **Default** and he was filing suit against the Defendant because Defendant was in **Breach Of The Contract.** ***(See Exhibit C – Emails from Douglas Sloan)*** So in other words Plaintiff decided to file a proof of claim on May 14, 2009, in United States Bankruptcy Court instead of filing suit. Plaintiff had 3 years from the time he knew or should have known based on his emails that the Defendant was in default. These accumulation of items show that the Plaintiff knew or should have known of the breach, based on all his correspondence with the Defendant. If that was not

enough, Plaintiff filed the proof of claim with US Bankruptcy court on May 14, 2009 for $8,000 more than what was stated on the contract.  With all these facts, if the Plaintiff still did not know that the statute of limitation was already tolled, when he filed his 2nd Amended Complaint with DC Superior Court on Feb 27, 2014, then **his attorney's Mr. Bender or Mr. Haley should have known** of the tolled statute of limitation. Defendant's prior attorney Daniel Press in DC Superior Court, filed a Motion of Defendant Anna Allen To Dismiss Plaintiff's Second Amended Complaint based on the Statute of Limitation was, was tolled. *(See Exhibt D – Motion of Defendant Anna Allen to Dismiss Second Amended Complaint)*.

Plaintiff alleges that Defendant concealed the naming of Capital One Bank from his Bankruptcy proceedings but Plaintiff fails to tell the court that the account is in the name of AMG Inc and the Defendant could not claim a company that he does not own on his Bankruptcy sheet. Plaintiff also knows and was told at the Meeting of Creditors that Defendant was not the owner of AMG Inc., Karen Brooks was the owner of the company. Defendant also told Plaintiff's attorney that he was a Marketing Officer for the company AMG Inc. and yes Defendant did open Eagle Bank and Capital One bank accounts for the owner Karen Brooks with her permission but that still does not show that Defendant is the owner of the company. Also Karen Brooks has provide a sworn affidavit to the Plaintiff that she is the owner of AMG Inc. but Plaintiff's attorney stills wants to make Defendant the owner of the company, even with the facts in front of him. *(See Exhibit E – Affidavit of Business Ownership- Karen Brooks/AMG Inc -----Karen Brooks/AMG Inc. Incorporation Doc)* The same way he **PERJURED HIMSELF** by stating in a **sworn affidavit** that Defendant's roommate **Andrew Chase** was also the "President and Resident Agent's Tenant. Also the Plaintiff as provided a sworn affidavit to the DC Superior Courts on line 23 of the 2nd page that states "it was believed that Carlos Allen was the President and Owner of AMG Inc. until Karen Brooks executed an affidavit stating that she was the

President and owner of AMG Inc." So Plaintiff used the affidavit of business ownership by Karen Brooks to bring Karen Brook's AMG Inc. into Superior Court as the owner and President of AMG Inc. The plaintiff cannot not continue to state that Carlos Allen is the President and owner of AMG Inc. in Bankruptcy court when he's acknowledging Karen Brooks is the owner and President of AMG Inc. in Superior Court to drag her company into the mix. *(See Exhibit F – Affidavit of Service by Special Process Server – Sworn Affidavit in Superior Court by Plaintiff Douglass Sloan )*

Plaintiff and his attorney also asserts that **"Per DCRA"**, Defendant is the President and owner of AMG Inc. and asserts in an affidavit that this is the case, when in-fact DCRA has stated that they do not know who the owner is and all they know is that Defendant is the registered agent and filed the incorporation papers.

1) Plaintiff states that Defendant induced Plaintiff to loan him the money under the guise of repairing his mother's home and repaying the debt. ---- When in fact the Defendant renovated the property and had the property on the market for sale, by owner and then hired a real estate agent David James to sell the property. But because it was the winter of 2008 and the market just Crashed, No one was trying the purchase the house for what the house was worth. Even Plaintiff and his Real Estate Agent Chuck Burger stated, that money was spent renovating the house in an email to the Defendant. *(See Exhibit G – Email from Douglass Sloan)*

2) Plaintiff states that Defendant orchestrated a fraudulent transfer of funds from the proceeds of the property sale to divest the Plaintiff of his interests related to the loan. --- **Defendant** owed Karen Brooks $102,000 from a previous loan to renovate 3102 18th NW DC in 2005 and signed a promissory note to pay back the loan. Once the property was sold, Defendant repaid he funds that were owed. To Karen Brooks.

Karen Brooks asked for the funds to be placed in her company new company name AMG Inc., a new company that was going to be founded to produce music and sell products.*( See Exhibit H - Promissory Note)*

3) Plaintiff states that Defendant failed to disclose assets on his Schedule of Assets and Liabilities. Like Capital One Bank and PNC. **---- Defendant** did not place Capitol One Bank on his Schedule because it's a business account owned by AMG Inc. and Defendant does not own AMG Inc. – Karen Brooks owns AMG Inc. as stated at the meeting of the creditors to Plaintiff.  Also Defendant did fail to include PNC bank because he thought it was a closed account. Later found out by the Plaintiff that there was only **$13.00** in the account and 3 accounts open at PNC but only one account had any funds in them of **$13.00**, at the time of the reporting on Schedules. *(See Exhibit I – PNC)*

4) Plaintiff states that Schedule of Assets and Liabilities filed in this matter do not include the assets indicated in the Plaintiff's Amended Complaint. **----Plaintiff** wants Defendant to include assets of AMG Inc. that the Defendant does not own.

5) Plaintiff states that Defendant submitted documents that indicated his property was valued at $985,000. **----That is true**, it was a Zillow Valuation at the time of the Bankruptcy filing but it was not an official document from a reputable appraiser.

*6)* Plaintiff submitted a property computer valuation report from a non-appraiser or real estate agent for $1,198,000. --- **Defendant** submitted a property report from an **Official DC Board Certified Appraiser** that came to the house and evaluated the property and gave a true and accurate valuation of $915,000 for 1715 Kilbourne Pl NW DC. *(See Exhibit J – Appraisal)*

7) Plaintiff states that Defendant was the Marketing officer of AMG Inc.-----**True**.

8) Plaintiff states that DCRA records indicated that Allen was the President of AMG Inc. which the Plaintiff is <u>not telling the truth</u> because **Defendant** has spoken with the **Deputy Superintendent of DCRA Josef Gasimov** and he has stated that DCRA only knows that Defendant Carlos Allen is the registered agent and filed the incorporation

papers for AMG Inc. – Josef Gasimov Phone 202-478-9285 Email
josef.gasimov@dc.gov

9) Plaintiff states that Eagle Bank records reflect that Defendant signed the bank
documents as President. ----- **When** in fact Defendant signed his name Carlos Allen
and never told Eagle bank he was the President. That title was placed in error by Eagle
Bank. If the Court and Plaintiff will notice is that the Defendant never signed his name
Carlos Allen President, Defendant only signs his name Carlos Allen not realizing that
Eagle Bank errored and placed President next to the name. Regardless Defendant does
not own the AMG Inc., Karen Brooks does. ***(See Exhibit K – Eagle Bank)***

10) This is the same as number 9

11) Plaintiff states that Defendant did not have any financial responsibility ---**Defendant**

stated to the Plaintiff that he is not the owner of AMG Inc.

12) Plaintiff states that Defendant opened AMG bank account and stated he was a board
member. Yes Defendant did say he was a board member but he is not the owner of
AMG Inc. / Karen Brooks is the owner of AMG Inc.

*13)* Plaintiff states that Defendant used and placed Carlos Allen For Mayor account in

Schedules and received funds from PayPal. ------ Yes- PayPal payments were coming

in to Carlos Allen for Mayor Account from rents from roommates. Which the amount

of rent from roommates was disclosed to the courts in Schedules. Also PayPal is not a

Bank ---all it does is holds the funds and you have to place them into an account. The

rents were going into the Industrial Bank account and was included in the Schedules.

Plus the Plaintiff has **subpoenaed** PayPal and knows that there is only one Paypal

account that was used that had any funds. But Plaintiff wants to play with the Courts

and make the Courts believe, Defendant had so many Paypal accounts with money in

them, which is not the case or the Plaintiff would have shown the accounts.***(See***

***Exhibit L – Paypal payments)***

14) Plaintiff states that Defendant failed to disclose Mayor Allen Merchandise. ------

**Mayor Allen** is the artist name for Carlos Allen that's owned by AMG Inc. and

Healer Cream is a product that AMG Inc owns and tried to sell as well and neither

sold. Again AMG Inc. is owned by Karen Brooks. ***(See Exhibit M – AMG Contract)***

15) Plaintiff states that the funds for the payment to Selene Finance came from Eagle Bank and Defendant did not know that Eagle Bank was closed.

16) Karen Brooks paid the Selene Finance with the funds from AMG's Capital One Bank account which was an open in the name of AMG Inc.

17) Plaintiff states that Defendant denied any knowledge of a political account. Defendant has placed the Industrial Bank account on the schedules and never denied that it existed.

18) Same as 14

19) Plaintiff submitted exhibits to online Marketing by AMG Inc. ---**Same as 14 ---** Defendant does not own AMG Inc.

20) Plaintiff states that Defendant actions in failing to disclose assets were intended to hinder Plaintiff-----**Plaintiff** wants Defendant to state he owns assets of AMG Inc. when he does not own AMG Inc., Karen Brooks owns AMG Inc.

21) Plaintiff wants to state that Defendant did not disclose multiple PayPal accounts. ---- **Plaintiff** fails to tell the Courts that he has subpoenaed the records from PayPal for the Defendant. The accounts that Plaintiff is referring to has **NO FUNDS** in them, except the one that was used in conjunction with Industrial Bank to receive the rents and Industrial Bank was included in Schedules.

22) Plaintiff states that Defendant failed to disclose assets on his Schedule of Assets and Liabilities. Like Capital One Bank and PNC.

**23)** Plaintiff states that Defendant concealed business assets of AMG Inc**. -----Defendant does not own AMG Inc. as disclosed in the 341 meeting.**

24) Plaintiff states that he asked Defendant for documents for AMG Inc. -----**Defendant** does not own AMG Inc.

25) Plaintiff states that Defendant failed to disclose Healer Cream. **----Healer Cream** is

part of AMG Inc. and Karen Brooks Owns AMG Inc. ***(See Exhibit M – AMG***

***Contract)***

26) Same as 14 – Defendant Does Not Own AMG Inc.

27) Same as 14 – Defendant Does Not Own AMG Inc.
28) Same as 14 – Defendant Does Not Own AMG Inc.
29) Same as 14 – Defendant Does Not Own AMG Inc.

*30)* Plaintiff states that Defendant did not disclose PayPal account. **---Defendant**

disclosed rents that were received thru PayPal and Industrial Bank Account that was

connected together. ***(See Exhibit L – PayPal)***

31) Plaintiff states no records of the bus owned by AMG were sold and that Defendant did
not know who the new owner of the bus was.

32) The bus was sold to Roderick Sweet ***(See Exhibits N – Colorado Certificate of Title)***

33) Plaintiff states that Defendant failed to accurately account for proceeds of loan.**---**

**Defendant** told Plaintiff that funds from the bus owned by AMG Inc. was used to

bring Defendants mortgage current and pay for attorney fees.

34) Plaintiff states that Defendant failed to identify all assets.**---Plaintiff** wants Defendant

to place AMG Inc. assets into Schedules when Defendant does not own AMG Inc.

35) Plaintiff states that Defendant failed to explain loss of assets. **----Defendant** explained

that there was a loss of a roommate so income from rent was decreased.

36) Plaintiff states that Defendant has elected to willfully be unemployed by US Air. **---**

**Defendant** became ill around August of 2015 and stopped working at US Air.

Defendant was not receiving any income from the organization at the time of

Bankruptcy filing.

37) Plaintiff states that Defendant denied the terms of the note. **------Defendant** could not

deny the terms of the note because Defendant signed the note. Also Defendant new he

was in default as well as <u>Plaintiff knows defendant was in default</u> based on all the

emails from Plaintiff. ***(See Exhibit G – Email from Douglass Sloan)***

38) Same as 37

39) Plaintiff keeps telling the Courts that DCRA records states that Defendant is the

President of AMG Inc.

40) Plaintiff states that on the Capital One Bank Defendant signed as Board Member for

AMG Inc. which is true and as stated in Meeting of the Creditors that I Was a

Marketing Officer for AMG Inc. but it still does not make Defendant the owner of

AMG Inc., Karen Brooks is the owner of AMG Inc.

41) Plaintiff states Defendant acted on behalf of Anna Allen and received a check for

AMG Inc. -----Defendant sent the funds to Karen Brooks AMG Inc. Eagle Bank

Account.

42) Plaintiff states that Eagle Bank records reflect that Defendant signed the bank
documents as President. ----- **When** in fact Defendant signed his name Carlos Allen
and never told Eagle bank he was the President. That title was placed in error by Eagle
Bank. If the Court and Plaintiff will notice is that the Defendant never signed his name
Carlos Allen President, Defendant only signs his name Carlos Allen not realizing that
Eagle Bank errored and placed President next to the name. Regardless Defendant does
not own the AMG Inc., Karen Brooks does. ***(See Exhibit K – Eagle Bank)***

43) Plaintiff keeps telling the Courts that DCRA records states that Defendant is the

President of AMG Inc.

44) Plaintiff states that Defendant issued checks and cashed checks on behalf of AMG

Inc. ----Yes Defendant did this with permission from owner of AMG Inc. Karen

Brooks.

## STATEMENT OF REVIEW

The Federal Courts have been consistent with Summary Judgment. The general premise is Summary Judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c). If, as in this case, the burden of persuasion at trial must be borne by the non-moving party, the party moving for summary judgment may satisfy the burden of production under Rule 56 of the Federal Rules of Civil Procedure by either submitting affirmative evidence that negates an essential element of the non-moving party's claim, or by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim. Celotex v. Catrett, 477 U.S. 317, 331 (1986); Lavespere v. Niagra Machine & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir. 1990). The non-movant must then present "specific facts showing there is a genuine issue for trial." FED. R. CIV. P. 56(e).  In the case at bar, the Plaintiff's case is insufficient to establish any essential elements for his claim to stand.

Bankruptcy Rule 7056, which governs summary judgment in bankruptcy proceedings, incorporates Rule 56 of the Federal Rules of Civil Procedure. FED. R. BANKR. P. 7056; United States v. Spicer, 57 F.3d 1152, 1159 (D.C. Cir. 1995). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995). **IV.**

## ARGUMENT

The Court should grant the Defendant's Summary Judgment based on previous precedents as stated in the standard of review above. Where the court is faced with two plausible but competing inferences, the court should grant summary judgment to the movant defendant when there is no reasonable evidentiary basis for drawing the inference beneficial to the nonmovant plaintiff. In essence, where the plaintiff's evidence is sufficient for the jury to adopt an inference beneficial to the plaintiff under the preponderance standard, summary judgment is not appropriate. *See* Anderson, 477 U.S. at 250, 106 S.Ct. at 2511. Conversely, however, if the court finds the plaintiff's evidence insufficient to support a jury adopting an inference in the plaintiff's favor under the preponderance standard the summary judgment should be granted in favor of the defendant. In this case, the summary judgment should be granted in the favor of the Debtor for the case at bar.  The Plaintiff's evidence will not support the preponderance of evidence because as evident from his discovery. The Plaintiff does not have any evidence therefore; his claim should not be maintained. Courts should not be used as a pawn in a game of deceit by parties. The Plaintiff's lawsuit is used more as miscarriage of justice because it is bogus, fraudulent and misleading for the Court and Defendant.  The Plaintiff has received a great deal of the money from the Defendant as a payment for the promissory note prior to filing the lawsuit.   This payment was in satisfaction of of the debt. The filing of the lawsuit along with the Complaint Objecting to the Discharge is nothing but examples of the patterns and practice of the Plaintiff trying to manipulate, fabricate, conceal and mislead the court.   The actions by the Plaintiff can only lead to a reasonable inference of intent to hinder, delay and defraud the Court.  Therefore, the Court should grant the Motion for Summary Judgment.

The second premise why the Court should grant the Defendant's Motion for Summary Judgment is that there are no genuine issues of a material fact which have been adequately shown by the

Plaintiff.   The Court should rule in the Defendant's favor because the Plaintiff has failed to comply

with Rule 56 of the Federal Rules of Civil Procedure which states:

Rule 56, Fed.R.Civ.P.
provides, in relevant part: "The judgment sought shall be rendered forthwith if the pleadings . . .
together with the affidavits, if any, show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of law. When a motion for summary
judgment is made and supported as provided in this rule, an adverse party may not rest upon the
mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts
showing that there is a genuine issue for trial. "
Rule 56(c) and (e), Fed.R.Civ.P
In addition, the nonmoving party may not rely solely on allegations or conclusory statements.

Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999); Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir.

1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury

to find in its favor. Greene, 164 F.3d at 675. If the evidence "is merely colorable, or is not

significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50.  In the

case at bar, the Plaintiff does not have any evidence to show a significantly probative value.

Significantly, the Motion for Summary Judgment should be granted for the Defendant.

*    *    *

A "genuine issue" is one whose resolution could establish an element of a claim or defense and,

therefore, affect the outcome of the action. *Id.* at 248. To prevail on a motion for summary

judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. By pointing to the absence of

evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.

*Id.*  In the case at the bar, the Plaintiff has failed to show any evidence to substantiate his claim.

The Defendant has more than a scintilla of evidence to show that the Plaintiff does not have a valid

claim, and the Plaintiff does not have the existence of enough elements to make his case viable.

Lastly, the Motion for Summary Judgment should be granted because this claim by the Plaintiff is time barred because of the statute of limitation.    The statute of limitation in accordance with the D.C. Code §12-301(7) states the any claims for contracts must be brought within three years.  In the present case, the contract was executed in 2008.   The Plaintiff had until 2011 to bring a claim. Yet, the Plaintiff did not bring a timely claim.   The Plaintiff attempted to file a claim in 2013, but it too is time barred because of the statute of limitation.  The Debtor filed the Bankruptcy Petition in 2016.  Now, the Plaintiff is attempting to try and collect after the statute of limitation has run. There is no plausible reason why the statute of limitation should be tolled.  Therefore, the Motion for Summary Judgment should be granted because the statute of limitation has passed for the Plaintiff to bring his claim. Precisely, the Plaintiff knew or should have known that his claim was timed barred by the applicable statute of limitation. Even if the Plaintiff did not know, his Attorney should have known that the case was time barred because of the statute of limitation.  This is yet another tool of deception by the Plaintiff and his Attorney. The Plaintiff's factual allegations are not true because of fraud and deceit.  However, if one even believed that the Plaintiff's factual allegations are true; he is not entitled to any monetary or equitable relief.  The Plaintiff's claim and objections are clearly outside of the applicable statute of limitations, and were therefore legally unenforceable claims." In Count One, Count Two , Count Three , Count Four, and Count Five  of the Plaintiff's Objections to the discharge, he is trying to ascertain information about the Debtor's financial affairs in which he does not have a right to . The Defendant  contending that the Plaintiff violated 11 U.S.C. §§ 105(a), 502 and 524 by filing a proof of claim that the Plaintiffs knew or should have known was "legally unenforceable" due to the expiration of the relevant statute of limitations. The Defendant will rely upon  Commonwealth ex rel Fisher v. Cole, 709 A.2d 994 (Pa. Cmwlth. 1998), the debtor maintains that a proof of claim filed when the claimant knows that the limitations period has expired violates both state law as well as federal bankruptcy and non-

bankruptcy law, and thus is sanctionable. Otherwise, the claimant may obtain a distribution in a

bankruptcy case to which it is not entitled. Moreover, trustees and debtor must expend time and

energy to insure that a wrongful distribution does not occur. In the present case, if the Plaintiff

should not be allowed to maintain his claim and objections should be dismissed and sanctions

ordered.

The Motion for Summary Judgment should be granted because the Plaintiff does not have a claim.

The mere existence of a claim, however, does not entitle a creditor to payment. Section 502(b) (1)

provides, in essence, "that a claim shall be disallowed to the extent that the claim is unenforceable

under applicable law." In re Greenspan, 2002 WL 31934321, at *2 (D. Md. 2002). Therefore, if as

of the date of the debtor's bankruptcy filing a creditor's claim was barred by the applicable statute

of limitations, then the claim must be disallowed upon objection by a party in interest.  Thus, the

claim by the Plaintiff should be disallowed because it is barred by the statute of limitations.

Finally, the Defendants avers the Plaintiff  violated 28 U.S.C. § 1927 by their "intentional filing of

improper proofs of claims" which "unreasonably and vexatiously multiplied the proceedings in

Defendant's Bankruptcy Proceeding.," The Plaintiff has  engaged in a pattern of filing improper

proofs of claims, having knowledge that such claims were improper at the time the proof(s) of

claim(s) were filed. This type of conduct shows a reckless disregard of the court and plagues the

Bankruptcy Court as well as the debtors, other claimants, attorneys, judges and clerk."

In addition to the relief previously mentioned, the debtor seeks attorneys' fees incurred in objecting

to the time-barred proofs of claim, attorneys' fees incurred in litigating this adversary proceeding,

monetary sanctions equal to the amount of Portfolio's proof of claim, as well as punitive damages

in the amount of $60,000.00.

Based on all of the foregoing reason above, the Court should grant the Defendant's Motion for

Summary Judgment.

WHEREFORE, based on all of the foregoing reasons, and the reasons stated in the Motion for

Summary Judgment, the Court should grant Summary Judgment to Defendant, with prejudice

and grant sunch other and further relief as is just and proper in this case.

Date:  December 19, 2016                    Respectfully Submitted,

                                            Carlos Allen
                                            1715 Kilbourne Pl NW
                                            Washington, DC 20010
                                            240-678-9846

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December 2016, I caused to be served by US

Postal Service to the foregoing party through their counsel of record; specifically, Howard E.

Haley 7600 Georgia Ave, NW #405 Washington DC 20012.

Date:  December 19, 2016                              Respectfully submitted,

                                                     Carlos Allen

**US BANKRUPCY COURT FOR THE
DISTRICT OF COLUMBIA**

DOUGLASS SLOAN,

)
)

)        Case No. 16-00023
)
)
)        Adversary Proceeding No. 16-
10027
)

CARLOS ALLEN, *et al.*,

)

)

Defendants.

)

)

**PROPOSED ORDER**

Upon consideration of Plaintiff's Opposition To Summary Judgment, the Reply To Opposition
to Summary Judgment by Defendant, and any other filings or oral argument relating to
Plaintiff's Motions, it is this _____day of_____2016, herby

ORDERED that Defendants Summary Judgment and Discharge is GRANTED.

Hon.  S. Martin Teel, Jr

17

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

RECEIVED
Civil Clerk's Office
FEB 2 7 2014
Superior Court of the
District of Columbia
Washington, D.C.

Douglass Sloan, Pro Se,
Plaintiff,                                     )
)
)                    Case No. 13 CA 005339 R(RP)
v.                                             )
)                    Judge Neil E. Kravitz
Carlos Allen, et al.                           )
Defendants.                                    )
)

**SECOND AMENDED COMPLAINT**

Plaintiff, pro se, hereby amends his complaint against Carlos Allen, Anna Maria Allen
and Karen Brooks for the reasons stated herein: **Plaintiff seeks restitution for the
real estate loan made to Defendants in the amount of $60,000.00 (sixty-
thousand dollars)**.  Plaintiff submits Defendant #1, (Carlos Allen) failed to honor
the terms of a signed contract regarding a loan from Plaintiff made against his and
Defendant #2's (Anna Maria Allen) property at 3102 18th Street, NW, Washington,
DC 20010, in the amount of $60,000.00 (sixty-thousand dollars) on July 23, 2008.
Plaintiff made the loan to Defendant #1 with the agreement that Defendant would
renovate the property to prepare it for sale and use the proceeds of that sale to
repay Plaintiff's loan.  Defendant made renovations to the property and then refused
to sell the property.

Defendant #2 acknowledged the contract and the debt owed to Plaintiff when she
filed a claim in United States Bankruptcy Court on March 23, 2009.  Defendant #2
stated that Plaintiff was a creditor holding a priority claim for an investment made
on the property at 3102 18th Street, NW, Washington, DC 20010, in the amount of
$80,000.00 (eighty-thousand dollars).

DEFENDANT'S
EXHIBIT
A
16-10027

Plaintiff includes Defendant #3 (Karen Brooks) in this complaint because she is Defendant #1's wife; she was married to Defendant #1 at the time the loan was made; and the funds from the loan were wired directly into her bank account. Plaintiff files this complaint to seek reimbursement on the investment loan made to Defendants on July 23, 2008.

On August 6, 2013, Defendants sold the property at 3102 18th Street, NW, Washington, DC 20010, for $1,015,000.00 (one million, fifteen-thousand dollars), without notifying Plaintiff and Defendants have not sought to settle the debt owed Plaintiff.

Respectfully submitted,

Douglass Sloan, Pro Se

## CERTIFICATE OF SERVICE

I CERTIFY that I sent a copy of the foregoing Second Amended Complaint to be served on Carlos Allen, Karen Brooks and Anna Maria Allen through their attorney, Daniel Press of Chung & Press, via certified mail on February 27, 2014. I also sent copies of this complaint to Carlos Allen, Karen Brooks and Anna Maria Allen at their home addresses via U.S. Mail.

Douglass Sloan

| Homes | Rentals | Mortgage Rates | Advice | Find a Pro | Local Info | Digs™ | More ⌄ | | For Pros | Sign In |

Location: City, State, or ZIP

Washington D.C.    Washington    Mount Pleasant    3102 18th St NW

Views: 3,053

# 3102 18th St NW, Washington, DC 20010

**Sold on 8/6/13: $1,015,000**
Zestimate®: $1,056,701
Est. Mortgage: $3,966/mo

See current rates on Zillow

| Photos | Map | Bird's Eye | Street View |

© 2013 MRIS                                    View larger

| | |
|---|---|
| Bedrooms: | 5 beds |
| Bathrooms: | 5 baths |
| Townhouse: | 2,587 sq ft |
| Lot: | 1,742 sqft |
| Year Built: | 1910 |
| Last Sold: | Aug 2013 for $1,015,000 |
| Heating Type: | Forced air, Other |

**Contact a local agent**

Samer Kuraishi (259)
[251] Recent sales
(240) 600-0699

Carlos Garcia, Esq. (77)
[154] Recent sales
(202) 664-7258

Tracy Trammell (2)
[1] Recent sales
(240) 377-0621

Your Name

Phone

Email Address

I would like advice about selling a home similar to 3102 18th St NW, Washington, DC 20010.

**Contact Agent**

☑ I want to get pre-approved.
Learn how to appear as the agent above

| Correct home facts | Save this home | Get updates | Email | more ⌄ |

## Description

Gorgeous 4 story, 5BR/4.5BA bay-front townhouse in Historic Mount Pleasant. Renovated granite & stainless KN. Huge MBR Suite w/dressing area, loads of closet space, large MBA. Rear porch, balcony, expansive deck. Roof deck w/views of DC and Rock Creek Park. 2 car garage. In-law suite on LL. Vacant, on lckbx, go & show. Pre-inspections encouraged.

| **Cooling** | **Parking** | **Basement Type** |
|---|---|---|
| Central | Garage - Attached | Finished |
| **Fireplace** | **Floor Covering** | **Attic** |
| Yes | Hardwood, Tile | No |

⌄ More    County website    See data sources

## Zestimates

| | Value | Range | 30-day change | $/sqft | Last updated |
|---|---|---|---|---|---|
| Zestimate | $1,056,701 | $951K – $1.15M | -$10,859 | $408 | 02/16/2014 |
| Rent Zestimate | $3,282/mo | $1.7K – $5.4K/mo | -$86 | $1.27 | 02/17/2014 |
| Owner tools | Post your own estimate | | | | |
| Market guide | Zillow predicts Mount Pleasant home values will increase 6.4% next year, compared to a 6.2% increase for Washington as a whole.... | | | | |
| | more | | | | |

**Similar Homes for Sale**

1703 Euclid St NW, Wa...
For Sale: $1,250,000
Beds: 6    Sqft: 2258
Baths: 5.0    Lot: 1,742

1720 Newton St NW AP...
For Sale: $699,000
Beds: 2    Sqft: 1521
Baths: 3.0    Lot: 1,569

See listings near 3102 18th St NW

Zestimate | Listing price | Rent Zestimate | more ⌄

1 year | 5 years | 10 years

$1.2m

---  This home
- - - Mount Pleasant
· · · Washington

$1.1m
$1.0m
$900k

**Zillow Digs™**
Ideas. Inspiration. Estimates.

# Promissory Note with Equity Interest

# Conversion feature

**FILED**

**MAY 1 4 2009**

Clerk, U.S. District and
Bankruptcy Courts

| | |
|---|---|
| Date: | July 23, 2008 |
| Borrower: | Carlos Allen |
| Borrower's Address: | 9709 Manteo Court |
| | Fort Washington, MD 20744 |
| Payee: | Douglass Sloan / Karen James |
| Place for Payment: | 7600 Georgia Avenue, NW Suite 208 |
| | Washington, DC 20012 |
| Principal Amount: | $60,000.00 |
| Term: | 60 (days) |
| Rate: | 20% |

**INTEREST RATE:** The interest rate on matured, unpaid amounts shall be the maximum amount permitted by the Laws of the District of Columbia.

**PAYMENT TERMS.** This Note is due and payable as follows: A single payment of $72,000.00, which shall comprise the total indebtedness hereunder, including principal and interest. Such amount shall be payable in full or, if necessary, in multiple payments until paid in full. If the payment(s) is not paid on prior to the end of the Term, the remaining balance will be subject to the maximum amount of interest permitted by the Laws of the District of Columbia.

**BORROWER'S PRE-PAYMENT RIGHT.** Borrower reserves the right to prepay this Note in whole or in part, prior to maturity, with all interest due as if such indebtedness were carried to maturity.

**PLACE FOR PAYMENT.** Borrower promises to pay to the order of Payee at the place for payment and according to the terms for payment the principal amount plus interest at the Rate stated above. All unpaid amounts shall be due by the final scheduled payment date.

**DEFAULT AND ACCELERATION CLAUSE.** If Borrower defaults, or if Payee has reasonable purpose to believe Borrower will default, in the payment of this Note or in the performance of any obligation, subject to any cure periods, then Payee may declare the unpaid principal balance and interest to maturity on this Note immediately due and payable. Borrower waives all demands for payment, presentation for payment, notices of intentions to accelerate

maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

**INTEREST ON PAST DUE INSTALLMENTS AND CHARGES.** Failure by Borrower to remit payment within the 60th day following the date that such payment is due entitles the Payee hereof to an additional 2% interest on the entire indebtedness. Failure by Borrower to remit payment within another 60 days shall entitle Payee to an additional 2% interest for a second cycle. Payee's forbearance in enforcing a right or remedy, as set forth herein shall not be deemed a waiver of said right or remedy for a subsequent cause, breach or default of the Borrower's obligations herein.

**INTEREST.** Subject to "Conversion to Equity Interest" below, Interest on this debt evidenced by this Note shall not exceed the maximum amount of interest that may be contracted for, taken, reserved, charged, or received under law. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this instrument (and any other instruments) concerning this debt. If interest amounts pursuant to this Note are, for any reason, considered usurious, Payee shall have the sole discretion and right to designate and convert indebtedness under this Note into an equity position in the "Subject Property" as set forth in "Conversion to Equity Interest" below.

**CONVERSION TO EQUITY INTEREST.** If for any reason, interest to be earned pursuant to indebtedness under the Note is considered usurious or, alternatively, at the sole option of Payee, Payee shall notify Borrower that it wishes to convert Borrower's Indebtedness hereunder into an equity position in the Borrower's property at 3102 18th Street, NW Washington, D.C. 20010 (the "Property"). Borrower shall pay to Payee an amount equal to 14.5% of the net proceeds of the sale of the Property (the "Equity Amount") within 10 days of sale of the Property. Borrower shall execute, or arrange for the execution of, any document and do anything necessary to ensure Payee's interest in the Property and to ensure Payee is paid the Equity Amount to Payee pursuant to this paragraph.

**FORM OF PAYMENT.** Any check, draft, Money Order, or other instrument given in payment of all or any portion hereof may be accepted by the Payee and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the holder hereof except to the extent that actual cash proceeds of such instruments are unconditionally received by the Payee and applied to this indebtedness in the manner elsewhere herein provided.

**ATTORNEY'S FEES.** If this Note is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Borrower shall pay all costs of collection and enforcement, including reasonable attorney's fees and all costs in addition to other amounts due under this Note.

**SEVERABILITY.** If any provision of this Note or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Note nor the

application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

**BINDING EFFECT**. The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

**DESCRIPTIVE HEADINGS**. The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations under this Note.

**CONSTRUCTION**. The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

**GOVERNING LAW**. This Note shall be governed, construed and interpreted by, through and under the Laws of the District of Columbia, without reference to conflict of law provisions.

Borrower is responsible for all obligations represented by this Note.


EXECUTED this 23rd day of July, 2008.


Carlos Allen


Douglass Sloan


Karen James


Witness

| UNITED STATES BANKRUPTCY COURT United States Bankruptcy Court for the District of Columbia | PROOF OF CLAIM |
|---|---|

Name of Debtor: Anna Maria Allen

Case Number: 09-00231

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
DOUGLASS SLOAN

☐ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:
DOUGLASS SLOAN
7600 GEORGIA AVE NW SUITE 208
WASHINGTON DC 20012-1616

**FILED**
MAY 14 2009
Clerk, U.S. District and
Bankruptcy Courts

Court Claim Number: _____
*(If known)*

Telephone number: 202-829-0674

Filed on: _____

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Telephone number:

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $ 80,000.⁰⁰

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** Money Loan
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:**

**3a. Debtor may have scheduled account as:**
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
**Describe:**

**Value of Property:** $    **Annual Interest Rate** %

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**if any:** $    **Basis for perfection:**

**Amount of Secured Claim:** $    **Amount Unsecured:** $

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**
$ _____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**Date:** 05/14/09    **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

**FOR COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.



DEFENDANT
EXHIBIT
B
16-10027

039609

douglas sloan        CARLOS   Account Info ▾   Sign Out   Home

Contacts   Notepad   Calendar       Switch to the newest Yahoo Mail

Actions      ▾   Apply

Check Other Mail

Carlos

Inbox (27425)

Drafts

Sent

Spam      [Empty]

Trash (366)      [Empty]

My Folders      [Edit]

0 Carlos Allen... (5)

0 Mayor Allen

1 AMG Reciepts

1 AMG Recordin... (4)

1 and 1 (2)

1 Booking Agen... (4)

1 Brazil Trip ...

1 Charity Buzz (1)

1 Columbus Tri...

1 Doug Crocker

1 Dubai Trip 2...

1 GFlick-Clip ... (2)

1 Isreal Trip ...

1 Las Vegas

1 Law

1 Los Angeles (2)

1 Miami (6)

1 Michael Rome... (16)

1 New Music Ar... (3)

1 New York Tri... (6)

1 Oklahoma Tri... (2)

1 Panama Trip ...

1 Publicist

1 Radio Airpla... (74)

1 Review Info ... (30)

1 San Diego (1)

1 Sounds To Sa... (1)

1 Telemarketin...

1 WeTransfer.c...

### Re: Prime RealEstate
Wednesday, March 18, 2009 8:45 PM

From: "Douglass Sloan" <sloangroup@verizon.net>

To: carlos5716@yahoo.com

Full Headers Printable View

Carlos, I never accused you of ill intent; I am accusing you of selfishness and to an extent, greed. Selfishness in that you are refusing to lower the price of the property into a more realistic price range so that it can be sold quickly even though you will still profit handsomely from it. Greed in that you were too cheap to use an agent when you first put the house on the market over six months ago and are just now, after six months of no movement, have decided to lower the price on the house slightly, but not enough to get it off the market. Which is of course what you would do if you were truly interested in honoring the agreement in the "most expeditious manner as possible." And Carlos, with $80k on the table, on a loan that is FOUR MONTHS in default, you damn well should be prepared to "explain every single step to me" because of what's at stake. The loan is in default as of November 23, 2008, I didn't start to press you about things until February of 2009. You still have not detailed a viable, realistic strategy to pay us the money back within a reasonable time frame. At this stage you are leaving me no choice but to seek to remedy of this situation through legal channels.

I addressed your issues below.

—— Original Message ——
From: carlos allen
To: Douglass Sloan
Sent: Tuesday, March 17, 2009 2:47 PM
Subject: Prime RealEstate

Doug

I have taken this opportunity to address your concerns listed below individually, so that you'll continue to realize I never no ill intent in this investment endeavor and that I'm doing everything possible to ensure honoring the agreement in the most expeditious manner possible. You are not privy to all of the aspects involved in my pending real estate transactions so it is easy for you to sit back and take stabs at what you think is transpiring. Please know that I do not plan to explain every single step to you throughout the course of our investment because my efforts are better utilized by finding some means of rapid closure so we can all move on with our lives.

Carlos, I did some research on your property on Kilbourne Place, NW. You only posted a few pictures of the property online: one of a bathroom, a living room area, and a bedroom conversion into a boardroom? You didn't show any bedrooms, or the kitchen, or the rest of the house; not nearly enough to arouse any interest in the property. The two agents that I talked to over the weekend about that property said that it will likely not sell in this market for $900K, especially not with tenants. They both said that the $800+ range would be more realistic. Given the money that you owe on that property it doesn't make sense for you to sell it in this market as you won't make much of a profit on it.

Based on our conversation last week, I advised you I decreased the Kilbourne Place listing price to well under $900K. I recall us discussing the revised listing price of $890K which will more than cover Karen's investment when the house sells. So I urge you to put aside the emotionalism and revisit your math, please.
Actually you did not say that you listed it under $900K, you told me that you would list it AT $900K, which is still not going to get that property sold. And what kind of math are you using if $10K less than $900k amounts to "well under" that amount? You are the one who needs a math lesson.

Although I haven't spoken to my agent specifically on the property photo strategy he used, I strongly believe he deliberately did not post photos for some of the rooms because the house IS a rooming house and Landlords have no authority to manage how someone



RUST-OLEUM 214944 ...

See price

Shop now



REFLECT-ALL
See price



RUST-OLEUM
See price

DEFEDANTS
EXHIBIT
C
16-10027

Re: Prime Real Estate - Inbox - Yahoo Mail

1642 Kramer St (1)

17th St Applic... (6)

18th St Applic... (2)

2 Donations (2)

Action Script ... (1)

ADDS FASHION (16)

ADDS (332)

AFS - 70373867... (2)

AFS - Emails C... (1)

AFS - EVENTS H...

AFS - FACEBOOK... (4)

AFS - MERCHEND...

AFS - STREAMIN...

AFS 2024838448 (621)

AFS Broadcast ... (3)

AFS BUS OP PS

AFS BUS OP UT

AFS BUS OP WP

AFS Disclaimer

AFS EIN NUMBER

AFS Getting St... (8)

AFS Mail List (1)

afs mortgage (55)

AFS Simple Voi... (2)

AFS-Conference...

Amazon (3)

American Airli...

Anit Virus Sof... (2)

Anna Allen (10)

Answering Serv...

AOL EMAIL

Apple

Archive (4)

Audio Engeneer

Audio Extracto...

AUTHORIZE.NET

AVS 4 Code

Bankruptcy (36)

BEATS Website (11)

Belltech Label... (1)

Binder Covers

BMI

furnishes or maintains improvement[s]...**if that is done more detriment than benefit.** I trust his judgment and will not second guess what he does because you make a remote observation based on your lack-of-knowledge about what is going on. Also and for your information, in April 2009 the tenants will move out of the property and that change will be reflected in MLS, as appropriate.

That puts us back where we ended things last week. I now have 3 different real estate agents telling me that 18th Street won't even get a second look listed at anything over $1 million. If you're serious about selling that house you're going to need to price it at about $960k. I understand that if you're concerned about your profit, but the fact of the matter is that you don't have a viable, realistic strategy to pay me and Karen our money back in any realistic time frame. You seem content to wait on the market to recover which could take another year or so, which I can tell you right now Karen isn't willing to wait on. The housing market in DC isn't like that of Arizona, Ohio, or Florida, properties are moving but just not at their 2006 prices. You seemed to have developed the idea that you're going to start throwing parties and make your money that way, but unfortunately that won't yield you enough capital to pay us back. Our agreement for the loan was for you to use the $60k to renovate the house into showing condition so that you could sell it and immediately repay the loan. Now your plan has changed but you don't have any strategy to pay us our money back. That's horrifically unfair on your part, because you could have kept the house the way it was if you were just going to use it host parties. Karen and I are ready to make a purchase on our next house and you are effectively preventing us from doing so. That's VERY unfair of you. I would like for you to uphold your part of our agreement and price the property on 18th Street at a reasonable price for this market so it can sell and we can all move on with our lives.

I won't debate with you on what your "3 different real estate agents" are saying about 18th Street because the fact of the matter is 1) they are not the listing agent. 2) they probably have never sold a property in the Mt. Pleasant subdivision. 3) they probably haven't sold a property in quite some time – say at least the last 6 months. and 4) if you had not sent me an exploitative real estate agent who blatantly tried to rip me off – then perhaps I would have used a real estate professional whose judgment we both trusted – but unfortunately that's not the case. Actually _two_ of those agents HAVE sold in Mt. Pleasant, and it's really stupid of you to assume that they haven't sold a property in "some time," when you know absolutely nothing about them or their business. And Carlos, Tanya denies sending you a contract with a request for 7%; she quoted 6%: 3% to the buyer's agent and 3% to the seller's agent which is standard, but it really doesn't matter. The issue in this scenario is that I HAD TO FORCE YOU TO USE AN AGENT IN THE FIRST PLACE GIVEN THE STATE OF THE CURRENT MARKET. What the hell were you thinking??? Why would you fuck around with someone's money like that for 6 months?!?! And you lied to me about it saying that you were using your "super agent" and that she would get the house sold in no time!! That's where the disingenuous issue comes in; you already lied to me regarding this money, so why should I trust you now?

The 18th street property Douglas, is not just about profit, it is my livelihood and has been and still is a premium lot of property in Washington, DC. I too, have made huge investments in the 18th St. property and I won't simply give it away no matter what psychology or professional logic you think you're giving me. And I'm not content waiting on the market to recover. I'm doing everything that I possibly can short of throwing away a premium property for the sole sake of making Karen's investment whole. The entire country and world is going through an economic meltdown and if anyone should be clearly and fully aware of that — it should be you and Karen based on the industry she works in, CNBC, as well as her current job function. None of my plans have changed based on the investment agreement we made but I'm not simply giving the property away. You stated very casually over the phone that the capital investments I've made in my properties is "water under the bridge" but what would **YOU** think and how would **YOU** feel if I took the same attitude about Karen's investment and said the same thing.

<u>Carlos, at this stage in the game, I'm not talking psychology, I'm talking law. It's been eight months since you received the money. You said you would return it within two months and you have not, thus you're loan is in default</u> and you haven't shown me a viable strategy to pay us the money back within a reasonable time frame. To say that you're throwing the property away when you stand to make a $400k+ profit is ludicrous. And Carlos, I wouldn't have played you like this on this type of loan. Not using an agent, and keeping the price at 2006 levels is playing us. I would have gotten you your money back before the year was out no matter what, but we do business differently.

Book Ideas (1)

Browser Code

Bulk Email Ext...

Business Oppor... (1)

Capshas .net

Carbon Copy (50)

Carlos (4)

CBS Outdoors

CD Baby

CD Burner

Clipper Magazi...

Comcast (3)

Conference Blu... (1)

Conference Cal...

CRAIGSLIST (7)

CRAZY FOX UNRE ...

Credit Info Re...

Credit Letter (1)

Credit Seminar

Customers (3)

DATABASE MARKE...

DC Wasa (1)

Delta (1)

Digg.com

DMV Tickets (5)

Doug Sloan

Dunn and Brads...

Eagle Bank

EBAY (25)

E:Credit Care R...

Email Add Camp... (3)

EMAIL BLAST 59... (1)

Email Commerci...

Email Large Fi...

EMail List (1)

EMBEDED WEBSIT...

Equifirst

Face Book Ads

Facebook Event... (2)

FacebookCI (1)

Famous Contact..

Fax Better (1)

I know this is a ve[...] [...] the for [...] of [...] since this
is your first investment deal but, in a down market investments
often take a hit and are negatively affected but that's part of the
risk of being an investor. The up-side is making lots of money, the
down-side is losing money. You both took a risk and invested in a
viable product that's still there and you'll get your investment
back, plus interest!! That's why people look at the stock markets
everyday ... To gauge their investments and see where they are
today as opposed to yesterday. Is the market up or down. This is all
part of being an investor but rarely do investors have the liberty of
invading ones privacy and business functions like you did to me on
March 8, 2009.
What are you talking about?? You INVITED ME to that party!!  And you
want to talk about investor responsibility; when people like you, or
Bernie Madoff or Robert Allen Stanford screw with people's money you
often suffer dire legal consequences (obviously I'm engaging in a bit of
hyperbole here, but you get the idea).

My investment strategy has a three-prong approach based on  a)
selling the Kilbourne Pl. property,  b) selling the 18th St. property
and,  c) getting my HUSH Galleria business up & running to execute
multiple lump sum investment payments. The good news for us all is
that the investment is still there. For many individuals /investors
/bankers their investments went belly-up; they've gained nothing
and lost everything in their stocks and real estate investments.
Karen will regain her investment and the source really should be
irrelevant.
Carlos you don't have a reasonable timeline for that to happen. Hell, you
don't have any timeline, and we're not ready to wait until the housing
market rebounds and you're able to sell 18th Street for over 1 million.
That day may not happen for another 2-3 years.

This weekend, March 21st marks 240 DAYS since we loaned you the
$60k.  You didn't even have an agent working with you for the first 5-6
months the house was on the market. You didn't drop the price on the
house even after it hadn't moved in 5-6 months, while other houses in the
area were selling competitively priced at less than 1 million.  You've been
yanking my chain for the last several months and this has gone on long
enough.

I'm grossly disappointed that you think I've been yanking your
chain because that course of action would be totally non-
productive AND your friendship means a lot more to me. I have
always taken your phone calls, answered any questions you have
pertaining to my actions, tactics, investment strategies, I have
spoken with numerous professionals that you've told me could
make investment loans. I almost used a real estate agent that you
recommended and who attempted to exploit before I terminated
communications with her. I invited you to attend a business event
for you to observe the efforts I'm putting forth to generate
revenues only to have you disrespect my wife and business event. I
have bent over backwards to make sure you know that I have
every intention of making good on any agreements I have made. I
am and have always been a person of honor. All I can tell you at
this point is that I will live up to our agreement as soon as I'm able
to do so.
1) This has nothing to do with friendship, this is business so you should
not take any of this personally.  The truth of this matter is that you
should have got into the club business a long time ago with Mike and
you could have made big money and even gone solo by now; but trying
to start it off from your house on 18th Street is a Hail Mary at best.  The
field is flooded with promoters who have far more experience, money
and clientele than you do.  At least if you sell the house on 18th Street
now you'll have the money to invest in a more realistic venture in a
commercial venue.
2) Dropping the price on Kilbourne does not equate to an investment
strategy.
3) You didn't host that event on March 8th to try to pay us back some of
the money that you owe, you kept it all to yourself.
4) PLEASE stop mentioning anything having to do with your wife Karen
regarding this issue.  She's a red herring in this matter and has nothing to
do with our current predicament.

douglas sloan

Contacts    Notepad    Calendar

CARLOS    Account Info ▼   Go    Sign Out    Home

Switch to the newest Yahoo Mail

Actions        ▼   Apply

**Check Other Mail**

Carlos

**Inbox (27425)**

Drafts

Sent

Spam                [Empty]

**Trash (366)**        [Empty]

**My Folders**        [Edit]

0 Carlos Allen... (5)

0 Mayor Allen

1 AMG Reciepts

1 AMG Recordin... (4)

1 and 1 (2)

1 Booking Agen... (4)

1 Brazil Trip ...

1 Charity Buzz (1)

1 Columbus Tri...

1 Doug Crocker

1 Dubai Trip 2...

1 GFlick-Clip ... (2)

1 Isreal Trip ...

1 Las Vegas

1 Law

1 Los Angeles (2)

1 Miami (6)

1 Michael Rome... (16)

1 New Music Ar... (3)

1 New York Tri... (6)

1 Oklahoma Tri... (2)

1 Panama Trip ...

1 Publicist

1 Radio Airpla... (74)

1 Review Info ... (30)

1 San Diego (1)

1 Sounds To Sa... (1)

1 Telemarketin...

1 WeTransfer.c...

---

**Douglass Sloan sent you a m**
**essage on Facebook...**

               Tuesday, May 5, 2009 1:30 AM

From:   "Facebook" <notification+of6hoope@facebookmail.com>

To:    "Carlos Allen" <carlos5716@yahoo.com>

             Full Headers Printable View

Douglass sent you a message.

Subject: Action

"Carlos, The attorney has completed the paperwork to file charges of fraud against you & your mother as she is listed as owner of the property. He urged me to contact you again to try to work out a settlement because the action is filed there's no going back. The penalty for fraud in the District of Columbia is a heavy fine and up to five years in prison. This is a federal case and given the amount of money you owe and the fact that the federal govt is prosecuting the majority of fraud cases right now, they are very likey to pursue the charges. If you don't contact me asap to try to negotiate an agreement, expect the action to be filed this week."

To reply to this message, follow the link below:
http://www.facebook.com/n/?
inbox/readmessage.php&t=1007773532651&mid=69da4cG2a592fe1G19cc5e
8G0

This message was intended for carlos5716@yahoo.com. Want to control which emails you receive from Facebook? Go to:
http://www.facebook.com/editaccount.php?
notifications&md=bXNnO2Zyb209ODg2MjEwNTc1O3Q9MTAwNzc3MzUzMj
Y1MTI0bz03MTA0ODgwMzM=&mid=69da4cG2a592fe1G19cc5e8G0
Facebook's offices are located at 156 University Ave., Palo Alto, CA 94301.

douglas sloan        CARLOS    Account Info ▼      Sign Out    Home

Contacts    Notepad    Calendar

Delete   Reply   Reply All   Forward    Actions         ▼   Apply

Switch to the newest Yahoo Mail

Check Other Mail

Carlos

Inbox (27425)

Drafts

Sent

Spam        [Empty]

Trash (366)       [Empty]

My Folders        [Edit]

0 Carlos Allen... (5)

0 Mayor Allen

1 AMG Reciepts

1 AMG Recordin... (4)

1 and 1 (2)

1 Booking Agen... (4)

1 Brazil Trip ...

1 Charity Buzz (1)

1 Columbus Tri...

1 Doug Crocker

1 Dubai Trip 2...

1 GFlick-Clip ... (2)

1 Isreal Trip ...

1 Las Vegas

1 Law

1 Los Angeles (2)

1 Miami (6)

1 Michael Rome... (16)

1 New Music Ar... (3)

1 New York Tri... (6)

1 Oklahoma Tri... (2)

1 Panama Trip ...

1 Publicist

1 Radio Airpla... (74)

1 Review Info ... (30)

1 San Diego (1)

1 Sounds To Sa... (1)

1 Telemarketin...

1 WeTransfer.c...

## $60K        Monday, September 21, 2009 9:44 AM

From:   "sloangroup@verizon.net" <sloangroup@verizon.net>

To:   "Carlos Allen" <carlos5716@yahoo.com>

Full Headers Printable View

Carlos what's up with this money you owe us. This has gotten out of hand.
It's been over a year since we lent it to you & we haven't seen anything from
you. This is a horrible way to treat someone who lent you money out of
kindness & concern for you to get out of a tight spot & now you won't even
talk to me or return phone calls or msgs. I wish I knew this side of you
before I convinced Karen that we lend you this money. She was really
concerned about if we would get it back & my dumb ass said "naw he's my
boy, he would never fuck us like that." Well with a baby due in six weeks &
her family unable to come & stay with us because my house is too small for
her mom & aunts you are definitely fucking us. She is up my ass every day
asking why you can't at least pay something or to give us a plan as to how
you will pay us back. She lent her friend some money who was in a similar
situation & her friend is paying her back in increments. Why can't you do
that?? Carlos, we have to hear from yo
u regarding this money before the month is out. I simply can't allow you to
straight fuck me & Karen out of $60K like this; I just cannot allow that to
happen & I have tried to give you space & time to operate but 15 months is
time enough. Please contact me immediately.

Douglass Sloan
Sloan Consulting, LLC
202-829-0674 (o)
202-829-4249 (f)
202-277-7573 (c)
www.thesloangroup.com

$99
$49.50

ADD TO CART

◄             ►

# Promissory Note with Contingency Interest

## Conversion feature

| | |
|---|---|
| Date: | July 23, 2008 |
| Borrower: | Carlos Allen |
| Borrower's Address: | 9709 Manteo Court |
| | Fort Washington, MD  20744 |
| Payee: | Douglass Sloan / Karen James |
| Place for Payment: | 7600 Georgia Avenue, NW  Suite 208 |
| | Washington, DC  20012 |
| Principal Amount: | $60,000.00 |
| Term: | 60  (days) |
| Rate: | 20% |



DEFENDANT
EXHIBIT
D

16-10027

**INTEREST RATE:** The interest rate on matured, unpaid amounts shall be the maximum amount permitted by the Laws of the District of Columbia.

**PAYMENT TERMS.**  This Note is due and payable as follows:  A single payment of $72,000.00, which shall comprise the total indebtedness hereunder, including principal and interest.  Such amount shall be payable in full or, if necessary, in multiple payments until paid in full.  If the payment(s) is not paid on prior to the end of the Term, the remaining balance will be subject to the maximum amount of interest permitted by the Laws of the District of Columbia.

**BORROWER'S PRE-PAYMENT RIGHT.**  Borrower reserves the right to prepay this Note in whole or in part, prior to maturity, with all interest due as if such indebtedness were carried to maturity.

**PLACE FOR PAYMENT.**  Borrower promises to pay to the order of Payee at the place for payment and according to the terms for payment the principal amount plus interest at the Rate stated above. All unpaid amounts shall be due by the final scheduled payment date.

**DEFAULT AND ACCELERATION CLAUSE.**  If Borrower defaults, or if Payee has reasonable purpose to believe Borrower will default, in the payment of this Note or in the performance of any obligation, subject to any cure periods, then Payee may declare the unpaid principal balance and interest to maturity on this Note immediately due and payable.  Borrower waives all demands for payment, presentation for payment, notices of intentions to accelerate

maturity, notices of acceleration of maturity, protest, and notices of protest, to the extent permitted by law.

**INTEREST ON PAST DUE INSTALLMENTS AND CHARGES**. Failure by Borrower to remit payment within the 60th day following the date that such payment is due entitles the Payee hereof to an additional 2% interest on the entire indebtedness. Failure by Borrower to remit payment within another 60 days shall entitle Payee to an additional 2% interest for a second cycle. Payee's forbearance in enforcing a right or remedy, as set forth herein shall not be deemed a waiver of said right or remedy for a subsequent cause, breach or default of the Borrower's obligations herein.

**INTEREST**. Subject to "Conversion to Equity Interest" below, Interest on this debt evidenced by this Note shall not exceed the maximum amount of interest that may be contracted for, taken, reserved, charged, or received under law. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this instrument (and any other instruments) concerning this debt. If interest amounts pursuant to this Note are, for any reason, considered usurious, Payee shall have the sole discretion and right to designate and convert indebtedness under this Note into an equity position in the "Subject Property" as set forth in "Conversion to Equity Interest" below.

**CONVERSION TO EQUITY INTEREST**. If for any reason, interest to be earned pursuant to indebtedness under the Note is considered usurious or, alternatively, at the sole option of Payee, Payee shall notify Borrower that it wishes to convert Borrower's Indebtedness hereunder into an equity position in the Borrower's property at 3102 18th Street, NW Washington, D.C. 20010 (the "Property"). Borrower shall pay to Payee an amount equal to 14.5% of the net proceeds of the sale of the Property (the "Equity Amount") within 10 days of sale of the Property. Borrower shall execute, or arrange for the execution of, any document and do anything necessary to ensure Payee's interest in the Property and to ensure Payee is paid the Equity Amount to Payee pursuant to this paragraph.

**FORM OF PAYMENT**. Any check, draft, Money Order, or other instrument given in payment of all or any portion hereof may be accepted by the Payee and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the holder hereof except to the extent that actual cash proceeds of such instruments are unconditionally received by the Payee and applied to this indebtedness in the manner elsewhere herein provided.

**ATTORNEY'S FEES**. If this Note is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Borrower shall pay all costs of collection and enforcement, including reasonable attorney's fees and all costs in addition to other amounts due under this Note.

**SEVERABILITY**. If any provision of this Note or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Note nor the

but instead shall be enforced to the maximum extent allowed by law.

**BINDING EFFECT**.  The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

**DESCRIPTIVE HEADINGS**.  The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations under this Note.

**CONSTRUCTION**.  The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

**GOVERNING LAW**.  This Note shall be governed, construed and interpreted by, through and under the Laws of the District of Columbia, without reference to conflict of law provisions.

Borrower is responsible for all obligations represented by this Note.

EXECUTED this 23rd day of July, 2008.


_____

Carlos Allen


_____

Douglass Sloan


_____

Karen James


_____

Witness

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

DOUGLASS SLOAN,                          :
                                         :
          Plaintiff,                     :
                                         :
                                         :        Civil Action No.
          v.                             :        2013 CA 005339 R(RP)
                                         :
CARLOS ALLEN, et al.,                    :        Judge Neal E. Kravitz
                                         :        Next Event: Initial Conf. 6/20/14
          Defendants.                    :
                                         :

**MOTION OF DEFENDANT ANNA ALLEN TO DISMISS SECOND AMENDED
COMPLAINT**

COMES NOW Defendant Anna Allen, through counsel, and moves to dismiss this action as
against her under SCR-Civ. 12(b)(6) for failure to state a claim, and in support thereof states as
follows:

1.      The Second Amended Complaint in this Action states that a "real estate loan" was
made to Defendants on July 23, 2008.  Plaintiff states that "Plaintiff made the loan to Defendant #1
[Carlos Allen] with the agreement that Defendant would renovate the property to prepare it for sale
and use the proceeds of that sale to repay the loan."   There is no deed of trust attached or
referenced, and no allegation that the loan was in fact secured against the referenced real estate.
Rather, the attachment shows a Note, signed only by Plaintiff, his wife Karen James, and Defendant
Carlos Allen, which provides that the Note is due and payable in full 60 days after the date of the
note.  The note does not state that it is secured, but rather includes an "equity conversion" option.
Plaintiff does not allege that he in fact exercised that option.

2.      Defendant Anna Allen did not sign the Note.  However, Plaintiff alleges that on

March 23, 2009, Defendant Anna Allen acknowledged the debt when she "filed a claim" in the bankruptcy case.

3.      The note, attached and made part of the pleading, now makes it clear that this action is time barred by the 3-year statute of limitations in DC Code § 12-301. It is not under seal. It was due in full on September 21, 2008. Anna Allen did not sign it, but she allegedly acknowledged the debt on March 23, 2009. A mere acknowledgement without at least an implied promise to pay (this was a bankruptcy petition – if anything, a promise *NOT* to pay) is not sufficient to extend the statute, *Grass v. Eiker*, 135 A.2d 153 (D.C.1957); *Brown v. Lamb*, 414 F.2d 1210 (D.C. Cir. 1969); *Hornblower v. George Washington University*, 31 U.S. App.D.C. 64, 73 (1908). In particular, scheduling a debt in a bankruptcy petition has been held *not* to be a sufficient acknowledgement to extend the statute. *See Grass v. Eiker*, 123 A.2d 613, 614 (D.C. 1956); *Fowler v. Pilson,* 74 App.D.C. 340, 123 F.2d 918, certiorari denied 316 U.S. 664, 62 S.Ct. 944, 86 L.Ed. 1740 (1941). In any event, this "acknowledgement" was itself well over 3 years before the commencement of this action. Accordingly, this claim is time barred as against Anna Allen.

3.      SCR-Civ. 12(b)(6) allows the Court to dismiss a complaint that fails to state a claim upon which relief can be granted. The statute of limitations may be raised on a SCR-Civ. 12(b)(6) motion to dismiss when the defense appears on the face of the complaint, as here. *Executive Sandwich Shoppe v. Carr Realty*, 749 A. 2d 724 (D.C. 2000). Here, the date of the note, the due date of the payment, and the date of the "acknowledgement," are all pled, and they establish that this action against Anna Allen is barred by the statute of limitations.

WHEREFORE, Defendant Anna Allen respectfully requests that the Court enter an Order dismissing this action against her under SCR-Civ. 12(b)(6) as time barred.

Dated: March 21, 2014.

Respectfully submitted,

/s/ Daniel M. Press
Daniel M. Press, D.C. Bar # 419739
CHUNG & PRESS, P.C.
6718 Whittier Avenue, Suite 200
McLean, VA 22101
(703) 734-3800
(703) 734-0590 [fax]
dpress@chung-press.com
Counsel for Defendant Anna Allen

### SCR-CIV. 12-I(a) CERTIFICATE

This is to certify that prior to filing this motion, I attempted to discuss the subject matter thereof with *pro se* Plaintiff but despite diligent efforts to reach him, consent to dismissal of this action as to Defendant Carlos Allen could not be obtained.

/s/ Daniel M. Press
Daniel M. Press

### POINTS AND AUTHORITIES

SCR-Civ. 12(b)(6)
DC Code § 12-301
*Grass v. Eiker*, 135 A.2d 153 (D.C.1957)
*Brown v. Lamb*, 414 F.2d 1210 (D.C. Cir. 1969)
*Hornblower v. George Washington University*, 31 U.S. App.D.C. 64, 73 (1908).
*Grass v. Eiker*, 123 A.2d 613, 614 (D.C. 1956)
*Fowler v. Pilson*, 74 App.D.C. 340, 123 F.2d 918,
    certiorari denied 316 U.S. 664, 62 S.Ct. 944, 86 L.Ed. 1740 (1941)
*Executive Sandwich Shoppe v. Carr Realty*, 749 A. 2d 724 (D.C. 2000).

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 21st day of March, 2014, I caused a copy of the foregoing Motion to be served on Plaintiff by first class mail, postage prepaid, addressed to:

Douglass Sloan
313 Nicholson St NE
Washington DC 20011

/s/ Daniel M. Press
Daniel M. Press

## United States Bankruptcy Court for the District of Columbia

Douglas Sloan )
          Plaintiff )
           )
           )    **Case No. 16-00023**
vs )
           )
Carlos Allen, et al )
          Defendant )

> DEFENDANT
> EXHIBIT
> E
> 16-10027

### AFFIDAVIT OF BUSINESS OWNERSHIP OF AMG INC.

COMES NOW, the affidavit, duly sworn, deposes and states as follows:

1. That I, Karen R. Brooks, am engaged in business under the name of AMG Inc.

2. That the registered business address with the District of Columbia – Department of Consumer and Regulatory Affairs (DCRA) is 1715 Kilbourne Place, NW, Washington, DC, 20010.

3. That since August 2013, I've been the sole owner of AMG Inc. so conducted and no other person, firm or corporation has any interest therein.

4. That All property held in such assumed name (Mayor Allen) belongs to me and is my sole property.

I hereby certify and affirm under penalty of perjury that the contents of the foregoing Affidavit are true and correct to the best of my knowledge, information and belief.

7/12/16
July 12, 2016

_____
Karen R. Brooks

SUBSCRIBED AND SWORN to before me this _____12_____ day of July, 2016

My commission expires: 1/14/2___

_____
Notary Public, DC

# ARTICLES OF INCORPORATION
# OF
# AMG INC.

TO:
DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
BUSINESS REGULATION ADMINISTRATION
CORPORATIONS DIVISION

I/ WE, the undersigned natural person(s) of the age of eighteen years or more acting as incorporator(s) of a corporation under the BUSINESS CORPORATION ACT (D.C. Code, 1981 edition, Title 29, Chapter 3, as amended), adopt the following Articles of Incorporation:

**FIRST:** The name of the corporation is (AMG Inc.).

**SECOND:** The period of its duration is Perpetual.

**THIRD:** The purpose(s) for which the corporation is organized is to product sales.

**FOURTH:** The aggregate number of shares, which the corporation is authorized to issue, is 1000 shares at par value.

**FIFTH:** The corporation AMG Inc. will not commence business until at least one thousand dollars ($1.000) has been received as initial capitalization.

**SIXTH:** There are no provisions limiting preemptive rights of the shareholders to acquire additional shares of the corporation.

**SEVENTH:** There are no provisions for the internal affairs of the corporation.

**EIGHTH:** The address of the registered agent of the corporation is 1715 Kilbourne Pl NW. The name of the agent is Carlos Allen. The address of the corporation is 9709 Manteo Ct Ft. Washington MD 20744.

**NINTH:** The initial number of directors is 1, the name is:
Karen Brooks 9709 Manteo Ct. Ft. Washington MD 20744

**TENTH:** The names and addresses of the incorporator is:
Karen Brooks 9709 Manteo Ct. Ft. Washington MD 20744

DATE: 8/7/13 _____ INCORPORATOR _____

DEFENDANT
EXHIBIT
F
16-10027

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION, CIVIL ACTIONS BRANCH**
500 Indiana Avenue, N.W., Room 5000
Washington, D.C. 20001
Telephone (202) 879-1133

Civil Action No. ___2013 CA 006339 R(RP)___

**DOUGLASS SLOAN**          VS   **CARLOS ALLEN, ET AL**
Plaintiff                              Defendant

## AFFIDAVIT OF SERVICE BY SPECIAL PROCESS SERVER

I, Howard Haley_____, age 18 or older, residing or working
at 7600 Georgia Ave, NW Ste 405, Washington, DC 20012____, am not a party and have
no interest in this case. On JUNE 15_____, 20 16__, at 10:26     AM/PM.

1. I served a copy of the summons, complaint, initial order, and addendum if necessary,
and any attachments as follows on **defendant** AMG

☐     Personally at _____

☐     By leaving said copy with _____, a person
      of suitable age and discretion, who stated that he/she resides with the defendant at
      _____

☒     By leaving said copy with CARLOS ALLEN - via Andrew Chase resident_____ at
      1715 Kilbourne Place, NW, Washington, DC 20010_____.
      He/She stated that they are authorized to accept service on behalf of the above defendant
      by statute or law and his/her official capacity is President & Resident Agent's tenant.

2. Below, you must set forth specific facts from which the Court can determine that
process was served as indicated above and in compliance with SCR CIV 4, including a
physical description (approximate age, height, weight) of any person on whom service
was made:
black male, approximately 6'1" tall, w twisted hair, wearing black t-shirt, jeans, and
brown shoe boots, approximately 160-170 pounds, appeared to be late 20's or early 30's
in age, and stated he lived there with Carlos Allen.

_____
Special Process Server

Subscribed and sworn to before me this 17th_ day of June_____, 20 16_.

_Theresa B Williams_    _7-31-19___
Notary Public / Deputy Clerk       My Commission Expires

THERESA B. WILLIAMS
MY COMMISSION EXPIRES
JULY
31,
2019
DISTRICT OF COLUMBIA
NOTARY PUBLIC

**NOTE:** A separate Affidavit of Service is required for each named Defendant

Form CV-3035 Jun 2011

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

DOUGLASS SLOAN )
)
Plaintiff, )
)
) Civil Action No. 2013 CA 005339 R(RP)
vs. )
) Judge: Hon. John Campbell
CARLOS ALLEN, ET AL., )
) Date of Next Event:
)   Scheduling Conference February
Defendants. ) 3, 2017
)

### **Sworn Affidavit**

My name is Douglass Sloan, I am a resident of Washington, DC, I am over the age of 18 and I state the following facts under penalty of perjury:

1. Carlos Allen approached me for a loan to rehabilitate his house at 3101 18th Street, NW, Washington, DC 20010.

2. Subsequently, it was found that the property belonged to his mother, Anna Allen and Carlos Allen had been granted Power of Attorney for Anna Allen.

3. Carlos Allen agreed to the terms of the loan and promised to pay according to the terms of the note.

4. In reliance on his promises, I agreed to loan him the money.

5. The loan was for $60,000.00 and he promised to repay $72,000.00 within 60 days; if he failed to pay within 60 days, there was an interest clause. In the event he failed to pay the money, the agreement included an option to convert the debt to an equity interest in the property at my discretion. The note was signed on July 23, 2008.

6. A discussion was had regarding delivery of the funds and it was determined that Carlos Allen' wife – Karen Brooks – would receive the funds in her personal bank account.

1

The funds were then deposited (via wire) to Karen Brooks' personal bank account. Karen Brooks then delivered the money to Carlos Allen.

7.  Carlos Allen failed to make payment in 60 days as he promised. I advised him that interest was accruing per the terms of the note and would continue until paid in full.

8.  Requests were made by myself and my wife Karen (James) Sloan to Karen Brooks and Carlos Allen regarding repayment of the debt under the terms of the note.

9.  Anna Allen filed a bankruptcy in 2009 that was dismissed for bad faith.

10. Carlos Allen failed to make any payments on the loan until November 2010. These payments were made via check and/or PayPal. The last payment toward the note was sent by Carlos Allen in March 2014.

11. Carlos Allen told me that he rehabilitated the house sometime in 2009, however the house was not sold until August of 2013.

12. After the sale of the property, Carlos Allen did not remit the balance of the monies on the note (principle and interest) within 10 days as required under the terms of the note.

13. I filed a *lis pendens* on the property, but after filing the *lis pendens* I was informed that the property had been sold and I was directed to remove the *lis pendens* by counsel for the settlement company.

14. I promptly filed this action (*pro se*) in August 2013, naming Carlos Allen, Anna Allen and Karen Brooks as defendants. Later, I hired Johnathan Bender represent me in the prosecution of this case.

15. Jonathan Bender advised me to voluntarily dismiss Karen Brooks because there was no evidence showing that she was involved in the fraud at that time and Daniel Press had threatened to file a motion for sanctions because we had no evidence that she was connected to the fraud other than her delivery of the money to Carlos Allen.

16. I was unaware that Karen Brooks was the president and owner of AMG, Inc., at this time, and consented to her dismissal.

17. Anna Allen filed a subsequent bankruptcy in Georgia on December 30, 2014. This caused an automatic stay in this case.

18. I hired an attorney in Georgia, Stephen Gumby, to object to the discharge of this new bankruptcy. The stay was lifted and this case was allowed to proceed in October 2015.

19. My present counsel – Howard Haley – was hired and entered the case in October 2015.

20. Carlos Allen filed a bankruptcy in Washington, DC in January 2016 just days prior to a scheduling conference. The filing of this bankruptcy created another automatic stay.

21. Judge Teel (Bankruptcy Judge) lifted the stay for this matter as to all defendants except Carlos Allen who may only be treated as a witness. My attorney filed an adverse action in that bankruptcy in June 2016.

22. As a result of subpoenas issued in this matter it was revealed that AMG received a check in the amount of $270,000.00 from the proceeds of the sale of the property. The complaint was amended to add AMG as a defendant.

23. It was believed that Carlos Allen was the president and owner of AMG until Karen Brooks executed an affidavit stating that she was the president and owner of AMG. This affidavit was filed in US Bankruptcy Court by Carlos Allen in July 2016.

24. Subsequently, the complaint was amended to add Karen Brooks in October 2016.

Douglass Sloan, Plaintiff

This certificate is attached to a _____ page document titled _____ dated 14 Nov 2016
# of pages

## ACKNOWLEDGMENT CERTIFICATE

Exhibit A

STATE OF _DC_

COUNTY OF _Washington_

On this _14_ day of _November_, 20 _16_,

before me, the undersigned notary public, personally appeared _Douglass Sloan_
Name of Person Acknowledging

proved to me through satisfactory evidence of identification, which was _DC Driver's lic_
Type of Identification _211 25 67_

to be the person whose name is signed on the preceding or attached document and acknowledged to me that
he/she signed it voluntarily for its stated purpose.

_Theresa B. Williams_
Signature of Notary Public

_July 31, 2017_
Commission Expiration Date of Notary Public

(Seal)

Form ACK-C copyright 2008 The Corporate Connection 1-800-523-2344

douglas sloan          Search Mail   Search Web   CARLOS   Account Info ▼  Go   Sign Out   Home

Inbox   Contacts   Notepad   Calendar

Switch to the newest Yahoo Mail

Check Other Mail

Carlos

Inbox (27425)

Drafts

Sent

Spam                    [Empty]

Trash (366)             [Empty]

My Folders              [Edit]

0 Carlos Allen... (5)

0 Mayor Allen

1 AMG Reciepts

1 AMG Recordin... (4)

1 and 1 (2)

1 Booking Agen... (4)

1 Brazil Trip ...

1 Charity Buzz (1)

1 Columbus Tri...

1 Doug Crocker

1 Dubai Trip 2...

1 GFlick-Clip ... (2)

1 Isreal Trip ...

1 Las Vegas

1 Law

1 Los Angeles (2)

1 Miami (2)

1 Michael Rome... (16)

1 New Music Ar... (3)

1 New York Tri... (6)

1 Oklahoma Tri... (2)

1 Panama Trip ...

1 Publicist

1 Radio Airpla... (74)

1 Review Info ... (30)

1 San Diego (1)

1 Sounds To Sa... (1)

1 Telemarketin...

1 WeTransfer.c...

Delete   Reply   Reply All   Forward   Actions        ▼  Apply

**18th Street**                    Monday, December 1, 2008 8:43 PM

From:  "sloangroup@verizon.net" <sloangroup@verizon.net>

To:    "Carlos Allen" <Carlos5716@yahoo.com>

                                    Full Headers Printable View

Carlos, I talked to Tanya, a real estate agent who says you have to do a
much better job staging your house if you want to sell it. Also your pics are
in great need of improvement. You paid big money for granite counters &
didn't showcase them. You didn't show the English basement, you have toilet
seats up in the pics, you need to do a much better job showcasing your
backyard. You may need to put in some furniture to make it seem more cozy
& inviting to buyers. A house in that price range needs to come with all the
bells & whistles. Let's talk tmrw.

Douglass Sloan
Sloan Consulting, LLC
202-829-0674 (O)
202-829-4249 (F)
www.thesloangroup.com

◄                                        ►

$50
**$35.40**

ADD TO CART

↑

Sloan states how big money
was spent on granite

DEFENDANT
EXHIBIT
G
16-10027

douglas sloan                                          CARLOS    Account Info ▾  Go    Sign Out    Home

Inbox    Contacts    Notepad    Calendar                          Switch to the newest Yahoo Mail

Delete    Reply    Reply All    Forward    Actions ▾    Apply

**Check Other Mail**

Carlos

**Inbox (27425)**            **Fw: 3102 18th Street NW**    Tuesday, March 3, 2009 1:57 PM

Drafts                        From:  "Douglass Sloan" <sloangroup@verizon.net>

Sent                            To:  "Carlos Allen" <Carlos5716@yahoo.com>

Spam                [Empty]              Full Headers Printable View

Trash (366)         [Empty]    Carlos, Chuck's assessment below.

                              Douglass Sloan
**My Folders**       [Edit]    Sloan Consulting, LLC
                              7600 Georgia Ave, NW Ste. 208
0 Carlos Allen... (5)         Washington, DC 20012
                              202-829-0674 Off
0 Mayor Allen                 202-829-4249 Fax
                              www.thesloangroup.com
1 AMG Reciepts
                              "Now more than ever, anything is possible"
1 AMG Recordin... (4)         OBAMA 2008
                              ----- Original Message -----
1 and 1 (2)                   From: Charles Burger
                              To: sloangroup@verizon.net
1 Booking Agen... (4)         Sent: Saturday, February 28, 2009 5:18 PM
                              Subject: 3102 18th Street NW
1 Brazil Trip ...
                              Doug,
1 Charity Buzz (1)
                              Enclosed are comps. Very interesting home, but the basic
1 Columbus Tri...             problem in aggresively pricing is the styling on the house and lot
                              layout for the higher end Mt Pleasand market. Over styled,
1 Doug Crocker                modern features, soft kitchen design and lack of yard/garden is
                              over the top for that market. Better staging and definitely better
1 Dubai Trip 2...             pictures are needed. House needs toned down I suggest they use
                              "Mouse" which is a service that matches better pics with acutal
1 GFlick-Clip ... (2)         floor plan to highlight sheer size of property. Competition is
                              selling, but unless you find a "perfect fit" with this home's style
1 Isreal Trip ...             and buyer you are going to be pressed to even get an offer above
                              $950k. What is needed is the right mix of marketing and targeted
1 Las Vegas                   advertising to get that right buyer in the house. Hope I haven't
                              been too blunt. It is a great specialty house that must look for the
1 Law                         right buyer!

1 Los Angeles (2)             Lee Smith heads up a group at McLean Funding a privately held
                              mortgage broker. He has the flexibility your friend may need.
1 Miami (6)
                              Hope this helps. Give me a call if I can be of any further
1 Michael Rome... (16)        assitance or to talk about property.

1 New Music Ar... (3)         Contact me at 202-258-5316 or cburger@cbmove.com.

1 New York Tri... (6)         Regards
                              Chuck
1 Oklahoma Tri... (2)
                              Click the following URL to see the CMA:
1 Panama Trip ...             http://matrix.mris.com/Matrix/Public/EmailCMA.aspx?
                              ID=602613113
1 Publicist

1 Radio Airpla... (74)

1 Review Info ... (30)        Note: Most email programs allow you to click the URL above to
                              view this email. However, some Internet Service Providers do not
1 San Diego (1)               support hyperlinks in email. If clicking on the above hyperlink
                              does not work, simply copy and paste the exact URL above into
1 Sounds To Sa... (1)         your Web browser.

1 Telemarketin...

1 WeTransfer.c...

Women's Amston
Roll-Top Boots

$140

Women's Carleton
Side-Zip Suede
Ankle Boots

$89.99

Women's Glancy 10-
Inch Lace-Up Boots

$160

# PROMISSORY NOTE

This Promissory Note (Hereinafter "Note") is entered into by:

Karen R. Brooks of 9709 Manteo Court Fort Washington, Maryland 20744

(Hereinafter "Lender")

&

Carlos Roberto Allen of 3102 18th St NW Washington DC 20010

(Hereinafter "Borrowers")

DEFENDANT
EXHIBIT
H
16-10027

1. PROMISE TO PAY
   On This Day September 23, 2005 the borrowers promise to pay to the Lender the
   total amount of One Hundred Two Thousand ($102,000.00), together with interest
   payable on the unpaid principal at the rate of 20% percent per annum,
   compounded monthly.

   Payments will be delivered to the Lender's address (9709 Manteo Court) or such
   other address as may later be agreed upon by the parties.

2. REPAYMENT
   The amount promised under this Agreement will be repaid in full, as well as
   accrued interest thereon, if any, November 10, 2005.

   Should the Borrowers default in payment, the Borrowers shall pay all costs,
   expenses and all reasonable legal costs incurred by the Lender, for the purpose of
   collection of this Promissory Note and including reasonable collection charges
   should collection be referred to a collection agency. These costs will be added to
   the outstanding principal and will become immediately due.

3. COLLATERAL
   This Promissory Note is secured by the following collateral: The property located
   at 3102 18th St., NW, Washington, DC, 20010 is being used as collateral. This
   property is deeded to Anna Allen, who is the mother of Carlos Roberto Allen. Mr.
   Allen states he has legal/current/active power of attorney for Mrs. Anna Allen to
   make purchases and borrow money on her behalf. He is signing this contract
   representing them both as "borrowers" on this loan. (Hereinafter "Collateral")

   Title to the Collateral will be retained by Lender until all payments due under this
   Promissory Note are paid in full.

10. The parties hereby indicate by their signatures below that they have read and agree with the terms and conditions of this Note in its entirety.

Lender Information
Karen R. Brooks
9709 Manteo Court
Fort Washington, Maryland 20744

Signature & Date: _____ 9/23/05 _____

Borrower Information
Carlos Roberto Allen
3102 18th St NW
Washington, DC 20010

Signature & Date: _____ 9/23/2005 _____

Signed September 23, 2005.

 **PNC BANK**

June 14, 2016

PNC Bank
Oxon Hill - 534
6196 Oxon Hill Road
Oxon Hill, MD 20745

CARLOS R ALLEN
1715 KILBOURNE PL NW
Washington, DC 20010

Dear CARLOS R ALLEN

In response to your request that PNC Bank, National Association provide written verification concerning your (checking/savings/certificate of deposit) account(s), we are providing the following information:

| Account No. | Date Opened | Balance as of date of this letter |
|---|---|---|
| 5313120903 | 03/15/2011 | $13.00 |
| 5313120911 | 03/15/2011 | |
| 5313120938 | 03/15/2011 | |

This information is subject to any outstanding items or charges.

Sincerely,

PNC Bank, National Association

Mohammed Donzo
Bank Sale Service Associate

CUSTOMER AUTHORIZATION/ACKNOWLEDGMENT

I/we hereby acknowledge that I/we have requested and authorized PNC Bank, National Association to provide this written verification concerning my/our (checking/savings/certificate of deposit) account(s).

Dated this 14 day of June 2016.

Customer Signature: _____

Customer Signature: _____

Exhibit II
DEFENDANT
I
16-10027

EFORM1:13019-1006

F.A.B. APPRAISAL INC.
Certified General Appraisers

1715 Kilbourne
File No. 6-062kil

********* INVOICE *********

File Number: 6-062kil                                              07/12/2016

Processor;
Mr Allen
Carlos Allen
1715 Kilbourne Pl Nw
Washington, DC 20010

DEFENDANT
EXHIBIT
J
16-10027

Borrower :          Carlos Allen

Invoice # :         6-062kil
Order Date :        07/12/2016
Reference/Case # :  1715 Kilbourne
PO Number :

1004 APPRAISAL

1715 Kilbourne Pl Nw
Washington, DC 20010

| | | |
|---|---|---|
| 1004 APPRAISAL | $ | 450.00 |
| | $ | |
| Invoice Total | $ | 450.00 |
| State Sales Tax @ | $ | 0.00 |
| Deposit | ($ | 450.00 ) |
| Deposit | ($ | ) |
| Amount Due | $ | 0.00 |

Terms:   DUE UPON RECEIPT

Please Make Check Payable To:

F.A.B. APPRAISAL INC.
7905 Deepwell DR
Bethesda, Maryland 20817

Fed. I.D. #  52-1808209

THANK YOU FOR ALLOWING US TO SERVE YOUR APPRAISAL NEEDS.

7905 DEEPWELL DR, BETHESDA, MD. 20817  OFFICE: 301-717-8137 FAX: 301-365-6144

F.A.B. APPRAISAL INC.
Certified General Appraisers

1715 Kilbourne
File No. 6-062kil

## APPRAISAL OF



Single Family Attached Property

## LOCATED AT:

1715 Kilbourne Pl Nw
Washington, DC 20010

## FOR:

Carlos Allen
1715 Kilbourne Pl Nw
Washington, DC 20010

## BORROWER:

Carlos Allen

## AS OF:

July 12, 2016

## BY:

Wayne Rogers
Certified General Real Estate Appraiser

7905 DEEPWELL DR, BETHESDA, MD. 20817  OFFICE: 301-717-8137 FAX: 301-365-6144

F.A.B. APPRAISAL INC.
Certified General Appraisers

1715 Kilbourne
File No. 6-062kil

7/12/16

Processor;
Mr Allen
Carlos Allen
1715 Kilbourne Pl Nw
Washington, DC  20010

File Number:  6-062kil

To Whom It May Concern,

In accordance with your request, I have appraised the real property at:

1715 Kilbourne Pl Nw
Washington, DC 20010

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of   July 12, 2016                         Is:

$915,000
Nine Hundred Fifteen Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.

Sincerely yours,

*Wayne D Rogers*

Wayne Rogers
Certified General Real Estate Appraiser
GA 10541-Dc

WR

7905 DEEPWELL DR, BETHESDA, MD. 20817  OFFICE: 301-717-8137 FAX: 301-365-6144

F.A.B APPRAISALS INC.

1715 Kilbourne

## Uniform Residential Appraisal Report

File No. 6-062kil

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | |
|---|---|---|
| Property Address 1715 Kilbourne Pl Nw | City Washington | State DC  Zip Code 20010 |
| Borrower Carlos Allen | Owner of Public Record Carlos Allen | County District of Columbia |
| Legal Description 2602/0090 Mount Pleasant | | |
| Assessor's Parcel # 2602/0090 | Tax Year 2015 | R.E. Taxes $ 6,769 |
| Neighborhood Name Mount Pleasant | Map Reference 9J8 | Census Tract 0027.02 |

Occupant [X] Owner [ ] Tenant [ ] Vacant    Special Assessments $ 0    [ ] PUD  HOA $ 0  [ ] per year  [ ] per month
Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)
Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) Estimate of Value
Lender/Client Carlos Allen    Address 1715 Kilbourne Pl Nw, Washington, DC 20010
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No
Report data source(s) used, offering price(s), and date(s). MRIS.

[ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ ___ Date of Contract ___ Is the property seller the owner of public record? [ ] Yes [ ] No  Data Source(s) ___
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | | | Property Values [ ] Increasing [X] Stable [ ] Declining | | | PRICE | AGE | One-Unit | 90% % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | | | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | | | $(000) | (yrs) | 2-4 Unit | % |
| Growth [ ] Rapid [X] Stable [ ] Slow | | | Marketing Time [X] Under 3 mths [ ] 3-6 mths [ ] Over 6 mths | | | 800 Low | 100 | Multi-Family | % |
| Neighborhood Boundaries Military Rd to the North, Georgia Ave to the East, Mass. Ave to the | | | | | | 1400 High | 113 | Commercial | 5% % |
| South and Rock Creek Park to the West. | | | | | | 1055 Pred. | 105 | Other VAC | 5% % |

Neighborhood Description See Attached Addendum

Market Conditions (including support for the above conclusions) See Attached Addendum

| | | | |
|---|---|---|---|
| Dimensions No plat available. | Area 1943 sf | Shape Typical | View N;Res; |
| Specific Zoning Classification Residential | Zoning Description Residential | | |

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)
Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street Asphalt | [X] | [X] |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley Asphalt | [X] | [X] |

FEMA Special Flood Hazard Area [ ] Yes [X] No  FEMA Flood Zone X  FEMA Map # 1100010016C  FEMA Map Date 09/27/2010
Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No  If No, describe.
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No  If Yes, describe. The utilities
were on and in working condition.

| GENERAL DESCRIPTION | | FOUNDATION | | EXTERIOR DESCRIPTION  materials/condition | | INTERIOR  materials/condition | |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | | [ ] Concrete Slab [ ] Crawl Space | | Foundation Walls Concrete | | Floors Hrdwd-/W-W-Avg | |
| # of Stories 3 | | [X] Full Basement [ ] Partial Basement | | Exterior Walls Brick/Siding-Avg | | Walls Drywall-Avg | |
| Type [ ] Det. [X] Att. [ ] S-Det./End Unit | | Basement Area 870 sq. ft. | | Roof Surface Composite | | Trim/Finish Wood-Avg | |
| [X] Existing [ ] Proposed [ ] Under Const. | | Basement Area 10 % | | Gutters & Downspouts Metal-Avg | | Bath Floor Tile-Avg | |
| Design (Style) Colonial | | [X] Outside Entry/Exit [ ] Sump Pump | | Window Type D/H-Avg | | Bath Wainscot Tile-Avg | |
| Year Built 1907 | | Evidence of [ ] Infestation | | Storm Sash/Insulated Yes | | Car Storage [ ] None | |
| Effective Age (Yrs) 25 Yrs | | [ ] Dampness [ ] Settlement | | Screens Yes | | [X] Driveway  # of Cars 2 | |
| Attic [ ] None | | Heating [ ] FWA [ ] HWBB [X] Radiant | | Amenities [ ] WoodStove(s) # 0 | | Driveway Surface Paved | |
| [ ] Drop Stair [ ] Stairs | | [ ] Other  Fuel Gas | | [ ] Fireplace(s) # 0 [ ] Fence None | | [ ] Garage  # of Cars 0 | |
| [ ] Floor [X] Scuttle | | Cooling [ ] Central Air Conditioning | | [X] Patio/Deck Patio [ ] Porch None | | [ ] Carport  # of Cars 0 | |
| [ ] Finished [ ] Heated | | [ ] Individual [X] Other Wac | | [ ] Pool None [ ] Other None | | [ ] Att. [ ] Det. [ ] Built-in | |
| Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [ ] Disposal [X] Microwave [X] Washer/Dryer [ ] Other (describe) | | | | | | | |
| Finished area above grade contains: 8 Rooms  5 Bedrooms  2.0 Bath(s)  2,690 Square Feet of Gross Living Area Above Grade | | | | | | | |

Additional features (special energy efficient items, etc.). Typical for age and community.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). C4;Kitchen-updated-eleven to fifteen years
ago;Bathrooms-updated-eleven to fifteen years ago;The subject was found in average condition, much of the house could be updated,
Hvac, Kitchen, baths, basement, etc. Please note pictures.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No  If Yes, describe.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No  If No, describe.

F.A.B APPRAISALS INC.

1715 Kilbourne
File No 6-062kil

## Uniform Residential Appraisal Report

There are **3** comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 1,199,000 to $ 1,395,000
There are **9** comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 800,000 to $ 1,400,000

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1715 Kilbourne Pl Nw<br>Washington, DC 20010 | 3317 17th St Nw<br>Washington, DC 20010 | | 1841 Monroe St Nw<br>Washington, DC 20010 | | 1643 Newton St Nw<br>Washington, DC 20010 | |
| Proximity to Subject | | 0.16 miles NE | | 0.25 miles NW | | 0.24 miles NE | |
| Sale Price | $ | | $ 980,000 | | $ 900,000 | | $ 800,000 |
| Sale Price/Gross Liv Area | 0.00 sq. ft. | $ 387.97 sq. ft. | | $ 335.57 sq. ft. | | $ 294.33 sq. ft. | |
| Data Source(s) | | Mris #DC9512963;DOM 42 | | Mris #DC9667124;DOM 23 | | Mris #DC8659238;DOM 0 | |
| Verification Source(s) | | Mris/Tax Recds | | Mris/Tax Recds | | Mris/Tax Recds | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Conv;0 | | Cash;0 | | Conv;0 | |
| Date of Sale/Time | N;Res; | s02/16;c12/15 | | s07/16;c05/16 | | s03/16;c06/15 | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | | |
| Site | 1943 sf | 2095 sf | 0 | 2067 sf | 0 | 2063 sf | 0 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | AT3;Colonial | AT3;Colonial | | AT3;Colonial | | AT3;Colonial | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 109 | 113 | 0 | 108 | 0 | 103 | 0 |
| Condition | C4 | C3 | -49,000 | C4 | | C4 | |
| Above Grade | Total Bdrms Baths<br>8  5  2.0 | Total Bdrms Baths<br>8  4  2.1 | -2,500 | Total Bdrms Baths<br>9  5  2.1 | -2,500 | Total Bdrms Baths<br>9  4  2.0 | 0 |
| Room Count | | | | | | | 0 |
| Gross Living Area | 50  2,690 sq. ft. | 2,526 sq. ft. | 8,200 | 2,682 sq. ft. | 0 | 2,718 sq. ft. | 0 |
| Basement & Finished | 870sf87sfwo | 892sf820sfwo | 0 | 985sf740sfwo | 0 | 906sf681sfwo | 0 |
| Rooms Below Grade | 0rr0br0.1ba1o | 1rr0br1.0ba1o | -7,500 | 1rr0br1.0ba1o | -7,500 | 1rr0br1.0ba0o | -7,500 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Radiant Wac | Fwa-Cac | -15,000 | Radi-Cac | -15,000 | Fwa-Cac | -15,000 |
| Energy Efficient Items | Typical Package | Typical Package | | Typical Package | | Typical Package | |
| Garage/Carport | 2dw | None | 5,000 | 2dw | | None | 5,000 |
| Porch/Patio/Deck | Patio | Patio | | Patio | | Patio | |
| Fireplaces | None | None | | None | | None | |
| Net Adjustment (Total) | | [ ]+ [X]- $ | 60,800 | [ ]+ [X]- $ | 25,000 | [ ]+ [X]- $ | 17,500 |
| Adjusted Sale Price | | Net Adj -6.2% | | Net Adj -2.8% | | Net Adj -2.2% | |
| of Comparables | | Gross Adj 8.9% $ 919,200 | | Gross Adj 2.8% $ 875,000 | | Gross Adj 3.4% $ 782,500 | |

i [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s)  MRIS
My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s)  MRIS
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Mris | Mris | Mris | Mris |
| Effective Date of Data Source(s) | 07/12/2016 | 07/12/2016 | 07/12/2016 | 07/12/2016 |

Analysis of prior sale or transfer history of the subject property and comparable sales  The subject has not sold within the past 36 months. No Comparables sold within the past 12 months.

Summary of Sales Comparison Approach  See Attached Addendum.

Indicated Value by Sales Comparison Approach $  915,000
Indicated Value by: Sales Comparison Approach $915,000  Cost Approach (if developed) $ 926,700  Income Approach (if developed) $ 0
See attached...

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  The appraisal is made "as is".

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $  915,000
, which is the date of inspection and the effective date of this appraisal.
as of  07/12/2016

Freddie Mac Form 70 March 2005    UAD Version 9/2011    Page 2 of 6    Fannie Mae Form 1004 March 2005

F.A.B. Appraisal Inc.

F.A.B APPRAISALS INC.

## Uniform Residential Appraisal Report

1715 Kilbourne
File No. 6-062kil

**ADDITIONAL COMMENTS**

**COST APPROACH TO VALUE** (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)   Recent land sales, public records.

| | | | | |
|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | = $ | 420,000 |
| Source of cost service See attached addendum | Dwelling | 2,690 Sq.Ft. @ $ 200 | = $ | 538,000 |
| Quality rating from cost service Average   Effective date of cost data 07/12/2016 | Bsmt: 870 | Sq.Ft. @ $ 60 | = $ | 52,200 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | |
| See attached addendum | Garage/Carport 0 | Sq.Ft. @ $ 15.00 | = $ | 0 |
| | Total Estimate of Cost-New | | = $ | 590,200 |
| | Less   50   Physical | Functional | External | |
| | Depreciation 15% | | = $( | 88,530 ) |
| | Depreciated Cost of Improvements | | = $ | 501,670 |
| | "As-is" Value of Site Improvements | | = $ | 5,000 |
| Estimated Remaining Economic Life (HUD and VA only)   25 Years | INDICATED VALUE BY COST APPROACH | | = $ | 926,700 |

**INCOME APPROACH TO VALUE** (not required by Fannie Mae)

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $   0  Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)  Do to lack of data, the income approach was not developed.

**PROJECT INFORMATION FOR PUDs** (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes ☐ No  Unit type(s)  ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

| | | |
|---|---|---|
| Total number of phases | Total number of units | Total number of units sold |
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of an existing building(s) into a PUD?  ☐ Yes ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units?  ☐ Yes ☐ No  Data source(s)

Are the units, common elements, and recreation facilities complete?  ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

F.A.B APPRAISALS INC.

1715 Kilbourne

## Uniform Residential Appraisal Report

File No. 6-062kil

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1.   The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2.   The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3.   The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.   The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5.   The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6.   The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

F.A.B APPRAISALS INC.

## Uniform Residential Appraisal Report

1715 Kilbourne
File No. 6-062kil

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sales, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

F.A.B APPRAISALS INC.

## Uniform Residential Appraisal Report

1715 Kilbourne

File No. 6-062kil

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1.  I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2.  I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3.  The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4.  This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *Wayne D. Rogers* | Signature _____ |
| Name Wayne Rogers | Name _____ |
| Company Name F.A.B. APPRAISALS INC. | Company Name _____ |
| Company Address 7905 Deepwell Dr. | Company Address _____ |
| Bethesda, MD 20817 | |
| Telephone Number 301-717-8137 | Telephone Number _____ |
| Email Address FABAPPRAISALS@GMAIL.COM | Email Address _____ |
| Date of Signature and Report 07/13/2016 | Date of Signature _____ |
| Effective Date of Appraisal 07/12/2016 | State Certification # _____ |
| State Certification # | or State License # _____ |
| or State License # GA10541 | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State DC | |
| Expiration Date of Certification or License 02/28/2018 | |
| Certified Residential Real Estate Appraiser | |
| ADDRESS OF PROPERTY APPRAISED | **SUBJECT PROPERTY** |
| 1715 Kilbourne Pl Nw | ☐ Did not inspect subject property |
| Washington, DC 20010 | ☐ Did inspect exterior of subject property from street |
| | Date of Inspection _____ |
| APPRAISED VALUE OF SUBJECT PROPERTY $ 915,000 | ☐ Did inspect interior and exterior of subject property |
| | Date of Inspection _____ |
| LENDER/CLIENT | |
| Name Mr Allen | **COMPARABLE SALES** |
| Company Name Carlos Allen | ☐ Did not inspect exterior of comparable sales from street |
| Company Address 1715 Kilbourne Pl Nw | ☐ Did inspect exterior of comparable sales from street |
| Washington, DC 20010 | Date of Inspection _____ |
| Email Address On File | |

Freddie Mac Form 70 March 2005          UAD Version 9/2011          Produced using ACI software, 800.234.8727 www.aciweb.com          Fannie Mae Form 1004 March 2005
Page 6 of 6                                                                1004_05GRID 12162013

F.A.B. Appraisal Inc.

## Uniform Residential Appraisal Report

1715 Kilbourne
File No 6-062kil

| FEATURE | SUBJECT | | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|---|
| Address | 1715 Kilbourne Pl Nw<br>Washington, DC 20010 | | 3161 18th St Nw<br>Washington, DC 20010 | | 2033 Park Rd Nw<br>Washington, DC 20010 | | | |
| Proximity to Subject | | | 0.08 miles SW | | 0.38 miles NW | | | |
| Sale Price | $ | | $ | 1,199,000 | $ | 1,199,000 | $ | |
| Sale Price/Gross Liv. Area | 0.00 sq. ft. | | 485.62 sq. ft. | | 457.63 sq. ft. | | sq. ft. | |
| Data Source(s) | | | Mris #DC9711767;DOM 73 | | Mris #DC9678505;DOM 16 | | | |
| Verification Source(s) | | | Mris/Tax Recds | | Mris/Tax Recds | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | | Listing | | Listing | | | |
| Concessions | | | ;0 | | ;0 | | | |
| Date of Sale/Time | | | Active | -11,990 | c07/16 | -11,990 | | |
| Location | N;Res; | | N;Res; | | N;Res; | | | |
| Leasehold/Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | | | |
| Site | 1943 sf | | 1428 sf | 0 | 2574 sf | -59,950 | | |
| View | N;Roc; | | N;Res; | | N,Res,, | | | |
| Design (Style) | AT3;Colonial | | AT3;Colonial | | AT3;Colonial | | | |
| Quality of Construction | Q3 | | Q3 | | Q3 | | | |
| Actual Age | 109 | | 100 | 0 | 105 | 0 | | |
| Condition | C4 | | C2 | -119,900 | C2 | -119,900 | | |
| Above Grade | Total | Bdrms | Baths | Total | Bdrms | Baths | | Total | Bdrms | Baths | | Total | Bdrms | Baths | |
| Room Count | 8 | 5 | 2.0 | 9 | 5 | 2.1 | -2,500 | 9 | 4 | 2.1 | -2,500 | | | | |
| Gross Living Area | 2,690 sq. ft. | | 2,469 sq. ft. | 11,050 | 2,620 sq. ft. | 0 | sq. ft. | |
| Basement & Finished | 870sf87sfwo | | 999sf734sfwo | 0 | 820sf620sfwo | 0 | | |
| Rooms Below Grade | 0rr0br0.1ba1o | | 1rr0br1.0ba2o | -7,500 | 1rr0br1.0ba1o | -7,500 | | |
| Functional Utility | Average | | Average | | Average | | | |
| Heating/Cooling | Radiant Wac | | Fwa-Cac | -15,000 | Radi/Cac | -15,000 | | |
| Energy Efficient Items | Typical Package | | Typical Package | | Typical Package | | | |
| Garage/Carport | 2dw | | None | 5,000 | 1gd2dw | -15,000 | | |
| Porch/Patio/Deck | Patio | | Patio | | Patio | | | |
| Fireplaces | None | | 2 F/p | -6,000 | 1 F/P | -3,000 | | |
| Net Adjustment (Total) | | | ☐ + ☒ - $ | 146,840 | ☐ + ☒ - $ | 234,840 | ☒ + ☐ - $ | 0 |
| Adjusted Sale Price | | | Net Adj. -12.2% | | Net Adj. -19.6% | | Net Adj. 0.0% % | |
| of Comparables | | | Gross Adj 14.9% $ | 1,052,160 | Gross Adj 19.6% $ | 964,160 | Gross Adj 0.0% % $ | 0 |

| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | COMPARABLE SALE NO. 5 | COMPARABLE SALE NO. 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Mris | Mris | Mris | |
| Effective Date of Data Source(s) | 07/12/2016 | 07/12/2016 | 07/12/2016 | |

Summary of Sales Comparison Approach    As shown on the above grid, comparables 4 and 5 are active listings.

F.A.B APPRAISALS INC.

## Uniform Appraisal Dataset Definitions

1715 Kilbourne
File No. 6-062kil

---

### Condition Ratings and Definitions

C1    The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.*

*Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and the recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

C2    The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

*Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

C3    The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

*Note: The improvement is in its first cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

C4    The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

*Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

C5    The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

*Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

C6    The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

*Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.

---

### Quality Ratings and Definitions

Q1    Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2    Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high quality tract developments featuring residences constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high-quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Q3    Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4    Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5    Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6    Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

---

### Definitions of Not Updated, Updated, and Remodeled

**Not Updated**
Little or no updating or modernization. This description includes, but is not limited to, new homes.
Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

**Updated**
The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.
An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

**Remodeled**
Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.
A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of square footage). This would include a complete gutting and rebuild.

---

### Explanation of Bathroom Count

The number of full and half baths is reported by separating the two values by a period. The full bath is represented to the left of the period. The half bath count is represented to the right of the period. Three quarter baths are to be counted as a full bath in all cases. Quarter baths (baths that feature only toilet) are not to be included in the bathroom count.

F.A.B APPRAISALS INC.

## Uniform Appraisal Dataset Definitions

1715 Kilbourne
File No. 6-062kil

### Abbreviations Used in Data Standardization Text

| Abbrev. | Full Name | Appropriate Fields | Abbrev. | Full Name | Appropriate Fields |
|---|---|---|---|---|---|
| ac | Acres | Area, Site | In | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| AdjPrk | Adjacent to Park | Location | Lndfl | Landfill | Location |
| AdjPwr | Adjacent to Power Lines | Location | LtdSght | Limited Sight | View |
| A | Adverse | Location & View | Listing | Listing | Sale or Financing Concessions |
| ArmLth | Arms Length Sale | Sale or Financing Concessions | MR | Mid-Rise Structure | Design(Style) |
| AT | Attached Structure | Design(Style) | Mtn | Mountain View | View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade | N | Neutral | Location & View |
| br | Bedroom | Basement & Finished Rooms Below Grade | NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| B | Beneficial | Location & View | op | Open | Garage/Carport |
| BsyRd | Busy Road | Location | o | Other | Basement & Finished Rooms Below Grade |
| cp | Carport | Garage/Carport | O | Other | Design(Style) |
| Cash | Cash | Sale or Financing Concessions | Prk | Park View | View |
| CtySky | City View Skyline View | View | Pstrl | Pastoral View | View |
| CtyStr | City Street View | View | PwrLn | Power Lines | View |
| Comm | Commercial Influence | Location | PubTrn | Public Transportation | Location |
| c | Contracted Date | Date of Sale/Time | rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Conv | Conventional | Sale or Financing Concessions | Relo | Relocation Sale | Sale or Financing Concessions |
| cv | Covered | Garage/Carport | REO | REO Sale | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions | Res | Residential | Location & View |
| DOM | Days On Market | Data Sources | R1 | Row or Townhouse | Design(Style) |
| DT | Detached Structure | Design(Style) | RH | Rural Housing - USDA | Sale or Financing Concessions |
| dw | Driveway | Garage/Carport | SD | Semi-detached Structure | Design(Style) |
| Estate | Estate Sale | Sale or Financing Concessions | s | Settlement Date | Date of Sale/Time |
| e | Expiration Date | Date of Sale/Time | Short | Short Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions | sf | Square Feet | Area, Site, Basement |
| g | Garage | Garage/Carport | sqm | Square Meters | Area, Site, Basement |
| ga | Garage - Attached | Garage/Carport | Unk | Unknown | Date of Sale/Time |
| gbi | Garage - Built-in | Garage/Carport | VA | Veterans Administration | Sale or Financing Concessions |
| gd | Garage - Detached | Garage/Carport | wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| GR | Garden Structure | Design(Style) | wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| GlfCse | Golf Course | Location | WtrFr | Water Frontage | Location |
| Glfvw | Golf Course View | View | Wtr | Water View | View |
| HR | High Rise Structure | Design(Style) | w | Withdrawn Date | Date of Sale/Time |
| Ind | Industrial | Location & View | Woods | Woods View | View |

### Other Appraiser-Defined Abbreviations

| Abbrev. | Full Name | Appropriate Fields | Abbrev. | Full Name | Appropriate Fields |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

Produced using ACI software, 800 734 8727 www.aciweb.com
Uniform Appraisal Dataset Definitions

1004_09UAD 12/10/2015

| Borrower: Carlos Allen | File No.: 6-062kil | |
| Property Address: 1715 Kilbourne Pl Nw | Case No.: 1715 Kilbourne | |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | |

### NEIGHBORHOOD DESCRIPTION
The subject property is located in northwest washington, dc.  The area has your typical infra structure, including shopping, employment, road, public transportation, and schools.  Utilities include public water and sewer.  This is a mature area, where homes are both new and being sold for the second and third times. The appraiser noted no particular negative factors in the immediate community.

### NEIGHBORHOOD MARKET CONDITIONS
This property is in a standard conventional marketplace; although va and fha loans are made also typical points are 1 to 3.  Sellers are accustomed to contributing towards closing.  This is a typical in the area wide marketplace and does not effect the value.  The market at present seems stable and market time falls in the 00 to 073 day time period, with median being 06 days.

### COMMENTS ON SALES COMPARISON
Scope of the Appraisal:

In order to estimate the subject's property market value, as of the date of the appraisal, a systematic procedure has been made to reach a logical final value conclusion.  Of the three approaches to value, the sales comparison approach and the cost approach are relied upon the estimate of the subject's market value.

Upon receiving the appraisal order, county assessor's records are researched to obtain basic property information such as the last sale date and price, lot size, zoning, assessments utilities present, real estate taxes, census tracts and other pertinent data as required in the appraisal report.  Than the local multiple listing service is consulted to research the subject property, if available, recent sale, contract sales and current available listing in the subject's subdivision and immediate market area that are most similar to the subject property.  An appointment is than set up to inspect the subject property, both interior and exterior.  Following the interior and exterior inspection of the subject property, the appraiser visually inspects the exterior of the comparables selected that are most  similar to the subject property.

Upon completion of the sales comparison analysis, the appraiser develops the cost approach, using the marshall & swift cost handbook, local builder estimates and other pertinent residential cost information to arrive at the reproduction cost new of the subject property.  Depreciation is estimated by the appraiser which takes into consideration the effective age of the subject property and its remaining economic life and any functional or external obsolescence extracted via matched pair analysis.  Any depreciation is subtracted from the estimated cost, the value of the site as if vacant and available to be up to its highest and best use, is added to obtain a value via the cost research.

After analysis of the three approaches to value the direct sales comparison approach, reproduction cost new (cost approach) and the income approach, the appraiser logically reconciles all three approaches to value to arrive at a final estimate of property value (market value) as of the valuation date.  It should be the best, most probable figure obtainable under current market circumstances.  The final value estimate is rounded appropriate to emphasize the fact that it is an estimate.

Adjustments Noted:

In the category of condition, comparable one varies from the subject and thus receives an adjustment.

In the category of gross living area/room count and below grade rooms, all three comparables varied from the subject and thus received  adjustments based on market.

In the categories of heating and parking,  all three comparables varied from the subject and thus received adjustments based on market.

Additional/General Comments and Assumptions:

All information obtained by the appraiser from any source or provided to the appraiser by others is assumed to be correct.  The appraiser reserves the right to change any information in this report, including the final value estimate, upon notification that such information provided by others was indeed incorrect.  The appraiser assumes no liability in such cases.

Appraiser is required to view the subject and all comparables used in the valuation, in some cases however, the appraiser is

| Borrower: Carlos Allen | | File No.: 6-062kil | |
|---|---|---|---|
| Property Address: 1715 Kilbourne Pl Nw | | | Case No.: 1715 Kilbourne |
| City: Washington | | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | | |

unable to obtain an image of a comparable property due to its location on its lot (home obscured by terrain or foliage), weather, time of day, etc. In such cases, in order to provide the reader with the best visual representation, alternative image sources must be utilized to obtain adequate images. To the best of the appraiser's knowledge, these images have not been altered in any way.

No adj = no adjustment. This is utilized so the reader can easily recognize that the appraiser IS AWARE THAT THE Subject and comparables differ in regard to a particular feature, but in the appraiser's opinion no adjustment is considered appropriate.

The gross living areas for the comparables properties are derived from public records, builder supplied data, in-house appraisal files or various field measurements techniques. Although deemed accurate, they should be considered approximations.

The intended use of this appraisal report is lender/client. The intended use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated scope of work, purpose of the appraisal, reporting requirements of the appraisal report form, and definition of market value. No additional intended users are identified by the appraiser.

The appraiser has prepared this appraisal in full compliance with the home valuation code of conduct and has not performed, participated in, or been associated with any activity in violation of the code.

I have performed no other services, as an appraiser or in any other capacity, regarding the property that is the subject of the work under review within the three-year period immediately preceding acceptance of this assignment.

Exposure time: Estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

As noted on the 1004mc, exposure time is 1-3 months.

Comment: exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market.

**FINAL RECONCILIATION**
The appraiser placed most of the weight on the sales comparison approach since this is the method that is used by buyers. The cost approach supports the sales comparison approach and final value conclusion. The income approach was not used due to the lack of data.

This appraisal has been performed with data that is commonly available to appraisers (public records) data limitations results when information provided by others from non-public sources (realtors, attorneys, accountants, etc.) are utilized and believed to be true and correct.

This appraisal is an opinion of value based on an analysis of information known to the appraiser at the time of appraisal. The appraiser assumes no responsibility for economic factors occurring at some later date due to changing local, state, or national economic conditions of the money market or changes or capital which may affect the opinions or conclusions herein.

This appraisal report is intended for use in a mortgage finance transaction only. This report is not intended for any other use. This is a summary appraisal report.

Finally this appraisal has been developed for the exclusive use of the client named on this appraisal, and for no one else. That use can only be obtained in writing by f.A.B. Appraisal and no one else. It can not be assigned without written consent by f.A.B. Appraisal.
**SOURCE OF COST DATA**
Marshall and swift and local contractors
**COST APPROACH COMMENTS**

Addendum Page 2 of 3

| Borrower: Carlos Allen | | File No.: 6-062kil |
|---|---|---|
| Property Address: 1715 Kilbourne Pl Nw | | Case No.: 1715 Kilbourne |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | |

Physical depreciation is calculated using the effective age/economic life method.  No significant functional obsolescence or external depreciation was noted.  Costs are based on industry accepted cost manuals and local builders.  The land to value ratio is normal for the area and marketplace.  The remaining economic life is estimated to be forty-eight plus years.

Addendum Page 3 of 3

F.A.B APPRAISALS INC.

## Market Conditions Addendum to the Appraisal Report

1715 Kilbourne
File No. 6-062kil

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| Property Address 1715 Kilbourne Pl Nw | City Washington | State DC | Zip Code 20010 |
|---|---|---|---|

Borrower Carlos Allen

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 4 | 0 | 5 | Increasing | X Stable | Declining |
| Absorption Rate (Total Sales/Months) | 0.7 | 0.0 | 1.7 | Increasing | X Stable | Declining |
| Total # of Comparable Active Listings | 0 | 0 | 3 | Declining | X Stable | Increasing |
| Months of Housing Supply (Total Listings/Ab. Rate) | 0.0 | 0.0 | 1.8 | Declining | X Stable | Increasing |

| Median Sale & List Price, DOM, Sale/List % | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Median Comparable Sale Price | 1,065,000 | 0 | 1,051,000 | X Increasing | Stable | Declining |
| Median Comparable Sales Days on Market | 10 | 0 | 0 | Increasing | X Stable | Declining |
| Median Comparable List Price | 0 | 0 | 1,250,000 | Increasing | X Stable | Declining |
| Median Comparable Listings Days on Market | 0 | 0 | 6 | Declining | X Stable | Increasing |
| Median Sale Price as % of List Price | 98.0% | 0.0% | 100.0% | Increasing | X Stable | Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | X Yes | No | | | | |

Explain in detail the seller concessions trends for the past 12 months (e.g. seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.)
In this given market the sellers and buyers tend to split closing costs. This ranges from 3% up to 6%. This closing cost include points recording and taxes.

Are foreclosure sales (REO sales) a factor in the market?    X Yes    No    If yes, explain (including the trends in listings and sales of foreclosed properties)
Over the past 24 months foreclosures have been a large part of inventory. To the extend that the absorption rate raised, helping the market to fall. As fewer foreclosures remain on the market they are having less and less of an impact.

Cite data sources for above information.  Mris, public records, realtors, and knowledge of the market.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
The market is stable, dom is less than 6 months, inventory is less than 6 months, list to sale is over 95% and prices are stable.

Please note there were good sales and listing in the immediate community, but they did not break down in the time frames marked above. THUS THIS LED TO "0" AND "N/A"

If the subject is a unit in a condominium or cooperative project, complete the following: N/A         Project Name:

| Subject Project Data | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | Increasing | Stable | Declining |
| Absorption Rate (Total Sales/Months) | | | | Increasing | Stable | Declining |
| Total # of Active Comparable Listings | | | | Declining | Stable | Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | | | | Declining | Stable | Increasing |

Are foreclosure sales (REO sales) a factor in the project?    Yes    No    If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.
THE SUBJECT IS NOT A CONDO

Summarize the above trends and address the impact on the subject unit and project.   The subject is not a condo

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *Wayne D Rogers* | Signature |
| Name Wayne Rogers | Name |
| Company Name F.A.B. APPRAISALS INC. | Company Name |
| Company Address 7905 Deepwell Dr. | Company Address |
| Bethesda, Md  20817 | |
| State License/Certification # GA10541    State DC | State License/Certification #    State |
| Email Address FABAPPRAISALS@GMAIL.COM | Email Address |

Freddie Mac Form 71 March 2009                Page 1 of 1                Fannie Mae Form 1000MC March 2009

SUBJECT PROPERTY PHOTO ADDENDUM

| Borrower: Carlos Allen | | File No.: 6-062kil |
|---|---|---|
| Property Address: 1715 Kilbourne Pl Nw | | Case No.: 1715 Kilbourne |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: July 12, 2016
Appraised Value: $ 915,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

| Borrower: Carlos Allen | File No.: 6-062kil |
| Property Address: 1715 Kilbourne Pl Nw | Case No.: 1715 Kilbourne |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | |



Kitchen

Comment:



Living Area

Description:

Comment:



Bathroom

Description:
1

Comment:

BATHROOM PHOTOS

| | |
|---|---|
| Borrower: Carlos Allen | File No.: 6-062kil |
| Property Address: 1715 Kilbourne Pl Nw | Case No.: 1715 Kilbourne |
| City: Washington | State: DC   Zip: 20010 |
| Lender: Carlos Allen | |



Dining

Comment:



Bedroom

Comment:



Bedroom

Comment:

INTERIOR PHOTOS

| | |
|---|---|
| Borrower: Carlos Allen | File No.: 6-062kil |
| Property Address: 1715 Kilbourne Pl Nw | Case No.: 1715 Kilbourne |
| City: Washington    State: DC | Zip: 20010 |
| Lender: Carlos Allen | |



Bedroom

Comment:



Bathroom

Comment:



Bedroom

Comment:

| Borrower: Carlos Allen | | File No.: 6-062kil |
| Property Address: 1715 Kilbourne Pl Nw | | Case No.: 1715 Kilbourne |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | |



Bedroom



Basement



Basement
Powder

F.A.B. APPRAISALS

| Borrower  Carlos Allen | | File No.:  6-062kil |
|---|---|---|
| Property Address: 1715 Kilbourne Pl Nw | | Case No.: 1715 Kilbourne |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | |



Basement

Walkout



Basement
Finished Area



Basement
Boiler

F.A.B. APPRAISALS

| Borrower: Carlos Allen | | File No.: 6-062kil |
|---|---|---|
| Property Address: 1715 Kilbourne Pl Nw | | Case No.: 1715 Kilbourne |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | |



Street
other



Front
other



COMPARABLE PROPERTY PHOTO ADDENDUM

| | | File No.: b-052kll |
|---|---|---|
| Borrower: Carlos Allen | | |
| Property Address: 1715 Kilbourne Pl Nw | | Case No.: 1715 Kilbourne |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | |



COMPARABLE SALE #1

3317 17th St Nw
Washington, DC 20010
Sale Date: s02/16;c12/15
Sale Price: $ 980,000



COMPARABLE SALE #2

1841 Monroe St Nw
Washington, DC 20010
Sale Date: s07/16;c05/16
Sale Price: $ 900,000



COMPARABLE SALE #3

1643 Newton St Nw
Washington, DC 20010
Sale Date: s03/16;c06/15
Sale Price: $ 800,000

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Carlos Allen | File No.: 6-062kil |
| Property Address: 1715 Kilbourne Pl Nw | Case No.: 1715 Kilbourne |
| City: Washington | State: DC  Zip: 20010 |
| Lender: Carlos Allen | |



COMPARABLE SALE #4

3161 18th St Nw
Washington, DC 20010
Sale Date: Active
Sale Price: $ 1,199,000



COMPARABLE SALE #5

2033 Park Rd Nw
Washington, DC 20010
Sale Date: c07/16
Sale Price: $ 1,199,000

COMPARABLE SALE #6

Sale Date:
Sale Price: $

| Borrower: Carlos Allen | | File No.: 6-062kil | |
| Properly Address: 1715 Kilbourne Pl Nw | | Case No : 1715 Kilbourne | |
| City: Washington | | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | | |



Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | First Floor | 1130.00 | 1130.00 |
| GLA2 | Second Floor | 870.00 | 870.00 |
| GLA3 | Third Floor | 690.00 | 690.00 |
| BSMT | Basement | 870.00 | 870.00 |
| | | | |
| | TOTAL LIVABLE    (rounded) | | 2690 |

| LIVING AREA BREAKDOWN | | | |
|---|---|---|---|
| | Breakdown | | Subtotals |
| First Floor | | | |
| | 4.0 | x 10.0 | 40.00 |
| | 1.0 | x 10.0 | 10.00 |
| | 20.0 | x 40.0 | 800.00 |
| | 14.0 | x 20.0 | 280.00 |
| Second Floor | | | |
| | 4.0 | x 10.0 | 40.00 |
| | 1.0 | x 10.0 | 10.00 |
| | 20.0 | x 41.0 | 820.00 |
| Third Floor | | | |
| | 4.0 | x 10.0 | 40.00 |
| | 1.0 | x 10.0 | 10.00 |
| | 2.0 | x 20.0 | 40.00 |
| | 20.0 | x 30.0 | 600.00 |
| 11 Calculations Total (rounded) | | | 2690 |

**LOCATION MAP**



| Borrower: Carlos Allen | File No.: 6-062kil |
| Property Address: 1715 Kilbourne Pl Nw | Case No.: 1715 Kilbourne |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | |

| Borrower: Carlos Allen | | File No.: 6-062kil | |
| Property Address: 1715 Kilbourne Pl Nw | | Case No.: 1715 Kilbourne | |
| City: Washington | State: DC | | Zip: 20010 |
| Lender: Carlos Allen | | | |



**FLOOD INFORMATION**

Community: DISTRICT OF COLUMBIA
Property is NOT in a FEMA Special Flood Hazard Area
Map Number: 1100010016C
Panel: 0016C
Zone: X
Map Date: 09-27-2010
FIPS: 11001
Source: FEMA DFIRM

**LEGEND**

= FEMA Special Flood Hazard Area - High Risk

= Moderate and Minimal Risk Areas

Road View:

= Forest          = Water

Sky Flood™

No representation or warranties to any party concerning the content, accuracy or completeness of this flood report, including any warranty of merchantability or fitness for a particular purpose is implied or provided. Visual scaling factors differ between map layers and are separate from flood zone information at earlier location. No liability is accepted to any third party for any use or misuse of this flood map or its data.

7905 DEEPWELL DR, BETHESDA, MD. 20817  OFFICE: 301-717-8137 FAX: 301-365-6144

LICENSE

| Borrower: Carlos Allen | | File No.: 6-062kil |
|---|---|---|
| Property Address: 1715 Kilbourne Pl Nw | | Case No.: 1715 Kilbourne |
| City: Washington | State: DC | Zip: 20010 |
| Lender: Carlos Allen | | |

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
Occupational and Professional Licensing Administration

**Appraiser Board**
*certifies that*
**WAYNE D ROGERS**
7905 DEEPWELL DR
BETHESDA MD 20817

*has met all the requirements prescribed*
*by law and regulations and is hereby licensed as a(n):*
Certified General Appraiser
License Number: GA10541
Issue Date: 07-31-2001
Expiration Date: 02-29-2016

Director, Department of Consumer and Regulatory Affairs

| Borrower: Carlos Allen | | File No.:   6-062kil | |
|---|---|---|---|
| Property Address: 1715 Kilbourne Pl Nw | | Case No.: 1715 Kilbourne | |
| City: Washington | State: DC | | Zip: 20010 |
| Lender: Carlos Allen | | | |

## LEXINGTON INSURANCE COMPANY
### WILMINGTON, DELAWARE
Administrative Offices - 99 High Street, Floor 23, Boston, Massachusetts 02110-2378

| Certificate Number: | 018391153-03 |
|---|---|
| This Certificate forms a part of Master Policy Number: | 018389876-03 |
| Renewal of Master Policy Number : | 018389876-02 |

**YOUR RISK PURCHASING GROUP MASTER POLICY IS A CLAIMS MADE POLICY.
READ THE ATTACHED MASTER POLICY CAREFULLY**

### THE AMERICAN ACADEMY OF STATE CERTIFIED APPRAISERS

#### CERTIFICATE DECLARATIONS

1. Name and Address of Certificate Holder:   **FAB Appraisals, Inc.**

      **7905 Deepwell Drive**
      **Bethesda**                        **MD      20817**

2. Certificate Period:      Effective Date:   **12/06/15**    to Expiration Date:   **12/06/16**
                           12.01 a.m. Local Time at the Address of the Insured.

2a. Retroactive Date:      **12/06/06**
                           12:01 a.m. Local Time at the Address of the Insured.

3. Limit of Liability:     $   1,000,000   each claim
                           $   1,000,000   aggregate limit

4. Deductible:             $      2,500   each claim

5. Professional Covered Services insured by this policy are:  REAL ESTATE APPRAISAL SERVICES

6. Advance Certificate Holder Premium:              $          670

7. Minimum Earned Premium:   25% or              $          168

**Forms and Endorsements:**
PRG 3150 (10/05) Real Estate Appraisers Professional Liability Declarations, PRG 3512 (07/12) Real Estate Appraisers
Professional Liability Coverage Form, 76713 (05/13) Addendum to the Declarations, 89644 (6/13) Economic Sanctions
Endorsement, 91222 (04/13) Policyholder Notice, 118477 (03/15) Policyholder Notice

Additional Endorsements applicable to this Certificate only:
None

Agency Name and Address:                **INTERCORP, INC.**
                                       **1438-F West Main Street**
                                       **Ephrata, PA 17522-1345**

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE CERTIFICATE HOLDER AGREES TO ALL TERMS AND CONDITIONS AS
SET FORTH IN THE ATTACHED MASTER POLICY.

THIS POLICY IS ISSUED BY YOUR RISK PURCHASING GROUP INSURER WHICH MAY NOT BE SUBJECT TO ALL OF THE
INSURANCE LAWS AND REGULATIONS OF YOUR STATE. STATE INSURANCE INSOLVENCY GUARANTY FUNDS ARE NOT
AVAILABLE FOR YOUR RISK PURCHASING GROUP INSURER

                                                              County: Montgomery

                           Authorized Representative OR
Countersignature (in states where applicable)                 Date: December 3, 2015

PRG 3152 (10/05)

# EAGLEBANK

**EagleBank Business Check Card Application**

Customer Name: Amg Inc                                              (the "Company")
(Legal Name of Business Entity)

Applicant's name as it should appear on the card (19 character maximum – no titles or surnames):

Name # 1: Carlos R Allen            SSN:            Home Phone: 240-678-9846

Card Number: �" "

Business Name as it should appear on card (19 character maximum): Amg Inc

Business Tax ID Number: ▀▀▀▀            Business Telephone: 240-678-9846

Business Address: 1715 Kilborne Pl Nw

City: Washington            State: DC    Zip: 20010

Designated Primary Business Checking Account the card(s) will access: ▀▀▀
(Primary account cannot be a ZBA)

Add Checking Accounts:

Add Savings Accounts:

*(handwritten, boxed)*
DEFENDANTS
EXHIBIT
K
16-10027

**Overnight Delivery**
- ☐ I authorize a charge to my account of $55.00 for overnight delivery of VISA debit card
- ☐ I authorize a charge to my account of $55.00 for overnight delivery of PIN for VISA debit card

Customer's signature: _____
(scan into Vision Content; email Electronic Banking for notification)

**To be signed by an Authorized Signer on the Company account**
I/We request and authorize EagleBank (the "Bank") to issue a Business Check Card (the "Card") to the Applicant named above    The Applicant will be provided direct access to the "Company" account(s) identified above, via direct debit and ATM withdrawal transactions; any use of the "Card" by the Applicant is authorized by the "Company"; the "Company" will be liable for all transactions on the "Card" by the Applicant. The Applicant and the "Company" are bound by the Business Check Card Agreement, the Business Check Card Rules and Regulations, the Bank's Deposit Account Rules and Regulations, for all matters relating to the "Card", and use of the "Card" including, but not limited to, loss or theft of any "Card", disclosure of any assigned Personal Identification Number (the "PIN"), or any unauthorized use of the "Card", "PIN" or account(s). The Authorized Signer(s) understand and agree that each one and the Company will be liable for all authorized, unauthorized or fraudulent Card use, and that the Bank will charge the account(s) for every "Card" transaction, even if the "Card" transaction creates an overdraft on the account(s). The undersigned authorize the "Bank" to deduct the amount of every transaction immediately from the available balance in the account(s). If the account requires more than one Authorized Signer to authorize transactions, the required number of signers must complete this Business Check Card Request form. The Authorized Signers authorize each Applicant to use the "Card" in accordance with the terms of the Business Check Card Agreement and Rules and Regulations without regard to any multiple signature requirement.

| | | | |
|---|---|---|---|
| Carlos R Allen | President | (X) *signature* | 8/7/13 |
| Print Name | Title/Position | Authorized Signer | Date |
| | | | |
| Print Name | Title/Position | Authorized Signer | Date |
| | | | |
| Print Name | Title/Position | Applicant | Date |

**FOR INTERNAL USE ONLY– MISCELLANEOUS INFORMATION:**

Use this form to order a Business Check Card for:
1. An authorized signer on a business account.
2. An employee of the business designated by the authorized signer to have a card.

Branch Employee:            Date:            Ops Employee:            Date:

APPROVALS: Original Date of Relationship:            # NSF or Overdrafts this year:

Officer: _____

Case 16-10027-ELG    Doc 27    Filed 12/19/16    Entered 12/20/16 13:46:16    Desc Main
Document    Page 80 of 98

Case 16-10027    Doc 9-2    Filed 07/25/16    Entered 07/25/16 16:32:48    Desc Exhibit
Company Enrollment Complete Confirmation Eagle Bank Records    Page 8 of 15    Page 1 of 2

 **Business Service Tool**

| Reporting | Processing | Bank Setup | Company Setup | Messaging | |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| BIB Bank ID  100828 | EAGLEBANK #975<br>7815 WOODMONT AVENUE<br>*<br>BETHESDA, MD 20814<br>* | Company ID  1011487<br>Primary contact:  Carlos Allen<br>Profile:  DEFAULT | AMG Inc<br>1715 Kilborne Pl NW `<br>*<br>Washington, DC 20010<br>2406789846 | | Logoff<br>Company Lookup |

## Company Enrollment Complete - Confirmation

**The enrollment for this company is complete. A welcome email has been sent to the primary user with instructions on how to log in to Business Internet Banking.**

**The ACH Company ID must be setup for accounts automatically entitled to ACH and Funds Transfer services before the user can use these services in BIB.**

Select additional tasks below or return to Company Enrollment - Summary Report.

To assign CIS numbers or make other changes to this company, go to Company Maintenance. To edit account information or complete the setup of accounts automatically entitled to ACH and Funds Transfer services, go to Account Maintenance. To enter client billing information, go to Client Billing.

**Enrollment**

Enrollment Information

| | |
|---|---|
| **Enrollment request date:** | 08/07/2013 |
| **Enrollment status:** | Complete |
| **Service agreement version no:** | 2 |

Login Credentials

| | |
|---|---|
| **User ID:** | CARLOS5716 |
| **Primary e-mail address:** | carlos@amgrecording.com |
| **Telephone number:** | Mobile: +1 (240) 678-9846 |

RECEIVED AUG 0 7 2013

Company Information

Case 16-10027-ELG   Doc 27   Filed 12/19/16   Entered 12/20/16 13:46:16   Desc Main
Case 16-10027   Doc 9-2   Filed 07/25/16   Entered 07/25/16 16:32:48   Desc Exhibit
Company Enrollment Complete - Confirmation   Document   Page 81 of 98
Eagle Bank Records   Page 9 of 15
B0009
Page 2 of 2

| | |
|---|---|
| **Sponsor bank:** | 100828 - EAGLEBANK #975 |
| **Company ID:** | 1011487 |
| **Company:** | AMG Inc |
| **Name:** | Carlos Allen |
| **Title:** | President |
| **Telephone number:** | 2406789846 |
| **Fax:** | |
| **Email address:** | carlos@amgrecording.com |
| **Address line 1:** | 1715 Kilborne Pl NW' |
| **Address line 2:** | |
| **City:** | Washington |
| **State / Province:** | DC |
| **Zip code:** | 20010 |
| **Country:** | USA |
| **Bank branch:** | Gallery Place |
| **Bank reference ID:** | |
| **Tax ID number:** | ███████ |

**Account Information**

| TRC | Account Number | Description | Account Type |
|---|---|---|---|
| 055003298 | ████████ | Operating | Checking |

⑦ Help For This Page

# ⌐EAGLEBANK
## ExecuBank Implementation

### Account Authorization

Designate which service you would like associated with which account by placing an "X" in the box under the service. Photocopy and complete this form if needed.

Eligible Account Types are: Demand Deposit (DDA), Savings (SAV), Certificate of Deposit (CD), Demand Deposit Loan (DDL), Loan

| Account Type | Account Number | Bill Pay | Internal Transfer | ACH | Positive Pay | Wire Transfer | Full Reconciliation | Partial Reconciliation | Deposit Reconciliation |
|---|---|---|---|---|---|---|---|---|---|
| DDA | ▨▨▨▨▨▨ | ☑ | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Note: Online Inquiry and Stop Payment are automatically included in ExecuBank services.

_____    _____    _____    Date
Authorized Signer
Carlos R Allen        President        AMG Inc
Print Name and Title        Print Company Name

_____    Date
Authorized Signer

Print Name and Title        Print Company Name

## Quinn F. Wilson

From:      Quinn F. Wilson
Sent:      Wednesday, July 23, 2014 10:26 AM
To:        'carlos@amgrecording.com'
Subject:   IMPORTANT - Overdrawn Account (Account Closing)

Dear Mr. Allen,

The AMG Inc. account ending in ▮▮▮▮ is currently **overdrawn** in the amount of $104.00. The account is scheduled to be charge off by the bank and the account will be closed on July 25, 2014 if no deposit is made to the account. Please make a deposit to the account before Friday, July 25, 2014.

Thank you for your prompt attention to this matter. Should you have any questions, please contact me at (202) 628-7300.

Sincerely,

Quinn F. Wilson
EagleBank, *Relationships F·I·R·S·T*
AVP, Branch Service Manager
700 7th Street NW
Washington, DC 20001
Office: 202-292-1587
Fax: 202-628-6116
QWilson@eaglebankcorp.com
www.eaglebankcorp.com

1

Case 16-10027    Doc 9-2    Filed 07/25/16    Entered 07/25/16 16:32:48    Desc Exhibit
Eagle Bank Records    Page 12 of 15                                      B0012

# EAGLEBANK

### EagleBank Business Check Card: Maintenance Form
(This form must be scanned into Vision Content under header doc "Non-Common docs Business Check Card: Authorization & Request")

I am requesting the following maintenance action on the Business Check Card number listed below:

Business Check Card Number ▉▉▉▉▉▉

☑ Replacement of an existing damaged Business Check Card (Keeping the same card number and PIN).
☐ Changes to an existing Business Check Card

Change Primary Checking to:                     from
Change Primary Savings to:                      from
Add Checking Account(s)              ,      ,
Add Savings Account(s)               ,      ,
Delete Checking Account(s)               ,        ,
Delete Savings Account(s)              ,       ,

☐ Reissue of Existing PIN
☐ Close Card

Signature of authorized account signer requesting the above changes to their Business Check Card:
Print Name of Authorized Signer on accounts:

Approved by Quinn Wilson                                         09/04/2013
_____ Signature:_____ Date:_____

Designated Employee Issued Cards:
Print name of Card Signer below:

_____ Signature:_____ Date:_____

Authorized Signer for accounts listed above:  Approval of maintenance/change request
Print name below of Authorized Signer on accounts:

_____ Signature:_____ Date:_____

Overnight Delivery

☑  I authorize a charge to my account of $55.00 for overnight delivery of VISA debit card

☐  I authorize a charge to my account of $55.00 for overnight delivery of PIN for VISA debit card

Authorized signer's signature: Approved by Quinn Wilson
_____

FOR INTERNAL USE ONLY –          Branch Employee:              Date:

### Notice to Commercial Deposit Customers

"In accordance with the requirements of the Unlawful Internet Gambling
Enforcement Act of 2006 and Regulation GG, this notification is to inform you
that restricted transactions are prohibited from being processed through your
account or relationship with our institution. Restricted transactions are
transactions in which a person accepts credit, funds, instruments or other
proceeds from another person in connection with unlawful Internet gambling.
This Notice is now considered part of the Terms and Conditions of your account.

### Commercial Customer Certification
### Regarding Unlawful Internet Gambling Enforcement Act of 2006

The Unlawful Internet Gambling Act of 2006 (UIGEA) prohibits any person
engaged in the business of betting or wagering (as defined in the Act) from
knowingly accepting payments in connection with the participation of another
person in unlawful Internet gambling. The Department of Treasury and the
Federal Reserve Board have issued a joint final rule, Regulation GG, to
implement this Act.

As defined in Regulation GG, unlawful Internet gambling means to "place,
receive or otherwise knowingly transmit a bet or wager by any means which
involves the use, at least in part, of the Internet where such bet or wager is
unlawful under any applicable Federal or State law in the State or Tribal lands in
which the bet or wager is initiated, received or otherwise made".

As a commercial customer of EagleBank, these restricted transactions are
prohibited from being processed through my account or banking relationship with
EagleBank. If I do engage in an Internet gambling business, I will provide
evidence of my legal capacity to do so. In the future if I intend to engage in an
Internet gambling business, I will provide EagleBank with evidence of my legal
capacity to do so prior to conducting such business through this account.

I hereby certify that the business listed below does not engage in unlawful
Internet gambling.

Name of Business: Amg Inc _____

Authorized Signature for
Business Entity (X) _____    Date: _____

Authorized Signers Name: _____

Bank Employee: Quinn Wilson _____    Date: _____

## Quinn F. Wilson

From:           Quinn F. Wilson
Sent:           Monday, July 14, 2014 9:55 AM
To:             'carlos@amgrecording.com'
Subject:        Overdrawn Account-█████

Importance:     High

Dear Mr. Allen:

Please be advised that as of July 11,2 014, checking account ending ████ is overdrawn in the amount of $104.00, a negative balance that has now existed since June 23, 2014, a period of 19 consecutive days.

To return your account to good standing, we must receive a deposit to cover the overdrawn balance immediately upon receipt of this letter. Furthermore, until this matter is corrected, any additional checks or debits presented for payment will be returned and additional charges may be assessed to the account.

If a deposit is not received within ten days of the date of this letter, your account will be closed, and we will pursue recovery of the funds through alternative means. Failure to remit the requested monies may further impact your ability to open an account with another financial institution.

Should you have any questions concerning this matter, please contact me at (202) 628-7300.

Sincerely,

Quinn F. Wilson
EagleBank, *Relationships F•I•R•S•T*
AVP, Branch Service Manager
700 7th Street NW
Washington, DC 20001
Office: 202-292-1567
Fax: 202-628-8116
QWilson@eaglebankcorp.com
www.eaglebankcorp.com



July 8, 2014

AMG Inc.
Carlos Allen
1715 Kilborne Pl NW
Washington DC 20010-2605

Dear Mr. Allen:

Please be advised that as of 07/07/2014, checking account #░░░░░░░░ is overdrawn in the amount of $68.00. This negative balance has now existed since 06/26/2014, a period of 13 consecutive days.

To return your account to good standing, we must receive a deposit to cover the overdrawn balance immediately upon receipt of this letter. Furthermore, until this matter is corrected, any additional checks or debits presented for payment will be returned and additional charges may be assessed to the account. Your immediate attention to this matter is required to avoid any additional expense to you and any further action on our part.

Should you have any questions concerning this matter, please contact me at (202) 628-7300.

Sincerely,

Quintella F. Wilson
EagleBank, *Relationships F·I·R·S·T*
Assistant Vice President, Branch Service Manager
700 7th Street NW
Washington, DC 20001
Office: 202-292-1567
Fax: 202-628-6116
QWilson@eaglebankcorp.com
www.eaglebankcorp.com

The following signatures are required to complete and certify this Deposit Account Resolution and Authorization for Business Entities:

- **Sole Proprietorships:** The proprietor (owner).
- **Corporations:** The President, Secretary or Assistant Secretary.
- **Limited Liability Companies:** All Members or Managers, unless the Operating Agreement authorizes one or more Members or Managers to conduct banking business.
- **Unincorporated Organizations or Associations:** An Officer of the organization who is authorized by the Bylaws or Operating Agreement of the Company to conduct banking business.
- **General Partnerships and Limited Partnerships:** All General Partners, unless the Partnership Agreement designates one or more partners to conduct banking business.
- **Limited Liability Partnerships:** All Partners unless the Company has designated one or more Managing Partners.
- **Professional Corporations, Professional Service Corporations & Associations:** An Officer of the organization who is authorized by the Bylaws or Operating Agreement of the Company to conduct banking business.
- **Government Banking Entities:** The individual(s) authorized to sign on behalf of the Government Banking Entity as designated by the governing unit, e.g., Board of County Commissioners, Mayor, Secretary of State, *et al.* to conduct banking business.

| Name | Title | Signature |
|------|-------|-----------|
| *Carlos Allen* | *Board Member* | |

(Corporate Seal, if available)

Witness
By: *Michelle Sallie-Whittle*                    Date *07-20-2015*

Bank Representative Name                    Bank Representative Signature

---

COMPLETE THE SECTION BELOW FOR SIGNATURES NOT OBTAINED IN THE PRESENCE OF A BANK REPRESENTATIVE (Add pages for multiple notarized signatures)

Name                              Title                              Signature

STATE OF _____ COUNTY/PARISH OF _____

Sworn to before me this _____ day of _____

_____ Notary Public

(Revised 2/12)
81NAA13 (3/15) 310430          Products and services offered by Capital One, N.A., Member FDIC. ©2015 Capital One. All rights reserved.          Page 4 of 4

| Active ⌄ | Payments received ⌄ | All currencies ⌄ | 1/1/15 - 6/14/16 ⌄ |

| Date | Description | Amount |
| --- | --- | --- |
| Jun 8, 2016 | **Payment from Alexandre Coanlih**<br>Completed | $1,424.00 USD |
| May 31, 2016 | **Payment from Bradley Hamilton**<br>Completed | $950.00 USD |
| Apr 29, 2016 | **Payment from Bradley Hamilton**<br>Completed | $950.00 USD |
| Apr 5, 2016 | **Payment from Bradley Hamilton**<br>Completed | $950.00 USD |
| Feb 28, 2016 | **Payment from Bradley Hamilton**<br>Completed | $950.00 USD |
| Feb 17, 2016 | **Payment from Roderick Sweet**<br>Completed | $2,150.00 USD |
| Feb 14, 2016 | **Purchase to Roderick Sweet**<br>Completed | $1,550.00 USD |
| Jan 31, 2016 | **Payment from Bradley Hamilton**<br>Completed | $950.00 USD |
| Jan 22, 2016 | **Payment from Bijan Manavizadeh**<br>Completed | $950.00 USD |
| Dec 24, 2015 | **Payment from Bradley Hamilton**<br>Cleared | $1,900.00 USD |
| Nov 15, 2015 | **Payment from Rita Richardson**<br>Completed | $7.99 USD |
| Aug 10, 2015 | **Payment from Mary Henkin**<br>Completed | $950.00 USD |
| Jul 8, 2015 | **Payment from Mary Henkin**<br>Completed | $950.00 USD |
| Jun 20, 2015 | **Payment from Ali Nadeem**<br>Completed | $1.00 USD |
| Jun 5, 2015 | **Payment from Mary Henkin**<br>Completed | $950.00 USD |
| May 2, 2015 | **Payment from Mary Henkin**<br>Completed | $950.00 USD |
| Mar 14, 2015 | **Payment from Green Dot MoneyPak**<br>Completed | $20.00 USD |

*Handwritten annotation:*

DEFENDANT
Exhibit 4
Deposits into
PayPal For L
a year
16-10027

DEFENDANTS
EXHIBIT
M
16-10027

# AMG CONTRACT

AGREEMENT made this day August 13th 2013 by and between Karen R. Brooks 100% owner of AMG Inc. a newly formed company that will market music and back pain product called Healer Cream, hereinafter referred to as (Label) and ("AMG Incorporating Agent, Artist") Carlos Allen performing as **"MAYOR ALLEN"** hereinafter referred to as (Artist).

WHEREAS, Artist wishes to obtain funding, guidance, and furtherance of Artist's career, both individually and in Artist's capacity as a member of any group or hereafter becomes a member or otherwise associated as a musician, composer, arranger, publisher, recording artist, producer (in any medium), actor, writer, performing artist and marketer of :

NOW, THEREFORE, in consideration of the mutual promises herein contained, it is agreed as follows:

1. New Label agrees to render services as a music Label and to provide such advice, guidance, counsel, direction, alongside artist and other services as Artist may reasonably require to further Artist's career as a musician, composer, arranger, publisher, recording artist, producer (in any medium), actor, writer and performing artist and in such new and different areas within which Artist's artistic talents can be developed and exploited, including but not limited to the following services:

(a) To represent Artist and act as Artist's negotiator, and subject to artist's knowledge and approval, to fix the terms governing all manner of disposition, use, employment or exploitation of Artist's talents and the products thereof, it being understood, however, that nothing contained in this Agreement shall restrict Artist from retaining Artist's own attorney;

(b) To supervise and direct Artist's professional activities and, on Artist's behalf, to consult with others so as to assure the proper use and marketing of Artist's services; COSTS. Label shall be responsible for all costs incurred in the production of the Recording, including the prepayment of all travel, hotel and meal costs incurred by Artist in attending the recording sessions. Label will recover such receipted expenses pursuant to the production of master recordings or the advancement of the Artist's career. Label's purchase of production, promotion, manufacturing, websites, products, copyrights and all other bonafide expenses relating to Artist are deemed recoupable from gross income and property of Label.

(c) To be available at reasonable times and places to confer with Artist in connection with all matters concerning Artist's professional career, interests, services and publicity;

(d) To exploit Artist's personality in all media, and, in connection therewith, to approve and permit, for the purpose of trade, advertising and publicity, the use, dissemination, reproduction and publication of Artist's name, photographic likeness, voice and artistic and musical materials,

provided, however, that Artist's prior approval shall be required with respect to the use of Artist's name and/or likeness in any commercial endorsement, sponsorship and/or so-called "merchandising" agreements.

(e) To engage, discharge and/or direct such theatrical agents, booking agencies and employment agencies, as well as other firms, persons or corporation who may be retained for the purpose of securing contracts, engagements or employment for Artist, or otherwise necessary in carrying out Label's services hereunder;

(f) IT BEING UNDERSTOOD, HOWEVER, THAT LABEL HAS ADVISED ARTIST AND IT IS CLEARLY UNDERSTOOD THAT LABEL IS NOT A TALENT AGENCY, EMPLOYMENT AGENT OR THEATRICAL AGENT, BUT THAT LABEL IS ACTIVE SOLELY AS A MUSIC LABEL AND THAT LABEL IS NOT LICENSED AS A "TALENT AGENCY" OR BOOKING AGENT. LABEL HAS AT ALL TIMES ADVISED ARTIST THAT LABEL IS NOT LICENSED TO SEEK, PROCURE, OR OBTAIN EMPLOYMENT OR ENGAGEMENTS FOR ARTIST, AND LABEL DOES NOT AGREE TO DO SO. LABEL HAS MADE NO REPRESENTATIONS TO ARTIST, EITHER ORAL OR WRITTEN, TO THE CONTRARY, AND ARTIST ACKNOWLEDGES THAT LABEL IS NOT OBLIGATED, AUTHORIZED, LICENSED OR EXPECTED TO DO SO;

(g) To represent Artist in all dealings with any union; and

(h) To exercise the power of attorney granted to Label pursuant to paragraph "4" hereof.

(i)  To provide upon Artist's assignment of the Songs, Label shall be the sole property owner of such songs and masters made by artist.

2. Label is not required to render its exclusive services to Artist or to devote the entire time of Label or the entire time of Label's employees to Artist's affairs. Nothing herein shall be construed as limiting Label's rights to represent other persons whose talents may be similar to or who may be in competition with Artist, or to have and pursue business interests which may be similar to or may compete with those of Artist. Label shall have the right to delegate management powers and responsibilities to others, provided, however, that any costs associated with such delegation shall be the sole responsibility of Label. Notwithstanding the forgoing, if Label shall be in competition or have any conflict of interest with Artist, Label shall notify Artist of any such conflicts.

3. Artist hereby engages Label as Artist's sole and exclusive music Label throughout the world in all matters related to Artist's artistic career, including, but not limited to, the advice, guidance, counsel and direction specifically referred to in Section 1 hereinabove, and Label hereby accepts such engagement. Artist agrees to seek such services from Label solely and exclusively and agrees that Artist will not engage any other representative or Label. Artist agrees that Artist will not perform said management services on his own behalf and will not negotiate, accept or execute any agreement, understanding or undertaking concerning Artist's career without Label's express prior knowledge. Furthermore, Artist agrees to devote his fulltime efforts to the development and enhancement of Artist's artistic career.

2

4. Artist hereby irrevocably appoints Label for the term of this Agreement (and any extensions hereof) as Artist's true and lawful attorney-in-fact regarding the following:

(a) All contracts (the material terms of which have been pre-approved by Artist) in Artist's name solely with respect to Artist's "live" engagements;

(b) It is expressly understood that the foregoing power of attorney is limited to matters reasonably related to Artist's career as a performing artist in the entertainment industry.

5. (a) As compensation for services to be rendered by Label hereunder, Label shall receive from Artist or retain from Artist's "Gross Earnings" (as defined hereinafter) a fee of thirty (30%) percent of Artist's Gross Earnings (the "Fee").= LABEL AMG INC.

(b) The term "Gross Earnings", as used herein, refers to the total of all earnings and receipts, which shall not be accumulated or averaged, whether in the form of salary, bonuses, royalties (or advances against royalties), interests, percentages, shares of profits, merchandise, shares in ventures, products, properties, or any other type of income which is in any way related to Artist's career in the entertainment, amusement, music, recording, motion picture, television, radio, publishing, literary, theatrical and advertising fields and all other areas whether now known or hereafter devised, in which Artist's artistic talents are developed and exploited, received directly or indirectly by Artist or Artist's heirs, executors, administrators or assigns, or by any person, firm or corporation (including Label) on Artist's behalf. It is understood that, for the purpose hereof, and except as specifically set forth hereafter, no expense, cost or disbursement incurred by Artist in connection with the receipt of Gross Earnings (including salaries, shares of profits or other sums paid to an individual participating in Artist's presentation) shall be deducted therefrom prior to the calculation of Label's compensation hereunder, including, but not limited to, the Fee.

(c) (i) The compensation agreed to be paid to Label shall be based upon Gross Earnings of Artist accruing to or received by Artist during the term of this Agreement (and any renewals thereof) or subsequent to the termination of this Agreement as a result of: (1) any services performed by Artist during the term hereof; (2) any contract substantially negotiated or entered into during the term hereof and any renewal, extension (by exercise of option or otherwise), modification, substitution, or resumption of such contract; (3) any agreements which may be discontinued during the term hereof and resumed within one (1) year thereafter provided that the basic terms of the agreement remain unchanged; (4) any product of Artist's services or talents or of any property created by Artist, in whole or in part, during or prior to the term hereof; and (5) any engagements, contracts and agreements for which negotiations were commenced during the term hereof but which were entered into thereafter and/or any offer, engagement, contract or agreement considered and entered into within one (1) year thereafter derived from Label's efforts during the Term; and/or with respect to any activities, contracts, services and earnings prior to, during or after the term hereof which are commissionable in accordance with subparagraph 5(b) above, payments for termination of activities, contracts and services, payments to refrain from any such activities, contracts and services and payments in connection with any settlement or other disposition of any dispute concerning said activities, contracts, services, and/or earnings.

(ii)   Notwithstanding the foregoing. solely with respect to products created by Artist during the term hereof or services rendered by Artist during the term hereof (hereinafter referred to as "Contemporaneous Products and Services"). and Artist's Gross Earnings re-earned or received by Artist solely from the Contemporaneous Products and Services, Label shall be entitled to receive the following percentages of the otherwise applicable amount of Label's compensation as set forth in paragraph 5(a) above with respect to such Gross Earnings derived therefrom and earned or received by Artist following the expiration or termination of the term hereof: one hundred (100%) percent thereof during the first year thereafter; eighty (60%) percent thereof during the second year thereafter; sixty (60%) percent thereof during the third year thereafter; forty (40%) percent thereof during the fourth year thereafter; twenty (20%) percent thereof during the fifth year thereafter; and zero (0%) percent from the sixth year and onward thereafter.

(iii) Notwithstanding anything to the contrary contained in this Agreement, for the purpose of determining whether Artist's products or services shall be deemed to be "Contemporaneous Products and Services", such products or services shall be deemed to be "created" or "rendered" at the time such activities are commenced.

(d) If a corporation furnishes or exploits Artist's artistic talent, Artist agrees that the Gross Earnings of such corporation, prior to the deduction of any corporate income taxes, expenses and deductions, shall be included as part of Artist's Gross Earnings, and any salary paid to Artist by such corporation shall be included in Artist's Gross Earnings for the purposes of calculating the compensation due to Label hereunder. Additionally, Artist agrees that said corporation shall offer to enter into a management contract with Label identical in all respects to this Agreement (except as to the parties thereto).

(e) Artist hereby assigns to Label an interest in all of Artist's earnings commissionable to Label hereunder to the extent of the aforesaid percentage thereof. Said assignment is coupled with an interest and is irrevocable.

6. Label shall be solely responsible for payment of all booking agencies' fees, union dues, publicity costs, promotion or exploitation costs, long distance telephone expenses, traveling expenses, wardrobe expenses and all other expenses, fees and costs incurred by Artist. In the event Label advances any of the foregoing fees, costs or expenses on behalf of Artist, or incurs any other costs, fees or expenses in connection with Artist's professional career or with the performance of Label's services hereunder, Artist shall reimburse Label for such fees. costs and expenses. Without limiting the foregoing, such expenses, costs or fees incurred by Label shall include long distance telephone expenses incurred on Artist's behalf, promotion and publicity expenses and travel/living accommodation expenses and costs whenever Label, at Artist's request or with Artist's approval, shall deem it advisable to travel on Artist's behalf or with Artist, but shall not include Label's general office or other overhead expenses.

7. (a) Artist warrants that: (i) Artist is under no disability, restriction or prohibition with respect to Artist's right to execute this Agreement and perform its terms and conditions; (ii) no act or

4

omission by Artist hereunder will violate any right or interest of any person or firm, or will subject Label to any liability, or claim or liability to any person or firm; (iii) Artist shall indemnify Label and hold Label harmless against any damages, costs, expenses, fees (including reasonable attorneys' fees) incurred by Label in any claim, suit or proceeding instituted by or against Label based upon any breach of any warranty, representation or covenant of Artist and which is reduced to final judgment or settled with Artist's prior written consent, such consent not to be unreasonably withheld; (iv) no other party is presently engaged to act as Artist's personal Label; (v) Artist has not assigned and shall not assign or otherwise dispose of any of its interest in any Gross Earnings that may be subject to Label's rights hereunder; and (vi) Artist is over 18 years of age and is under no restriction or prohibition regarding Artist's right to execute and perform this Agreement.

(b) Label warrants that: (i) Label is under no disability, restriction or prohibition with respect to Label's right to execute this agreement and perform its terms and conditions; (ii) no act or omission by Label hereunder will violate any right or interest of any person or firm, or will subject Artist to any liability, or claim or liability to any person or firm; and (iii) Label shall indemnify Artist and hold Artist harmless against any damages, costs, expenses, fees (including reasonable attorneys' fees) incurred by Artist in any claim, suit or proceeding instituted by or against Artist in which any assertion is made which is inconsistent with any warranty, representation or covenant of Label and which is reduced to final judgment or settled with Label's prior written consent, such consent not to be unreasonably withheld.

8. (a) The initial term of this Agreement shall be for a period of five (5) years from the date hereof ("Initial Period").

(b) Label shall have three (3) options to extend the Initial Term for an additional consecutive one year period (the "Option Period"). Each Option Period shall be deemed automatically exercised by Label unless Label gives Artist written notice to the contrary at least ninety (90) days prior to the end of the period then in effect (i.e., the Initial Period or any subsequent Option Period).

(c) If Artist fails for any reason to fulfill any obligation assumed by Artist hereunder (all of which obligations are agreed to be "of the essence" and material) Label shall be entitled (by written notice mailed to Artist at any time) to extend the duration of the Initial Period (or of the Option Period if such notice is mailed by Label during the Option Period) for a period of time equal to the duration of such failure by Artist and until Artist shall fully cure any such failure. It is understood that no failure of delay of Label to enforce the rights of Label under this subparagraph shall be deemed a waiver of Label's subsequent right to enforce the rights granted to Label hereunder.

9. (a) Artist shall maintain accurate and complete books and records of all amounts received by Artist in connection with Artist's professional career and of all transactions undertaken by Artist in connection with Artist's professional career, which books and records may be inspected by a certified public accountant designated by Label at Artist's office during regular business hours,

5

upon reasonable notice to Artist and at Label's sole expense. All funds collected by Artist on Label's behalf shall be held in a separate interest bearing account in Label's name.

10. Label reserves the right, by written notice to Artist, to suspend the operation of the term hereof for the duration of the following contingencies if by reason of such contingencies Label is materially hampered or its normal business operations become commercially impractical: labor disagreements, fire, catastrophe, shortage of materials or any like cause beyond Label's control. Additionally, should Artist engage in the abuse of either drugs and/or alcohol to the extent that, in Label's sole opinion, such behavior materially impacts Artist's ability to perform as an artist, Label reserves the right to suspend the operation of the term pursuant to this paragraph. The number of days equal to the total of all days of suspension shall be added to the period then in effect. Label's failure to exercise any such right and remedies in any one instance herein shall not be deemed a waiver of such right in any other instance.

11. No waiver of any breach of this Agreement shall be construed as a continuing waiver or consent to any subsequent breach hereof.

12. (a) It is agreed that as a condition precedent to any assertion by Artist that Label is in default in performing any obligation contained herein, Artist must advise Label by written notice of the specific facts upon which it is claimed that Label is in default and of the specific obligation which it is claimed has been breached, and Label shall be allowed a period of sixty (60) days after receipt of such written notice within which to cure such default or, if not capable of cure within said time limit, then to commence such cure within said sixty (60) days. The parties agree that no breach of the terms hereof by Label will be deemed incurable during such sixty (60) day period.

(b) It is agreed that as a condition precedent to any assertion by Label that Artist is in default in performing any obligation contained herein, Label must advise Artist by written notice of the specific facts upon which it is claimed that Artist is in default and of the specific obligation which it is claimed has been breached, and Artist shall be allowed a period of sixty (60) days after receipt of such written notice within which to cure such default or, if not capable of cure within said time limit, then to commence such cure within said sixty (60) days. Notwithstanding the foregoing, said "cure" provision shall not apply to any allegation by Label that Artist has breached the exclusivity provisions of this agreement. Except as aforesaid, the parties agree that no breach of the terms hereof by Artist will be deemed incurable during such sixty (60) day period.

13. This agreement does not and shall not be construed to create a partnership or joint venture between the parties hereto, it being specifically understood and agreed that Label is an independent contractor hereunder.

14. Artist acknowledges and agrees that Label's right to represent Artist as Artist's sole and exclusive personal Label and Artist's obligation to solely and exclusively use Label in such capacity are unique, irreplaceable and extraordinary rights and obligations and that any breach or threatened breach by Artist thereof shall be material and shall cause Label immediate and unavoidable damages which cannot be adequately compensated for by money

judgment. Accordingly, Artist agrees that, in addition to all other forms of relief and all other remedies which may be available to Label in the event of any such breach or threatened breach by Artist, Label shall be entitled to seek and obtain injunctive relief against Artist.

15. Label shall have the right to assign this Agreement to any person, corporation or other entity including, but not limited to, any corporation or entity which is formed by Label or into which Label merges, or which Label now or hereafter owns, acquires or controls, in whole or in part, or of which Label acquires a substantial interest or which acquires a substantial interest in the assets of Label, or by which Label is hereafter employed. Artist shall not have the right to assign this agreement, or any of its rights hereunder, without obtaining Label's express prior written consent, and any such purported assignment without such consent shall be void.

16. This Agreement shall be construed in accordance with the laws of the State of Washington DC governing contracts wholly executed and performed therein, and shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, and successors and to the assignees of Label. Both parties consent that any petition, process, or notice of motion or other application to a court or judge thereof may be served outside of Washington DC area by registered mail or by personal service if a reasonable time for appearance is allowed.

17. If Artist on the date hereof is, or during the term becomes, a group consisting of two or more members, then the term "Artist" shall mean, whenever used herein, each member of Artist individually and severally and all members of Artist's group jointly, unless the context expressly specifies otherwise. During the term of this Agreement, no person shall for any reason be added to Artist or substituted for any member of Artist's group, unless such person agrees to be bound with Artist, both individually and jointly, by this Agreement, and such person executes and delivers to Label such documents as Label deems necessary to evidence such agreement. Artist shall cause any such person to execute and deliver such documents, and Label's rights hereunder shall not be diminished by such person's failure or refusal to do so. If any member of Artist engages, separate and apart from Artist as a group, in activities in the entertainment industry of the type contemplated by Section 1 hereinabove, then this Agreement shall be applicable to such activities. Any breach of this Agreement by any member of Artist shall be deemed a breach by all members of Artist.

18. If, during the term of this Agreement (or any extension hereof), Artist's group disbands or any member of Artist for any reason leaves the group or ceases to render his services to the group, then Label shall have the irrevocable right and option to continue as the personal Label of (as the case may be) (a)all continuing members of Artist's group and/or (b) such leaving member(s), in each case upon the same terms and conditions contemplated by this Agreement. Label shall exercise such option by giving written notice to such effect to the member(s) of Artist at issue within ninety (90) days after Label has first been notified in writing by Artist that (as the case may be) the group has disbanded or one or more of its members has left or refused to render services to it. Artist shall deliver such a notice to Label promptly upon the occurrence of any such event.

7

19. This Agreement shall be binding upon and inure to the benefit of each party hereto, each party's permitted assignees, the successors of such party and such assignees, and such party's heirs, estates, administrators and executors. This Agreement (a) embodies the entire agreement of the parties in respect of, and supersedes all prior written and oral understandings and representations between them concerning the subject matter hereof and (b) may not be cancelled, amended or waived in whole or part, except by a written instrument signed by all parties hereto.

20. In the event of any dispute under or relating to the terms of this Agreement, or the breach, validity or legality thereof, it is agreed that the same shall be subject to the exclusive jurisdiction of the state and federal courts located in the City of Washington DC and not elsewhere.

21. In the event any provision hereof shall be for any reason illegal or unenforceable, then the remainder of this Agreement shall in no way be affected or invalidated (except that Label may terminate the term of the Agreement if any such determination materially adversely affects Label's rights to compensation hereunder).

22. Notwithstanding anything contained herein, in the event that this Agreement is terminated for any reason, such termination shall not in any way affect Label's rights to receive both its Fee, pursuant to Section 5 hereinabove (or any other portion of the Gross Earnings owed to Label) and any expenses incurred herewith, pursuant to Section 7 hereinabove.

23. All notices hereunder shall be in writing and shall be sent via certified mail, return receipt requested, or via personal delivery to the addresses of the parties as set forth herein, or to any other addresses as the addressee may hereafter designate in writing. The date of receipt of such notice shall be deemed the date of the giving thereof.

24. Artist warrants and represents that Artist is free to enter into and perform this Agreement and that Artist has been advised to seek legal counsel to advise Artist on the benefits and obligations of this Agreement.    IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first indicated above.


_____    Date __8/13/13__

Carlos Allen aka Mayor Allen


_____    Date __8/15/13__

AMG Inc. (Karen R Brooks Owner)


8

DO NOT ACCEPT WITHOUT VERIFYING EAGLE WATERMARK IN PA

STATE OF COLORADO
## CERTIFICATE OF TITLE
**\*\*\*\*MOTOR VEHICLE\*\*\*\***

| VIN | YEAR | MAKE | MODEL | BODY |
|---|---|---|---|---|
| WKK138HA7F1030003 | 1985 | MERZ | | MT MTH |

MAIL TO

SWEET RODERICK
43981 HWY 550
DURANGO, CO 81301

OWNER
SWEET RODERICK

CWT/CAP/SIZE
CWT 352

PREVIOUS TITLE
DC

FUEL

DATE PURCHASED
02/17/2016

DATE ACCEPTED
02/22/2016

DATE ISSUED
02/29/2016

DEFENDANTS
EXHIBIT
N
16-10027

FIRST LIENHOLDER

FILE NUMBER

AMOUNT OF LIEN          LIEN EXTENDED TO COUNTY

SECOND LIENHOLDER

FILE NUMBER

AMOUNT OF LIEN          LIEN EXTENDED TO COUNTY

THIRD LIENHOLDER

FILE NUMBER

AMOUNT OF LIEN          LIEN EXTENDED TO COUNTY

FOURTH LIENHOLDER

FILE NUMBER

AMOUNT OF LIEN          LIEN EXTENDED TO COUNTY

DATE FILED

MATURITY DATE

DATE FILED

MATURITY DATE

DATE FILED

MATURITY DATE

DATE FILED

MATURITY DATE