The document below is hereby signed.

Signed: September 20, 2017



_S. Martin Teel Jr._

S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CARLOS ROBERTO ALLEN, | ) | Case No. 16-00023 |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| DOUGLASS SLOAN, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. |
| | ) | 16-10027 |
| CARLOS ROBERTO ALLEN, | ) | |
| | ) | Not for publication in |
| | ) | West's Bankruptcy Reporter. |
| Defendant. | ) | |

<u>MEMORANDUM DECISION</u>

This adversary proceeding grows out of a debt owed by the

defendant, Carlos Allen ("Allen"), to the plaintiff, Douglass

Sloan, and Karen James, by reason of a *Promissory Note with*

*Equity Interest Conversion Feature* (the "*Sloan Note*"), executed

by Allen on July 23, 2008. At the time the *Note* was executed,

Douglass Sloan and Karen James were not yet married. However,

they later married and Karen James has taken Douglass Sloan's last name, so I will refer to her as Karen Sloan.  For simplicity, I will on occasion refer to Douglass Sloan as "Sloan" and refer to Karen Sloan as Mrs. Sloan.[1]

On January 20, 2016, Allen commenced the bankruptcy case within which this adversary proceeding was filed (Case No. 16-00023).  He commenced the case under chapter 13 of the Bankruptcy Code (11 U.S.C.), but on February 29, 2016, he converted the case to a case under chapter 7 of the Bankruptcy Code.  On June 6, 2016, Sloan commenced this adversary proceeding, seeking to have the court treat the *Sloan Note* obligation as nondischargeable, or, alternatively, deny Allen a discharge.  For the following reasons, I find that Allen fabricated a promissory note (the "*Brooks Note*") representing a non-existent loan made to him by his estranged wife, Karen Brooks, which (if the *Brooks Note* had

---

[1]  Although Karen Sloan did not sue as a plaintiff in this adversary proceeding, for ease of discussion I will on occasion refer to the Sloans as though both Douglass and Karen Sloan were plaintiffs.  The outcome in this adversary proceeding would have been the same even if both Douglass and Karen Sloan had been plaintiffs.  The debt is owed to Douglass Sloan (even if Karen Sloan was the source of most of the funds lent), and Allen never moved to dismiss for the plaintiff's failure to join Karen Sloan. It is now too late for Karen Sloan to sue to deny the debtor a discharge or to seek to declare the debt nondischargeable if Douglass Sloan were not to prevail.  She will be bound by the outcome of this proceeding.

been genuine) was a document from which his financial condition

and business transactions might be ascertained, and falsification

of the document was not justified, thus requiring a denial of

discharge under 11 U.S.C. § 727(a)(3).  In addition, the debtor

falsely testified that his transfer of money to AMG, Inc. out of

the proceeds of real property was made in satisfaction of the

*Brooks Note*, in an attempt, fraudulently, to defend against

Sloan's assertion, pursuant to the *Sloan Note*, of an interest in

the equity realized from the sale.  On the basis of such false

oath, Allen should be denied a discharge pursuant to 11 U.S.C.

§ 727(a)(4)(A).  As such, none of the debtor's debts, including

his debt to Sloan (including prejudgment interest from the date

of the sale plus reasonable attorney's fees, and postjudgment

interest) will be discharged.  A judgment will be issued denying

the debtor a discharge.

I

THE DEBT OWED TO THE SLOANS AND THIS ADVERSARY PROCEEDING

Under the terms of the *Sloan Note*, the Sloans agreed to loan

Allen $60,000.  Allen agreed to repay $72,000 within 60 days,

with interest accruing thereafter at the highest rate permitted

under District of Columbia law if Allen failed to make the

payment by the 60-day deadline.  The parties understood that

Allen intended to use the money loaned by the Sloans to renovate

3

and ready for the sale a property located at 3102 18th Street,
NW, Washington, D.C. (the "Property").  The promissory note also
included an equity interest conversion provision, which read:

> If . . . Payee shall notify Borrower that it wishes to
> convert Borrower's Indebtedness hereunder into an equity
> position in the Borrower's property at 3102 18th Street,
> NW Washington, D.C. 20010 (the "Property")[] Borrower
> shall pay to Payee an amount equal to 14.5% of the net
> proceeds of the sale of the Property (the "Equity
> Amount") within 10 days of sale of the Property.

*See* Pl.'s Ex. 1, at PL-3.  The Sloans were aware that the
property was technically owned by Allen's mother, but Sloan
learned that Allen had a power of attorney in regards to the
renovation and sale of the property, which would have permitted
Allen to enter into an agreement with such an equity interest
conversion provision.  The *Sloan Note* did not specify a rate of
interest to be paid if the Sloans converted the indebtedness to a
14.5% equity interest.  The *Sloan Note* did, however, include a
provision for the Sloans to recover costs of collection and
enforcement, including reasonable attorney's fees, if they gave
the *Sloan Note* "to an attorney for collection or enforcement, or
if suit is brought for collection or enforcement . . . ."  *See
id.*

Even though Sloan obtained the assistance of an attorney in
New York in drafting the Note, the Sloans did not insist on a
mortgage (which in the District of Columbia ordinarily takes the

4

form of a deed of trust) to encumber the Property to ensure that the Property would serve as collateral to secure repayment of the *Sloan Note* and to protect the Sloans with respect to any later-recorded liens against the Property.  The Sloans believed they would be repaid $72,000 on time, when the *Sloan Note* came due. All parties contemplated that the Sloans would be repaid when the Property was sold, though Allen also believed that he could alternatively repay the Sloans via his earnings from his mortgage business.  After the parties entered into their agreement, the financial crisis of 2008 worsened, and Allen found no success in his mortgage business and was unable for years to attain his desired price for the Property, which he intended to sell.

When the *Sloan Note* came due 60 days after its execution, Allen failed to repay the debt.  For some time, he made no payments at all.  After continued prompting from Karen Sloan, on November 6, 2010, Allen began making monthly payments on his outstanding debt to the Sloans, first in the amount of $1,000 and then in the amount of $500.  Allen sold the Property on August 2, 2013.  Upon the sale of the property, Allen did not pay the Sloans a portion of the sales proceeds in repayment of the outstanding debt pursuant to the *Sloan Note* or a portion of the

sales proceeds amounting to a 14.5% equity interest.[2]  Rather, he continued making his regular monthly payments towards the outstanding debt until March 10, 2014, at which time he stopped making payments.  Although Allen made payments under the *Sloan Note* over the course of years, a substantial amount of the debt remains outstanding.

On June 6, 2016, Douglass Sloan timely filed his complaint commencing this adversary proceeding.  In his complaint, as later amended, he alleged that the debt Allen owes him is nondischargeable under 11 U.S.C. § 523(a)(2) and § 523(a)(6) (mislabeled as § 548), based on Allen's failure to make payment to the Sloans when he sold the Property (as to which Allen had a power of attorney at the time of the sale).  The complaint, as amended, also sought a denial of discharge under 11 U.S.C. §§ 727(a)(2)(A) and (B), 727(a)(3), 727(a)(4)(A) and (D), and 727(a)(5).

---

[2]  The distribution of the sales proceeds is detailed in Part III, *infra.*

II

NONDISCHARGEABILITY PURSUANT TO § 523(a)(2)(A)

In Count Seven of the amended complaint (Dkt. No. 3), Sloan contended that the debt Allen owes to Sloan pursuant to the *Sloan Note* should be deemed nondischargeable under 11 U.S.C. § 523(a)(2)(A).[3] Section 523(a)(2)(A) provides in relevant part that a discharge does not apply to any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by [] false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"

In his pretrial statement Sloan elaborated that § 523(a)(2)(A) applies:

> because the Defendant induced the Plaintiff to lend the money to him through false pretenses, misrepresentations that were wonton and malicious. The Plaintiff reasonably relied on the promises of the Defendant and loaned money. The Defendant encumbered the property with the promissory note. The Defendant used the money to rehab the property, used the property as a for profit party house; yet, failed to pay the Plaintiff under the terms of the note for two years. The Defendant subsequently placed the property for sale, failed to disclose the note to the buyer of the property, executed the sale of the property encumbered by the note, and then directed the proceeds of the sale to a business entity for whom he was a board member, and subsequently spent the funds that

---

[3] Sloan captioned his claim in Count Seven as based on 11 U.S.C. § 523(a), but the claim specifically falls within the provisions of subsection 523(a)(2)(A).

> rightfully belonged to the Plaintiff. The sale and
> failure to pay was the act that consummated the material
> breach of the contract. The Defendant was the sole
> signatory on the financial accounts of the business
> entity and consistently told the Plaintiff that no funds
> were available to repay the debt while he was lavishly
> spending the proceeds of the sale.

*See* Dkt. No. 48, at 8-9.

Sloan has not established that, within the meaning of

§ 523(a)(2)(A), Allen obtained the loan from the Sloans via false

pretenses, a false representation, or actual fraud. Allen made

no false representations in obtaining the loan from the Sloans to

justify deeming the debt nondischargeable pursuant to

§ 523(a)(2)(A). Allen and Sloan were long-time friends. Sloan

learned that Allen was in need of a loan to renovate and ready

for resale the Property. Sloan knew that the Property was

actually owned by Allen's mother, but Sloan learned that Allen

had a power of attorney from his mother with respect to the

Property. Sloan investigated the status of the Property and

determined that, *based on the liens of record*, the sale of the

Property would yield substantial equity that would be more than

sufficient to repay the amount the Sloans lent to Allen. Sloan

encouraged Allen to borrow the money from the Sloans.[4]

---

[4] While the bulk of the funds lent came from Karen Sloan,
the money loaned to Allen was sent to him from an account into
which both Douglass and Karen Sloan placed their savings. The
loan was therefore a loan by both Douglass and Karen Sloan.

Sloan then negotiated the loan with Allen and did not request a financial statement from Allen. There is no indication that Sloan inquired about other outstanding debts that Allen owed. Allen testified at trial that he had a substantial outstanding debt to his wife when he and the Sloans executed the *Sloan Note*. In the course of this adversary proceeding, Allen produced a promissory note (the "*Brooks Note*") representing that on September 23, 2005, almost three years before Allen and the Sloans entered into their loan agreement, Karen Brooks, Allen's wife, loaned him $102,000, bearing interest at 20% per annum, compounded monthly. *See* Pl.'s Ex. 20. The note purports to grant Brooks a security interest in the Property as collateral to secure repayment of the alleged loan. *See id*.

Brooks never recorded the note as a lien against the Property in the land records, so Sloan could not have discovered the existence of the secured debt (if it had existed) by an independent search of the land records. In his pretrial statement, Sloan noted that "Allen never disclosed the existence of any prior loan owed to Karen Brooks before he induced the plaintiff to loan him $60,000[.]" *See* Dkt. No. 48, at ¶ 18. He later wrote in his motion for summary judgment that he "first learned of the Brooks note when Allen filed it as an exhibit in this matter." *See* Dkt. No. 41, at ¶ 79. For reasons discussed

later, the court has determined that Brooks never made a loan to Allen, and the note in favor of Brooks is a sham.

However, Allen's falsification of the *Brooks Note* and misrepresentations regarding that note do not bear on the issue of nondischargeability under § 523(a)(2)(A) because they have no relation to the creation of Allen's debt to the Sloans. Even if the *Brooke Note* were valid, Sloan has not demonstrated that Allen obtained the loan from the Sloans by making any false representations regarding the existence of that *Note*. The Sloans testified that they would not have made the loan to Allen if they had known that Brooks had an unrecorded lien against the Property. However, there is no evidence that, before making the loan, the Sloans asked Allen about the amount of debts he owed, secured or unsecured, or to which the Property was subject. Because they never took the necessary steps to secure their debt with the Property as collateral, the Sloans became unsecured creditors who faced the potential that Allen might have other debts (either present debts or debts incurred in the future) that were or could become liens against the Property, with such liens required to be paid out of the proceeds of any sale of the Property, leaving insufficient amounts to pay the Sloans anything.

Additionally, while the amended complaint can be read as alleging that Allen made a fraudulent representation that he intended to comply with the terms of the *Note*, Sloan has not shown that from the outset when he executed the *Note*, Allen falsely represented that he intended to repay the loan. Before the *Note* was executed, Allen was in dire financial straits, and he hoped that obtaining a loan from the Sloans would permit him to meet pressing financial obligations and carry him through until he was on a sound financial footing. Allen was an eternal optimist, and believed that he would be able to repay the loan once his finances improved or once he sold the Property and realized what he anticipated would be a substantial amount of equity. Allen intended to use the loan to rehabilitate the Property, and he did make substantial improvements to the Property after the Sloans made their loan to him.

He had intended to sell the Property, which he thought was worth more than $1,000,000, after making the improvements. If Allen had been able to sell the Property for $1,000,000 promptly after rehabilitating it, the proceeds would have sufficed to repay his debt to the Sloans, pursuant to the *Sloan Note*. Moreover, the proceeds of a prompt sale of the Property might have even at that time sufficed to satisfy the alleged obligation owed to Brooks (if it did exist), pursuant to her purported note,

11

while leaving a healthy 14.5% equity that the Sloans could elect to claim. However, the real estate market suffered a downturn as a result of the 2008 financial crisis, and Allen could not achieve a sale for $1,000,000 until years later, in 2013.

Just as Allen was unable to sell the Property for a worthwhile price, as he had originally intended, after the *Sloan Note* was executed, he was likewise unable to improve his finances.  Allen and his wife, Karen Brooks, had operated a successful mortgage business, known as AFS Mortgage, but the financial crisis of 2008 rendered Allen unable to earn a living from his mortgage business.  While Brooks went back to work at another job, Allen was unable to earn any significant amount of employment income.  After Allen utilized the money loaned to him by the Sloans to improve the Property, he used the Property as a for-profit party house until he sold the Property in 2013. Despite this endeavor to earn a living, Allen was still suffering financially and was unable to come close to making substantial payments on the *Sloan Note*.

In response to repeated requests from Karen Sloan, Allen began to make monthly payments on the *Note* on November 6, 2010, first in the amount of $1,000 before reducing the monthly payments to approximately $500, though sometimes less.  The payments continued through March 10, 2014, ultimately totaling

between $17,997.54.  *See* Def.'s Mot. Summ. J., Dkt. No. 8, at 9–
10 (listing payments that aggregate $17,997.54); Pl.'s Opp., Dkt.
No. 9, at 3 (conceding that the amount of $17,997.54 was paid).
Such payments clearly amounted to far less than what was owed
under the *Sloan Note*, but they demonstrate Allen's desire to
repay the loan as he could within his financial constraints.[5]
His failure to make more payments or higher payments to the
Sloans than he did does not demonstrate that his implicit
representation to the Sloans at the time the *Sloan Note* was
executed that he intended to repay the *Note*, or to honor a 14.5%
equity interest in favor of the Sloans if the Sloans elected the
conversion option, was a false representation.

　　　Douglass Sloan testified that, after the *Sloan Note* had gone
unpaid for a lengthy period of time, and before the Property was
sold in 2013, he told Allen that the Sloans wanted him to honor
their right to a 14.5% equity interest upon the sale of the
Property.  Allen, not credibly and in contravention of previous
representations in his motions to the court, testified at trial

---

[5]   Contrary to Allen's testimony and arguments, when Allen
was making these small monthly payments on the debt, Karen Sloan
never agreed that only the principal amount of the loan had to be
paid.  She understood that Allen was paying what he felt he could
pay but she did not change the terms of the loan.  Moreover, even
if the payments are credited to only principal, not only does
more than $42,000 of principal remain unpaid, but a substantial
amount of interest also remains unpaid.

13

that he and Sloan never discussed the *Sloan Note* after it was
executed and Allen only ever dealt with Karen Sloan after the
*Sloan Note* was executed.  *See*  Def.'s Pretrial Statement, Dkt.
No. 33, at 2-3 (directly quoting e-mail and Facebook
correspondence between Douglass Sloan and Allen regarding the
outstanding debt, which appears as Attachment A to the pretrial
statement with the quoted language underlined); Def.'s Pretrial
Statement, Dkt. No. 33, at 5 (noting that he negotiated a payment
plan with both Douglass and Karen Sloan); Def.'s Mot. to Dismiss,
Dkt. No. 11, at 2 (same); Def.'s Mot. to Dismiss, Dkt. No. 11, at
4 (referencing e-mails he received from Douglass Sloan regarding
the outstanding loan including threats from Douglass Sloan in
regards to hiring a lawyer if the debt was not repaid); Def.'s
Mot. to Dismiss, Dkt. No. 11, at 14 (containing what appears to
be an unverified e-mail from Facebook regarding a message sent by
Douglass Sloan to Carlos Allen regarding the outstanding debt and
Sloan's intention to file suit against Allen).

There is insufficient evidence that the Sloans ever elected
to convert the obligation to an equity interest.  Sloan may have
reminded Allen that he had such a right, and that he expected
Allen to honor that right, but Sloan has not offered any specific
evidence of how or when he elected the equity interest conversion
option.  Sloan had the burden of demonstrating that he elected to

14

convert the indebtedness to an equity interest in the Property and he failed to meet that burden.

Sloan likewise has not demonstrated that, at the time the *Sloan Note* was executed, Allen did not intend to repay the debt and did not intend to honor a 14.5% equity interest in the Property if the Sloans elected the conversion option.  Allen was an optimist and hoped the loan from the Sloans would enable him to improve the Property, sell the Property promptly for at least $1,000,000, and thereby achieve a return to a financially secure position.  It appears that when Allen executed the Note, he fully intended to repay the loan (or to honor any 14.5% equity interest the Sloans opted for) once he was financially able to do so, and his hopes of doing so were higher when the *Sloan Note* was executed in 2008 than in 2013 when Allen sold the Property.

Indeed, as Sloan concedes, Allen made payments on the *Sloan Note* from November 6, 2010 to March 10, 2014.  After the sale took place on August 2, 2013, Allen continued making payments on the *Sloan Note* and still believed that he would be able to repay the loan once his finances improved.  Allen did not succeed financially, and that is what led to his non-payment of the *Sloan Note*, not an intention, that he held at the time he executed the note, never to repay the debt.  Allen failed to pay the Sloans out of the proceeds of the sale of the property.  Instead, he

15

transferred proceeds from the sale of the Property to a company
he effectively controlled.  However, Sloan has not shown that
Allen held an intention to disregard his obligations under the
*Sloan Note* when Allen and the Sloans entered into the loan
agreement.

Allen stopped making payments on March 10, 2014.  The Sloans
had sued him, and he needed to make payments on a mortgage or he
would lose the house encumbered by the mortgage.  It is unclear
if the mortgage payments Allen prioritized were for a mortgage on
the Property or for a mortgage on a different property at which
Allen resided, but that need not be sorted out.  It is sufficient
that Allen's failure to make payments did not arise from an
intention not to make payments (or an intention not to honor a
14.5% equity interest) at the outset of the execution of the
*Sloan Note*.  Rather, Allen's non-payment of the *Sloan Note* was
due to financial hardship that led him to dishonor his obligation
to the Sloans by not using the proceeds of the sale of the
Property to repay the Sloans.  When he entered into the loan
agreement, Allen intended to repay the *Sloan Note*, and to honor
any 14.5% equity interest that the Sloans elected to receive.
Allen's implicit representation to the Sloans that this was his
intention when he obtained the loan from them was not a false
representation.

16

To recapitulate, although Allen reneged on his promise to repay the loan, Sloan has not shown that Allen falsely represented an intention of repaying the loan when he borrowed the money, or falsely represented an intention of honoring the equity interest he had promised the Sloans (if they elected to convert the loan to an equity interest), or made any other misrepresentation in obtaining the loan from the Sloans. Accordingly, Sloan has failed to show that the debt owed the Sloans is nondischargeable under § 523(a)(2)(A).

III

THE SALE OF THE PROPERTY, THE DISTRIBUTION OF THE SALES PROCEEDS, AND EXISTENCE AND PURPORTED REPAYMENT OF THE *BROOKS NOTE*

Allen, on behalf of his mother, sold the Property on August 2, 2013, for $1,015,000.[6]  After $628,867.08 of the proceeds of the August 2, 2013, sale were used to pay off a first mortgage and other various closing costs were covered, $312,789.57 of the sales proceeds were left, of which $311,900 were distributed as follows:

| | |
|---|---|
| Keith Remeke (Contractor) | $  4,000 |
| ATS (Contractor) | $  8,900 |

---

[6]  *See* Pl.'s Ex. 3, at PL-13.  At the time of the sale, Allen's mother had signed a recent power of attorney granting Allen authority to sell the property on her behalf.  *See* Pl.'s Ex. 3, at PL-11.

17

```
Kenneth Nykabwa (Contractor)              $  4,000

AMG                                       $270,000

David Williams                           $ 25,000.
```

*See* Pl.'s Ex. 3, at PL-15.  The remainder, $889.57, was the net amount realized by Anna Allen as the seller.  *See* Pl.'s Ex. 3, at PL-13.

The payments to contractors of $4,000, $8,900, and $4,000 related to work on the Property.  Allen testified that the $270,000 distribution to AMG, Inc. ("AMG") was a disbursement in satisfaction of the loan he claims Karen Brooks made to him in 2005 pursuant to the *Brooks Note*.  AMG was a company registered as a corporation on August 7, 2013 (less than one week after the closing of the sale),[7] of which Brooks became the owner.[8]  The $25,000 payment to David Williams was for the purchase of a bus that was to be used by AMG.

Allen testified that prior to the sale he had convinced his wife that he could achieve success as a rap musician.  According to Allen, Brooks listened to and liked his music and, based on her enjoyment of his music and the financial success she and Allen had achieved through the mortgage business they had created and run together, she agreed that a corporation should be formed,

---

[7]  *See* Pl.'s Ex. 4, at PL-33.

[8]  *See* Pl.'s Ex. 19.

18

which she would own, and which Allen would operate principally as a vehicle for promoting Allen as a rap musician. While Allen primarily used AMG as a vehicle for promoting and marketing himself as a rap musician, he also used AMG as a vehicle for selling (or attempting to sell) merchandise such as a product known as Healer Cream,[9] and "Mayor Allen" backpacks. The contract between Karen Brooks, as owner of AMG, and Allen, as the rap artist being promoted, contemplated that AMG would be operated for those uses. *See* Pl.'s Ex. 19, at PL-260. Allen's efforts, through AMG, to become a successful rap musician or seller of merchandise were a financial flop, and AMG's charter was revoked on April 1, 2014. *See* Pl.'s Ex. 4, at PL-33.

While Allen contends that Brooks agreed to accept funds placed in AMG as a payment of the alleged $102,000 *Brooks Note*, a brief review of the past bankruptcy filings of parties related to this dispute demonstrates that the *Brooks Note* is a sham and there never was a loan from Brooks to Allen. First, Allen filed a bankruptcy case in the District of Columbia in 2008, before the sale of the Property, in which he failed to schedule any debt owed to Brooks. *See* Case No. 08-00591, at Dkt. Nos. 16 & 45 (listing Karen Brooks as neither a secured nor an unsecured

---

[9] Allen had suffered a back injury in 2010 and Healer Cream had successfully relieved the pain from the injury.

creditor).  That, along with the incredible nature of Allen's testimony, suffices to persuade me that the *Brooks Note* is fake.

Second, Allen's mother, from whom Allen had a power of attorney to deal with the Property and who was recited by the sham note as being an obligor on the note never listed Brooks as a creditor in her own bankruptcy cases in the District of Columbia.  *See* Case No. 09-00231, at Dkt. No. 5 (failing to list Karen Brooks as a creditor); Case No. 09-00900, at Dkt. No. 4 (same); Case No. 09-01114, at Dkt. No. 15 (same).  Moreover, in reviewing the filings in Anna Allen's past bankruptcy cases and comparing the signatures on those filings with the signatures of Anna Allen and Carlos Roberto Allen on exhibits presented at trial in this case (*see* Pl.'s Ex. 3, at PL-11; Pl.'s Ex. 4, at PL-41) it is now apparent to the court that Carlos Roberto Allen signed the petition and schedules in each one of Anna Allen's past bankruptcy cases in the District of Columbia, demonstrating that he was attesting to the accuracy and completeness of the

petition and schedules that failed to list an outstanding debt to Karen Brooks.[10]

Moreover, evidence in the record contradicts Allen's testimony that the transfer of $270,000 of proceeds from the sale of the Property was made to AMG in satisfaction of an outstanding debt to Brooks that was secured by the Property pursuant to the *Brooks Note*. At 12:36 p.m. on August 1, 2013 (the day before the sale took place), in an e-mail conversation with a representative from the title company handling the sale, Allen's mother instructed that one of the debts to be paid from the proceeds of the sale was in the amount of $270,000 to AMG, which she termed "a private 2nd." *See* Pl.'s Ex. 3, at PL-19. After exchanging more e-mails regarding the sale, at 3:10 p.m. on the same

---

[10] Although Carlos Allen's bankruptcy filings alone cause me to find that the *Brooks Note* is a sham, and although that finding is only strengthened by the bankruptcy filings he made on behalf of his mother, there is yet one more bankruptcy filing that would support that finding. Karen Brooks filed a bankruptcy case in the United States Bankruptcy Court for the District of Maryland on March 24, 2009, roughly three and one-half years after she allegedly loaned Allen $102,000 pursuant to the *Brooks Note* of September 23, 2005. *See* Case No. 09-14994. Brooks did not list the alleged outstanding $102,000 loan to Allen as an account receivable on her Schedule B in that case. *See* Case No. 09-14994, Dkt. No. 1-1, at 4-6. Sloan's attorney represented that Brooks avoided his efforts to serve her with a subpoena for trial, but I bypass the issue of whether that Schedule B is admissible evidence in this case under Fed. R. Evid. 804(b)(3) or otherwise because I do not need to rely on that Schedule B to support my findings.

afternoon, Cathy Gale of the title company requested for Anna
Allen to "confirm that the private 2nd loan was not intended to
be a secured loan."  *See* Pl.'s Ex. 3, at PL-16.  Allen's mother
responded by e-mail twenty minutes later at 3:30 p.m.: "This is
to confirm that the private funding AMG is not secured against
the property."

Although the foregoing convinces me that the *Brooks Note* was
a sham and that Brooks never made the $102,000 loan to Allen,
other facts buttress that conclusion.  First, the sham note
obligation purportedly owed to Brooks would have stood at more
than $450,000 as of the date the Property was sold, and there is
no evidence that Allen had made payments to Brooks after the
execution of the *Brooks Note* in 2005.  A payment of $270,000 to
AMG plus $25,000 for the bus AMG acquired would have left more
than $150,000 owing to Brooks.  Allen did not list Brooks as a
creditor on his schedules in this case, and offered no records of
prior payments to Brooks and no explanation of how a payment of
$270,000 could satisfy the *Brooks Note*.

Second, Allen's credibility at trial was shot when Allen
testified that he did not realize that the *Sloan Note* had an
equity interest conversion feature when the *Sloan Note* was
executed; when (as previously discussed) Allen testified that he
and Douglass Sloan never discussed the outstanding debt pursuant

22

to the *Sloan Note* after the note was executed; and when Allen
attempted to treat Karen Sloan's entreaties for him to continue
making monthly payments towards the indebtedness pursuant to the
*Sloan Note* as an agreement among the parties that only the
$72,000 maturity date amount of the *Sloan Note* had to be paid.
This attempt by Allen to characterize his monthly payments as an
accord and satisfaction among the parties for Allen to only pay
the $72,000 maturity date amount of the debt also damages Allen's
credibility because in multiple previous filings in this
adversary proceeding Allen claimed that he and the Sloans had
agreed to new payment terms according to which the Sloans would
simply accept the total amount of money Allen paid in monthly
payments through PayPal ($17,997.54, but miscalculated by Allen
as $20,000) in satisfaction of the outstanding debt.  *See* Def.'s
Pretrial Statement, Dkt. No. 33, at 5; Def.'s Mot. to Dismiss,
Dkt. No. 11, at 2.  Neither of Allen's conflicting stories as to
a negotiated revision of the terms under the *Sloan Note* is
supported by any evidence or would make sense logically on the
part of the Sloans.  Indeed, the Sloans would be just as unlikely
to accept $20,000 or $72,000 instead of far more with accrued
interest added as would be Karen Brooks to accept $150,000 less
than what she was due under the sham *Brooks Note*.

23

Third, the sale of the Property took place after the mortgage business Allen and Brooks owned together became unprofitable.  It is highly unlikely that Brooks (who, from time to time, appears to have been separated from Allen) would have agreed to let Allen take the proceeds of the sale of the Property to embark on a highly speculative venture of Allen's becoming a rap musician and attempting to sell merchandise.  Allen's credibility has also been tarnished by the court's aforementioned realization that Allen signed and evidently prepared his mother's past petitions and schedules without making any disclosures to the court that he was doing so.

Finally, Allen's failure to mention the *Brooks Note* until six months after the complaint in this adversary proceeding was filed (after Allen had already filed a motion to dismiss and a motion for summary judgment with no mention of the *Brooks Note*), in addition to Allen's failure to ever present any records relating to the purported $102,000 loan (e-mails, other correspondence, or records relating to the making of the $102,000 loan or regarding Allen's plans to pay the $102,000 loan) belie the genuine existence of the loan.

For all of these reasons, the court has determined that the *Brooks Note* reflecting a $102,000 loan from Brooks to Allen in 2005 is a sham and Brooks never made a $102,000 loan to Allen.

24

Rather, the sham *Brooks Note* and the loan described therein were both fabrications that Allen held up to the Sloans and to this court as a justification for why there was no equity from the sale of the Property from which the Sloans would have been entitled to a payment and why the bulk of the equity from the sale of the property was transferred to AMG, which was held under the ownership (at least on paper) of Karen Brooks.  Allen decided that instead of using the equity to pay his creditors, he would use all of the equity from the sale of the Property to attempt, through AMG, to return to being financially successful, and to pay the Sloans as he was able to over time.

IV

NONDISCHARGEABILITY PURSUANT TO § 523(a)(6)

Count Eight of the amended complaint is properly characterized as a claim under § 523(a)(6) rather than as a claim under § 548, as the court already explained in a memorandum decision related to the defendant's motion for summary judgment. *See* Dkt. No. 56, at 9-14.  For the court to deny Allen a discharge of his debt to Sloan pursuant to § 523(a)(6), Sloan must have proven that Allen caused "willful and malicious injury . . . to another entity or to the property of another entity[.]" See 11 U.S.C. § 523(a)(6).  In his pretrial statement, Sloan

25

contends that the debt should be declared nondischargeable under

11 U.S.C. § 523(a)(6):

> because the [sic] fraudulently transferred funds and
> assets that should have been used to repay his
> obligations to his creditors to others with the intent to
> harm the Plaintiff. Defendant caused funds that were
> promised to the Plaintiff to be directed to a business
> entity that was created by the Defendant as a part of a
> scheme to divest the Plaintiff of his investment and
> property interest. The Defendant knew that he had
> encumbered the property with the loan and promissory
> note. The Defendant failed to inform the buyer or the
> settlement company of the existence of the note. The
> Defendant directed that funds that were due to the
> Plaintiff be diverted to AMG, Inc. The Defendant
> incorporated AMG, Inc. and has identified his wife as the
> owner. The Defendant has admitted that he was also the
> Marketing Officer and a Board Member of AMG, Inc. The
> Defendant was the sole signor on the financial accounts
> of AMG, Inc. and had exclusive control and use of the
> funds received from the sale of the property. The
> Defendant has not produced any documents in response to
> discovery requests of the Plaintiff regarding his
> involvement with AMG, Inc. or any of his business
> enterprises.

*See* Dkt. No. 48, at 9-10.

Section 523(a)(6) generally does not apply to breaches of

contract—even intentional ones. Most courts hold that a creditor

asserting a claim of nondischargeability pursuant to § 523(a)(6)

for a breach of contract by the debtor must additionally allege

conduct amounting to an independent tort (for example,

conversion). *Oakland Ridge Homeowners Ass'n v. Braverman (In re

Braverman)*, 463 B.R. 115, 119 (Bankr. N.D. Ill. 2011). *See also

Wish Acquisition, LLC v. Salvino (In re Salvino)*, 373 B.R. 578,

26

589-91 (Bankr. N.D. Ill. 2007), *aff'd*, No. 07 C 4756, 2008 WL
182241 (N.D. Ill. 2008).

The elements of what constitutes an independent tort are
determined by non-bankruptcy law.  Sloan appears to argue that
Allen's breach of contract was an independent tort of conversion
because Sloan's equity interest was a lien on the Property.  No
lien was created via a deed of trust, thus casting doubt that
there was a conversion of Sloan's property.  See *IBA, Inc. v.
Hoyt (In re Hoyt)*, 326 B.R. 13, 20 (Bankr. W.D.N.Y. 2005)
(holding that because "IBA retained no security interest or other
ownership interest in the dairy supplies sold to Dairy and/or
Hoyt, it cannot prevail on an alleged willful and malicious cause
of action for conversion").

As discussed already, Sloan did not adequately prove that he
converted the indebtedness under the *Sloan Note* to a 14.5% equity
interest in the Property.  If Sloan had done so, he would have
been able to argue that Allen's debt to Sloan should be deemed
nondischargeable because of Allen's willful and malicious failure
to pay Sloan the 14.5% equity interest from the proceeds of the
sale of the Property to which Sloan was entitled.  Because Sloan
has not proven that he converted the indebtedness to an equity
interest within the time period prescribed by the *Sloan Note*, the

debt cannot be deemed nondischargeable pursuant to § 523(a)(6) on the basis of an existing equity interest.

Nor does § 523(a)(6) apply on the theory that Allen implicitly had an obligation to notify the Sloans when the property was being sold so that they could decide whether to convert the indebtedness under the *Sloan Note* into an equity interest in the Property, and that Allen's failure to do so constituted a willful and malicious infliction of injury. The Sloans foolishly drafted the *Sloan Note* as broadly granting them the right to decide whether and when to convert the *Sloan Note* obligation into an equity interest. The Sloans apparently trusted in Allen's good will to keep them apprised of sale efforts and information as to whether equity would be realized. Allen had no affirmative obligation to keep the Sloans apprised regarding sale efforts. The Sloans failed to exercise the conversion option and thus, upon the passage of ten days after the sale (the date for distributing equity to them if they had exercised the conversion option), they were no longer entitled to exercise the conversion option.

V

DENIAL OF DISCHARGE PURSUANT TO § 727(a)(2)(A) AND (B)

In Counts One and Two, Sloan contended that a denial of discharge is appropriate under 11 U.S.C. § 727(a)(2)(A) and (B). In pertinent part, 11 U.S.C. § 727(a)(2) requires a denial of discharge if the debtor:

> with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has . . . concealed . . .
>     (A) property of the debtor, within one year before the date of the filing of the petition; or
>     (B) property of the estate, after the date of the filing of the petition[.]

In his pretrial statement, Sloan elaborated that a denial of discharge under § 727(a)(2)(A) is appropriate:

> because the Defendant concealed property within one year before the filing of his petition. Defendant failed to disclose the monies held in bank accounts [over] which he had exclusive control. Defendant failed to disclose the monies received through PayPal accounts [over] which he had exclusive control. Defendant failed to disclose his involvement with sales of Healer Cream and Mayor Allen merchandise for which he had exclusive control over the financial accounts associated with those enterprises.

*See* Dkt. No. 48, at 6. Additionally, in his pretrial statement, Sloan elaborated that a discharge is appropriate under 11 U.S.C. § 727(a)(2)(B):

> because the Defendant concealed property of the estate after the date of filing the petition. Defendant failed to identify the bank accounts opened after the filing of the petition. Defendant failed to identify his position as a board member of AMG, Inc. Defendant has not

provided any records related to his business associations
with AMG, Inc. or Healer Cream, or any records related to
the remuneration obtained in exchange for the Mayor Allen
contracts.

*See* Dkt. No. 48, at 7.

Sloan has not shown that a denial of discharge is warranted
under § 727(a)(2)(A).  With respect to denial of a discharge
pursuant to § 727(a)(2)(A) based on an alleged failure to
disclose a bank account, paragraph 26 of the amended complaint
(Dkt. No. 3) Sloan alleged that "[w]ithin one year of the filing
of the petition commencing []his bankruptcy case, [Allen] "used a
bank account owned by his political campaign — Carlos Allen for
Mayor — that was not disclose[d] on his schedules (Schedules
indicated it was a personal checking account — not a campaign
finance account)."  At trial, Sloan demonstrated that this
"Carlos Allen for Mayor" bank account did exist and it was a
small business checking account.  *See* Pl.'s Ex. 6, at PL-76.
Regardless of how Allen may have described the account, Allen
disclosed it on his schedules and therefore did not conceal his
property for the purposes of a § 727(a)(2)(A) denial of
discharge.

At trial, Sloan also demonstrated that the debtor has an
additional bank account that he shares with his mother that he
failed to disclose on his schedules.  The account had no funds in

it when he filed the petition.  Allen testified that he did not
recall that he had that account with his mother when he failed to
list that account in his schedules.  Sloan has not demonstrated
that either of the foregoing inaccurate disclosures (the
characterization of the first account as a personal checking
account rather than a small business checking account and Allen's
failure to disclose the account with his mother) was made with an
intent to hinder, delay, or defraud a creditor or the bankruptcy
trustee, for purposes of § 727(a)(2)(A).

Although Allen also failed to list his PayPal accounts on
his schedules, he testified that he viewed PayPal as "just a
portal" (that is, as a temporary intermediary used to facilitate
receipts of payments and disbursements).  For example, his
tenants would pay rent to one of Allen's PayPal accounts and
Allen would then transfer the money from that account to either
his Industrial Bank account (the "Carlos Allen for Mayor"
account) or to his current Bank of America account.

However, on occasion he would use his PayPal accounts to pay
various bills.  Funds would be deposited in the PayPal accounts
and those funds would be paid promptly to an intended recipient
rather than being transferred to Allen's bank accounts.  In
addition, the PayPal accounts operated as a debit card, as
evidenced by purchases of small dollar amounts at establishments

31

such as Safeway stores, Seafood Palace Buffet, and CVS Pharmacy.
One of the PayPal accounts had a balance of $199.14 as of the
petition date.  *See* Pl.'s Ex. 9, at PL-196.   That $199.14 was
the residue of a $1,900 payment on December 24, 2015, from
"bradley.hamilton@13@gmail.com."  The Court infers that this was
a payment for two months of rent by Brad Hamilton, one of the
tenants that Allen scheduled on his Schedule G in Allen's pending
bankruptcy case.  *See* Dkt. No. 50, at 20 (listing Brad Hamilton
as a tenant under a month to month lease paying monthly rental
payments of $950).  That deposit by Brad Hamilton brought the
account balance from $0 to $1,900, and by the petition date the
$1,900 balance had been reduced to $199.14.  *See* Pl.'s Ex. 9, at
PL-196.  No evidence was presented regarding any balance held in
any other PayPal account on the petition date.[11]  Sloan has also
not demonstrated, as required by § 727(a)(2)(B), that Allen's
failure to disclose any of the PayPal accounts arose from an
intent to hinder, delay, or defraud a creditor or the bankruptcy
trustee.  This is especially true as Allen disclosed both on his

---

[11]  Sloan has not shown that Allen owed any debt to PayPal
in connection with any other PayPal account as of the petition
date.  Accordingly, it was not necessary for Allen to list those
other PayPal accounts on his schedules on account of any creditor
status of PayPal.

schedules and at the § 341 meeting of creditors that he was
receiving monthly rent payments from various tenants.

This finding that the failure to list PayPal accounts did
not arise from the type of intent required to justify denial of
discharge pursuant to § 727(a)(2)(A) is strengthened by the fact
that the $199.14 that at the time Allen filed his petition was in
the one PayPal account for which Sloan provided documentation was
fully exemptible.  Even the entirety of the $1,900 deposit by
Brad Hamilton (had it not been partially dissipated by the
petition date) would have been fully exemptible.  Allen owns a
residence as a tenant by the entirety.  His schedules reveal that
the property is fully encumbered.  Accordingly, Allen could not
utilize D.C. Code § 15-501(a)(14) to exempt any value with
respect to his residence.  D.C. Code § 15-501(a)(3), a so-called
wild card exemption, provides that Allen may exempt "the debtor's
aggregate interest in any property, not to exceed $850 in value,
plus up to $8,075 of any unused amount of the exemption provided
under paragraph (14) of this subsection."  Because Allen could
not utilize the § 15-501(a)(14) exemption in regards to his fully
encumbered property, Allen was entitled to exempt, under D.C.

Code § 15-501(a)(3), $8,075 plus $850 of any property.[12]  Allen

exempted at most $3,173 of other property utilizing the

§ 15-501(a)(3) exemption.[13]  The exemption under D.C. Code

§ 15-501(a)(3) was thus adequate to absorb more than $5,752 of

additional property.  That $5,752 of permissible exemptions far

exceeds the $199.14 that Sloan demonstrated existed in one of

Allen's PayPal accounts as of the petition date.  Sloan has not

offered evidence of the account balance of any other PayPal

account as of the petition date.  As such, Allen will not be

denied a discharge on the basis of his failure to disclose his

PayPal accounts.

    Sloan additionally alleged that there are bank accounts

associated with AMG but controlled by Allen that Allen should

have disclosed in the bankruptcy proceedings.  Sloan alleged that

Allen had exclusive control over such bank accounts and over

other assets belonging to AMG, including Mayor Allen merchandise,

--------

[12]  Allen claimed his entire interest in his residence as
exempt, but the exemption was worthless and, accordingly,
effectively the § 15-501(a)(14) exemption was not utilized.  In
any event, Allen could amend his claim of exemptions to declare
no claim of exemption as to his residence.

[13]  In his Schedule C, as amended, Allen listed six items of
personal property as being the subject of § 15-501(a)(3)
exemptions but neglected to set forth the dollar amounts of those
assets that he claimed as exempt.  *See* Dkt. No. 63, at 12.  When
the full amount of the value of each of those six assets is
treated as the amount claimed as exempt as to those assets, the
total of § 15-501(a)(3) exemptions is $3,173.

Healer Cream, and a bus. *See, e.g.*, Pl.'s Pretrial Statement, Dkt. No. 48, at 6-7. At trial, Sloan questioned the true position Allen held in AMG as well as whether Karen Brooks was actually involved in the company in any fashion. In his amended complaint and pretrial statement, Sloan raised these questions in relation to his claims for denial of discharge pursuant to § 727(a)(2)(A) and § 727(a)(2)(B).

To address these questions, we must examine the evidence in the record related to the formation and operation of AMG. On August 7, 2013, days after the sale of the Property, Allen registered and incorporated AMG. *See* Pl.'s Ex. 4, at PL-33 - PL-35. Allen was listed as the only incorporator and there were no directors of the corporation identified. *See* Pl.'s Ex. 4, a t PL-35. On the same day, Allen opened a bank account for AMG at Eagle Bank, and listed himself as the company's president on an application for a debit card related to the bank account. *See* Pl.'s Ex. 5, at PL-66. On August 13, 2013, an agreement was drawn up between "Karen R. Brooks 100% owner of AMG Inc." and "Carlos Allen performing as 'MAYOR ALLEN' . . . (Artist)." *See* Pl.'s Ex. 19 (emphasis omitted). Allen signed that contract on August 13, 2013, and Brooks signed the contract on August 18, 2013. *See* Pl.'s Ex. 19, at PL-267.

As previously addressed, AMG's efforts to market Allen's rap music, sell related Mayor Allen merchandise, and sell Healer Cream were a complete flop and AMG's charter was revoked on April 1, 2014. *See* Pl.'s Ex. 4, at PL-33. It appears that after the charter was revoked, on July 20, 2015, Allen opened a bank account for AMG at Capital One Bank, N.A., listing himself as the owner and as a board member of AMG. *See* Pl.'s Ex. 7, at PL-124 - PL-129.

The documentation of AMG's incorporation and of the opening of AMG's bank accounts strengthen the conclusion that Allen transferred proceeds of the sale of the Property to AMG not in payment of a purported outstanding loan to his wife but in an attempt to shelter the proceeds of the sale from creditors and instead invest them in his endeavor to achieve success as a rap musician. Allen, the eternal optimist, presumably hoped that by achieving success as a rap musician, he could regain financial stability and success and eventually repay his creditors. Even if the agreement signed by Brooks and Allen claims that Brooks was the owner of AMG, it is evident that Allen held himself out as the owner of AMG, had exclusive control of the financial accounts of AMG, and handled all operations of AMG. Allen simply used Brooks as a straw owner of AMG on paper so that he could technically place the bulk of the sales proceeds out of his hands

but keep the money within exclusive his reach so he could pursue his rap career in hopes of attaining financial stability and success.  Allen created this arrangement so that if creditors like Sloan inquired after the sales proceeds and requested repayment he could claim that all of the money was held by AMG, which belonged to Karen Brooks.

Allen took these actions prior to 2015.  Because a denial of discharge under § 727(a)(2)(A) pertains to actions taken by the debtor within one year before the date the debtor filed his petition, these actions cannot justify denial of discharge under § 727(a)(2)(A).  In contrast, § 727(a)(2)(B) pertains to actions taken by the debtor to transfer, remove, or conceal property of the estate "with intent to hinder, delay, or defraud a creditor or an officer of the estate" after the date the debtor filed his petition.

It is clear that after the date the debtor filed the petition the debtor still had exclusive control over AMG's finances and while AMG had technically ceased operations it still had assets and sold its bus and at least attempted to sell its Mayor Allen merchandise.  It appears that AMG's Twitter account continued to send 'tweets,' marketing Allen as a rap artist and attempting to sell Mayor Allen merchandise after the charter was revoked in both 2014 and 2015.  *See* Pl.'s Ex. 10, at PL-202.  As

37

of February 11, 2016, Mayor Allen merchandise was still being
sold on Amazon. *See* Pl.'s Ex. 10, at PL-212. However, the court
credits Allen's testimony that he has been unable to sell both
the merchandise and Healer Cream. Thus, any failure by Allen
voluntarily to disclose his involvement with sales of Healer
Cream and Mayor Allen merchandise or his involvement with the
financial accounts associated with those enterprises and with AMG
could not have arisen from an intent to hinder, delay, or defraud
a creditor or the bankruptcy trustee.

However, AMG did successfully sell AMG's Mercedez-Benz tour
bus after Allen filed his petition and Sloan seems to argue that
the bus could constitute property of the estate. As will be
discussed, Allen will be denied a discharge pursuant to
§ 727(a)(3) for falsifying the *Brooks Note* and pursuant to
§ 727(a)(4)(A) for making false oaths to the court regarding the
validity of the *Brooks Note* and the existence of a loan from his
wife. Thus, the court need not decide whether  Allen's failure
to disclose any *de facto* ownership interest he held in AMG (in
his petition and schedules and at the § 341 meeting of creditors)
justifies a denial of discharge under § 727(a)(2)(B) or whether
the assets of AMG constituted property of the estate that Allen
intentionally concealed and transferred with the intent to
hinder, delay, or defraud creditors and the chapter 7 trustee for

purposes of a § 727(a)(2)(B) denial of discharge.  Additionally,
any failure of Allen to provide records of AMG is more
appropriately addressed as a § 727(a)(3) issue rather than a
§ 727(a)(2)(B) issue, and because the court relies on another
basis to deny Allen a discharge, the court need not rule on the
issue of whether a denial of discharge is warranted in that
regard.

Finally, as to the contention in Sloan's pretrial statement
that Allen "failed to identify the bank accounts opened after the
filing of the petition[,]" such accounts were not in existence
before the filing of the petition and thus were not concealed
"within one year before the date of the filing of the
petition[,]" as required for § 727(a)(2)(A) to apply.  Allen was
only required to schedule assets he held on the petition date.
Furthermore, Sloan has not shown that these accounts were
property of the estate, as required for § 727(a)(2)(B) to apply.
There was no intent to hinder, delay, or defraud a creditor or
the bankruptcy trustee in failing to disclose such accounts.

VI

DENIAL OF DISCHARGE PURSUANT TO § 727(a)(3)

In Count Three of the amended complaint, Sloan contended
that a denial of discharge is appropriate under 11 U.S.C.

§ 727(a)(3), which provides for a denial of discharge if a debtor

has:

> concealed, destroyed, mutilated, falsified, or failed to
> keep or preserve any recorded information, including
> books, documents, records, and papers, from which the
> debtor's financial condition or business transactions
> might be ascertained, unless such act or failure to act
> was justified under all the of the circumstances of the
> case[.]

Sloan's amended complaint, at paragraphs 35 through 39, addressed

Sloan's claim under § 727(a)(3) and discussed only business

records relating to AMG and its association with Healer Cream and

Mayor Allen digital sales.  In his pretrial statement, Sloan

elaborated that a denial of discharge under § 727(a)(3) is

warranted:

> because the Defendant has failed to produce, concealed,
> destroyed, falsified, or failed to keep or preserve any
> recorded information from which the debtor's financial
> condition or business transactions might be ascertained.
> No financial records were ever produced by the
> Debtor/Defendant in response to production requests.

*See* Dkt. No. 48, at 7.

A.  <u>Failure to Produce Documents</u>.  As to "production

requests," the evidence is unclear as to which documents the

plaintiff requested in this adversary proceeding.  Sloan never

filed a motion in this adversary proceeding to compel the

production of any documents.  Also, while Sloan's counsel asked

questions of Allen assuming that he had failed to produce

documents, no formal evidence was presented at trial to establish
the failure to produce documents.  As to any documents the
trustee requested, the trustee was not called as a witness to
establish that no documents were produced.  When asked about his
failure to produce documents, Allen explained at trial that he
had an attorney in this adversary proceeding, Edward Gonzales,
who later withdrew, to whom he had supplied documents to produce,
and if any documents were not produced it was not Allen's fault.
Sloan did not call Gonzales as a witness.

    Sloan appears to believe that a failure to produce documents
alone justifies denying a discharge under § 727(a)(3). However,
establishing a failure to produce documents when requested does
not, alone, establish that the debtor "concealed, destroyed,
mutilated, falsified, or failed to keep or preserve any recorded
information" in order to justify denial of a discharge under
§ 727(a)(3).  "The initial burden lies with the creditor to show
that the debtor failed to keep and preserve any books or records
from which the debtor's financial condition or business
transactions might be ascertained."  *D.A.N. Joint Venture v.*
*Cacioli (In re Cacioli)*, 463 F.3d 229, 235 (2d Cir. 2006) (citing
*White v. Schoenfeld*, 117 F.2d 131, 132 (2d Cir. 1941)).

    In regards to documents Sloan requested related to AMG, AMG
transacted business through its debit card and bank accounts, and

there is no suggestion that the records for those accounts are
unavailable.  Additionally, Sloan failed to establish that such
documents were not kept or were not preserved; the record is
largely a mystery in that regard, though at trial Allen
volunteered the information that Karen Brooks prepared tax
returns for AMG.  Then again, there is a note from the District
of Columbia Department of Consumer and Regulatory Affairs,
Corporations Division, that AMG's certificate and registration
document were revoked on September 4, 2014 "pursuant to the
District of Columbia Business Organizations Code, for having
failed and/or refused to file reports and pay all fees due and
owing on or before April 1st, 2014."  Pl.'s Ex. 4, at PL-33.
This seems to indicate that possibly no documents were kept and
those that may have existed may not have been preserved.

No inquiry was made of Allen regarding how the business
records of AMG were maintained, and the extent to which such
documents exist and where they are currently stored.  Even if
Allen had been asked these questions, he may not have known.  AMG
was run by Allen but on paper was not Allen's corporation.  It
may have been his wife who either prepared or who hired an
accountant to prepare tax returns.  AMG also technically had its
charter revoked well before the filing of the bankruptcy case.
It is unclear who retained the records of the company while AMG

42

was operational or after AMG's charter and registration was

revoked.[14]   Sloan did not subpoena Brooks as a witness to testify

in that regard (although he represents that he was unable to do

so), and did not query Allen at the trial in regards to what

happened to AMG's business records.   Although a failure to

produce documents may provide a basis for inferring that no such

documents exist, I do not draw that inference here.   The record

is entirely unclear as to which documents were requested and

whether any failure to produce those documents necessarily must

have flowed from the documents not having been preserved.   For

all of these reasons, Allen will not be denied a discharge on

§ 727(a)(3) grounds based on a failure to produce documents.

     B.   <u>Falsification of Document</u>.   Sloan did not identify the

*Brooks Note* in his amended complaint because at the time the

---

     [14]   As Allen testified, the business was a bust: he sold
only one Mayor Allen backpack (to himself), made no Healer Cream
sales, and had to pay for appearing as a rap artist in his
unsuccessful attempt to find a niche for his rap music.   Allen
used the company's debit card to pay traveling expenses but the
company never generated sufficient revenues with which to pay him
compensation.   The debit card and bank records may be a ready
source for ascertaining AMG's financial condition or business
transactions, which in turn would shed light on Allen's failure
to succeed financially via that company, but on the record I
cannot conclude that if AMG failed to preserve any records
whatsoever, the failure of the business would justify that
failure to preserve records (assuming that such a failure could
be treated as a failure by Allen that could be a basis for
denying a discharge if the failure was not substantially
justified).

complaint was filed Sloan had never seen or heard of the *Brooks Note*. This is evident both from a review of all filings in this adversary proceeding and from Sloan's own contentions at trial. *See, e.g.*, Pl.'s Mot. Summ. J., Dkt. No. 41, at ¶ 79 ("The Plaintiff first learned of the Brooks note when Allen filed it as an exhibit in this matter."). It was not until over six months later, on December 19, 2016, that Allen first mentioned the *Brooks Note* and filed it on the docket. *See* Def.'s Reply, Dkt. No. 27, at 4-5 & Ex. H. It is notable that the first appearance and mention of the *Brooks Note* was eight months after the § 341 meeting of creditors, which took place on April 7, 2016. Thus, the *Brooks Note* was not discussed at the meeting of creditors under 11 U.S.C. § 341 in the bankruptcy case. The Reply (Dkt. No. 27) that first mentioned the *Brooks Note* was stricken as untimely filed (*see* Dkt. No. 57) but Allen again attached the *Brooks Note* to his pretrial statement. *See* Dkt. No. 33, at 31-32. Allen then testified at trial about the existence of the 2005 loan pursuant to the *Brooks Note* and his transfer of $270,000 to AMG in satisfaction of that debt to his wife.

In Sloan's pretrial statement, when addressing his claim for denial of discharge pursuant to § 727(a)(4)(A), Sloan acknowledged Allen's claim that Allen had borrowed $102,000 from Karen Brooks and the loan was secured by a note executed on

44

November 10, 2005, but in his motion for summary judgment Sloan
rejected such contention stating: "The undersigned believes that
this is a fabricated document as it is not supported by any other
part of the record." *See* Dkt. No. 41, at ¶ 56.  Sloan also noted
the lack of evidence to support the existence of a loan from
Karen Brooks based on Anna Allen's bankruptcy filings and based
on the record in Allen's bankruptcy case and this adversary
proceeding. *See* Dkt. No. 41, at ¶¶ 55-60.  Accordingly, Allen
was on notice that Sloan contended that the *Brooks Note* was fake.

Allen designed the bogus *Brooks Note* to provide an excuse
for there being no meaningful equity from the sale to which the
Sloans would have been entitled had they exercised the option to
convert the indebtedness to a 14.5% equity interest,[15] and also
to provide a false explanation for Brooks being made the owner of
AMG (whose assets could not be reached by Allen's creditors).
Although the court has rejected Sloan's contention that he
exercised the option to convert the *Sloan Note* obligation into an
equity interest, Allen's explanation for why he asserted there
was no meaningful equity realized from the sale was intended to

_____

[15]  As noted previously, after the sale occurred and money
was transferred to AMG purportedly in payment of the *Brooks Note*,
the only equity realized was the $889.57 paid to Anna Allen.  The
payments that Allen made to the Sloans after the sale occurred
exceeded 14.5% of the $889.57 treated by the HUD-1 statement as
the equity realized.

demonstrate that if the conversion option had been exercised, it would have yielded nothing meaningful.

As has been already discussed extensively, all of the evidence demonstrates that the *Brooks Note* is indeed a fabricated document, Brooks did not loan $102,000 to Allen in 2005, and the $270,000 of sales proceeds Allen transferred to AMG after selling the Property was not a payment in satisfaction of that purported outstanding debt.  Allen falsified the Brooks Note, which, if it were genuine, was a document from which "the debtor's financial condition or business transactions might be ascertained" within the meaning of § 727(a)(3).  Allen's falsification of that document was not, within the meaning of § 727(a)(3), "justified under all of the circumstances of the case" but was an attempt to mislead Sloan and the court, and to defeat any rights of Sloan based on the equity conversion feature of the *Sloan Note*.  For that reason, the court will grant Sloan's claim for denial of discharge under § 727(a)(3).

VII

§ 727(a)(4)(A)

In Count Four, Sloan contends that a denial of discharge is appropriate under 11 U.S.C. § 727(a)(4)(A).  In pertinent part, § 727(a)(4)(A) provides for a denial of discharge if the debtor "knowingly or fraudulently, in or in connection with the case []

46

made a false oath or account[.]"  In his pretrial statement,

Sloan elaborated that a denial of discharge was warranted under

§ 727(a)(4)(A):

> because the debtor knowingly and fraudulently, in
> connection with the case, made a false oath or account.
> Defendant knowingly made false statements at the 341
> hearing before the Trustee regarding his income, bank
> accounts, his role with AMG, Inc., and the status of his
> employment.  Defendant failed to accurately account for
> the proceeds of the loan from AMG, Inc. of the proceeds
> of the asset sale.  Defendant failed to accurately
> identify all financial accounts held or accessed
> exclusively by debtor.  Defendant failed to provide any
> records from which an accurate accounting could be
> ascertained by the Trustee.

*See* Dkt. No. 48, at 7.

These allegations also appear in the allegations

accompanying Count Four of Sloan's amended complaint.  *See* Dkt.

No. 3, at ¶¶ 40-50.  No transcript of the meeting of creditors

under 11 U.S.C. § 341 was received into evidence, and Sloan has

not shown that there was false testimony by Allen at that meeting

"regarding his income, bank accounts, his role with AMG, Inc.,

and the status of his employment."  As mentioned in the earlier

discussion of § 727(a)(2)(A) with respect to alleged concealment

of assets, Sloan failed to demonstrate a knowing and fraudulent

false oath or account in this case regarding estate assets,

including bank accounts.  As to Allen's statements regarding his

income, Sloan failed to pinpoint a specific false statement that

Allen made.  As to the proceeds of the asset sale, the HUD-1 form

provided at the closing of the sale explains the disposition of

the proceeds, and Sloan has not established that Allen made a

false oath regarding their disposition.  As to the status of

Sloan's employment, Allen testified at the meeting of creditors

that he was forced to take off time from his job because of an

undiagnosed ailment.  That he testified at trial that he had a

respiratory condition, does not mean that he had a diagnosis of

what was causing the condition.  I am not persuaded that Allen

testified falsely in this regard at the meeting of creditors.

However, Allen knowingly misrepresented his true role in AMG

throughout this case, including at the trial.  While it appears

from the agreement signed by both Allen and Brooks that Brooks

was the 100% owner of AMG, she was in fact a straw owner.  Allen

was functionally the owner and sole board member of the company

and he held himself out as such when opening bank accounts on

behalf of the company-which he solely controlled.  Because of

Allen's false oaths regarding the purported loan from his wife

pursuant to the sham *Brooks Note*, which underlies Allen's version

of his role in AMG, the court need not rule as to whether his

representation of his role, on paper, in AMG constitutes a false

oath or account for purposes of denying a discharge pursuant to

48

§ 727(a)(4)(A) when Brooks was, indeed, the owner of the company on paper.

As already noted with respect to § 727(a)(3)[16] and as discussed extensively, all of the evidence demonstrates that the *Brooks Note* is indeed a fabricated document, that Brooks did not loan $102,000 to Allen in 2005, and that the $270,000 of sales proceeds Allen transferred to AMG after selling the Property was not a payment in satisfaction of that purported outstanding debt. Allen presented to Sloan and to the court the fabricated *Brooks Note* and the fraudulent testimony related thereto in an attempt to defeat Sloan's alleged entitlement to proceeds of the sale of the Property based on the equity conversion feature of the *Sloan Note* and to provide a false explanation for why Karen Brooks was made the owner of AMG, the recipient of the bulk of the equity realized from the sale of the Property. For that reason, the court will grant Sloan's claim for a denial of discharge under § 727(a)(4)(A).

## VIII

### DENIAL OF DISCHARGE PURSUANT TO § 727(a)(4)(D)

In Count Five, Sloan contends that a denial of discharge is appropriate under 11 U.S.C. § 727 (a)(4)(D), which provides that

---

[16] *See supra*, Part VI(B).

49

a discharge shall be denied if:

> the debtor knowingly and fraudulently, in or in
> connection with the case . . . withheld from an officer
> of the estate entitled to possession under this title,
> any recorded information, including books, documents,
> records, and papers, relating to the debtor's property or
> financial affairs.

In his pretrial statement, Sloan elaborated that § 727(a)(4)(D)

warrants a denial of discharge:

> because the debtor knowingly and fraudulently, in
> connection with the case, withheld from Trustee records,
> papers, and information relating to the debtor's property
> or financial affairs.  The Defendant did not produce to
> the Trustee any records related to his involvement with
> AMG, Inc. or any records related to his position of
> Marketing Officer or Board Member of AMG, Inc.  The
> Defendant did not produce any response to the production
> requests of the Plaintiff either.

*See* Dkt. No. 48, at 8.

Sloan was not "an officer of the estate" within the meaning

of § 727(a)(4)(D), but even if Allen's failure to produce records

requested by Sloan could justify denial of discharge under

§ 727(a)(4)(D), Sloan's own requests for production of documents

are not in evidence to demonstrate Allen's failure to comply with

such requests.  Nor is there evidence in the record of the extent

to which the chapter 7 trustee requested AMG records from Allen.

Sloan did not call the chapter 7 trustee as a witness.  As such,

Sloan has not established the extent to which Allen failed to

produce to the chapter 7 trustee records relating to AMG.  Thus,

Sloan has not shown that Allen, knowingly and fraudulently, in connection with the case, withheld from the chapter 7 trustee records, papers, and information relating to Allen's financial affairs for purposes of denial of discharge pursuant to § 727(a)(4)(D).

## IX

## DENIAL OF DISCHARGE PURSUANT TO § 727(a)(5)

In Count Six, Sloan contends that a denial of discharge is appropriate under 11 U.S.C. § 727(a)(5), which provides for a denial of discharge if "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."  In his pretrial statement, Sloan elaborated that § 727(a)(5) requires a denial of discharge:

> because the Defendant has failed to explain satisfactorily any loss of assets or deficiency of assets to meet the debtor's liabilities. Defendant has not produced any records related to his claimed illness that prevented him from retaining his job prior to the bankruptcy. Defendant claimed that he was seen by a physician; however, no records related to any diagnosis was [sic] ever produced to the Trustee or to the Plaintiff. There has been no explanation of why the Defendant has remained unemployed and has not found gainful employment to repay his obligations.  The Defendant stated he just simply stopped going to work. Then [he] stated he was on extended leave with the permission of his employer.  To date, no records substantiating either his illness or his leave have been produced.

*See* Dkt. No. 48, at 8.  Sloan has not shown that Allen failed to

explain satisfactorily any loss of employment income, to the

extent that such loss may have diminished Allen's financial

resources with which to pay debts.  It is not clear that the

cessation of employment was the cause of Allen's loss of assets

or deficiency of assets to meet Allen's liabilities, as Allen

stopped working only shortly before he filed his bankruptcy

petition.  According to Allen's testimony, Allen was employed at

US Air starting in January of 2015.  Shortly before he filed his

bankruptcy petition on January 20, 2016, he had quit working and

did not intend to return to that job due to health problems he

was suffering that he believed were related to that employment.

However, eventually, in approximately August of 2016, he was re-

hired by US Air.  Allen estimates that he was unemployed for

approximately eight months to a year.

Most of the period of unemployment was postpetition. Failing

to satisfactorily explain why a debtor continued for months

postpetition to be unemployed does not appear to be the focus of

§ 727(a)(5): instead, the focus appears to be whether there has

been a failure to explain satisfactorily a loss of assets or

deficiency of assets to meet the debtor's liabilities as of the

petition date.  Nevertheless, I will assume in Sloan's favor

(without deciding) that Allen was required to explain

satisfactorily why he continued for some eight months postpetition to remain unemployed.

Sloan contends that Allen willfully remained unemployed. Allen explained at trial that he fell ill from a respiratory ailment that led to his becoming dizzy, and falling down, possibly because of work conditions, such that he could not work. Allen did not clearly testify falsely in reciting that the ailment was undiagnosed even if he had met with a doctor in regards to his symptoms because he may have viewed the cause of the ailment as not being precisely explained.  Whether Allen was malingering or not does not seem important.  The point is that one way or another he was not working, and to the extent that this lack of employment was causing an inability to pay debts, he explained the lack of employment satisfactorily.  For all of these reasons, Sloan has not shown that Allen has failed satisfactorily to explain a loss of assets or deficiency of assets to meet his liabilities for purposes of denial of discharge under § 727(a)(5).

## X

### DETERMINATION OF THE AMOUNT OWED TO SLOAN

Allen still owes a substantial debt to Sloan but Allen's bankruptcy case is one in which no distribution will be made to creditors and it is thus unnecessary, for distribution purposes, to fix the amount of the claim under the *Sloan Note* and to determine the related attorney's fees that are recoverable as part of that debt. Because Sloan's civil action against Allen is pending in the D.C. Superior Court, the court will abstain from deciding the precise amount of the debt owed to Sloan and from entering a monetary judgment for such debt.

## XI

### CONCLUSION

For all of these reasons, Allen will be denied a discharge pursuant to § 727(a)(3) and § 727(a)(4)(A). A judgment for the plaintiff follows in accordance with this memorandum decision.

[Signed and dated above.]

Copies to: All counsel of record; Office of United States Trustee.